

FILED
HARRISBURG, PA

JAN 0 2 2003

MARY E. D'ANDREA, CLERK
Per _____

IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CLARK, | : | NO.: 1:CV01-0764 |
|     Plaintiff | : | |
| | : | (JUDGE CALDWELL) |
| v. | : | |
| | : | |
| MARTIN HORN, et al, | : | JURY TRIAL DEMANDED |
|     Defendants | : | |

### WEXFORD DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

AND NOW, come Defendants, Wexford Health Sources, Inc. and John Symons, M.D., and file this Statement of Undisputed Material Facts and aver as follows:

1. Dr. Symons is a medical doctor licensed by the Commonwealth of Pennsylvania and has been so licensed continuously since 1980. Dr. Symons is Board certified in the field of family practice. (Symons Dec. par. 1)

2. Since September, 1996, Wexford Health Sources, Inc. has been the contracted medical provider at SCI-Rockview to provide medical

services to inmates at the facility, including utilization review and case management. (Symons Dec. par. 2; Rowe Dec. par. 2)

   3.   Dr. Symons has served as the contract Medical Director at SCI-Rockview since September, 1998 and has provided medical services to inmates at SCI-Rockview. Those services include the examination, diagnosis and treatment of inmates at the facility, as well as referral of inmates for consultations with outside physicians whenever medically necessary. (Symons Dec. par. 3)

   4.   It is the policy, practice and custom of Wexford Health Sources, Inc. that all inmates are to receive reasonable and medically necessary care in accordance with state and federal laws and the United States Constitution. (Symons Dec. par. 4; Rowe Dec. par. 4)

   5.   In the ordinary course of business, SCI-Rockview maintains prison medical records on each of the inmates incarcerated at the facility, including the Plaintiff, William Clark. (Symons Dec. par. 5)

   6.   Dr. Symons is familiar with the standard practices and procedures utilized in compiling and maintaining the medical records at SCI-Rockview relating to the medical treatment afforded inmate Clark. (Symons Dec. par. 6)

7. Dr. Symons is personally familiar with inmate Clark's medical history as reflected in the medical records from SCI-Rockview, including the treatment provided to him by other treating professionals. (Symons Dec. par. 7)

8. The care provided to Mr. Clark at SCI-Rockview was at all times in accordance with acceptable medical standards and, based upon Clark's prison medical records, no Wexford Health Sources, Inc. personnel were deliberately indifferent to any serious medical need of inmate Clark, including, but not limited to, his Hepatitis C condition, while he was incarcerated at SCI-Rockview. (Symons Dec. par. 8)

9. In Dr. Symons' professional medical opinion, Mr. Clark was provided with reasonable and appropriate medical attention on every occasion that a request was brought to the attention of medical personnel, or on every occasion that medical personnel deemed intervention necessary, whether or not initiated by a request from Mr. Clark while he was incarcerated at SCI-Rockview. (Symons Dec. par. 9)

10. At no time during Mr. Clark's incarceration at SCI-Rockview was Dr. Symons ever deliberately indifferent to any serious medical need of the Plaintiff. To the contrary, throughout his incarceration at SCI-

Rockview, Mr. Clark was evaluated, monitored, and treated appropriately by Dr. Symons and other medical personnel at SCI-Rockview. (Symons Dec. par. 10)

11. As the contract Medical Director at SCI-Rockview, Dr. Symons is not responsible for nor does he have any personal involvement with the preparation and/or drafting of the protocol for Hepatitis C identification and treatment developed by the Pennsylvania Department of Corrections. (Symons Dec. par. 11)

12. Dr. Symons first saw inmate Clark on November 13, 1998 for evaluation of his psoriasis condition. At that time, Plaintiff did not voice any complaints concerning fatigue, abdominal pain, jaundice or any other symptoms from his Hepatitis C condition. (Symons Dec. par. 12)

13. Dr. Symons evaluated and/or treated inmate Clark on December 8, 1998, January 13, January 26, March 5, April 20 and May 6, 1999 for his psoriasis condition. During none of those evaluations did inmate Clark voice any complaint concerning fatigue, weight loss, abdominal pain, jaundice and/or other symptoms from his Hepatitis C condition. (Symons Dec. par. 13)

14.   At inmate Clark's request, a liver profile was done on October 15, 1999 which confirmed the presence of HCV antibodies and showed that Plaintiff's liver enzymes were slightly elevated. (Symons Dec. par. 14)

15.   On November 10, 1999, Dr. Symons saw inmate Clark and had a lengthy discussion with him at that time concerning his Hepatitis C condition. (Symons Dec. par. 15)

16.   Inmate Clark was referred to the Hepatitis C clinic at SCI-Rockview. He was seen at the clinic on December 1, 1999, and at that time, he denied fatigue, weight loss, abdominal pain, jaundice or other symptoms associated with his Hepatitis C. He did, however, request moisturizing cream for his psoriasis. (Symons Dec. par. 16)

17.   In January 2000, the Bureau of Healthcare Services, Pennsylvania Department of Corrections, implemented a protocol for Hepatitis C identification and treatment. This protocol was provided to all medical vendors to be used as an evaluation and treatment guide for Hepatitis C in all Department of Corrections institutions, including SCI-Rockview. Pursuant to that protocol, for those inmates/patients who meet criteria for treatment and are not excluded for medical, psychiatric or other reasons, several medications were available for use and treatment. These

5

medications were Interferon, either monotherapy or dual therapy. However, the medications had limited effectiveness, had significant side effects and could not be used in the instance of ongoing substance abuse. Accordingly, the protocol requires that potential recipients of the medications are to undergo evaluation for treatment candidacy pursuant to the protocol for Hepatitis C identification and treatment. (Symons Dec. par. 17)

18. On February 17, 2000, inmate Clark was evaluated by Dr. Eggler and at that time inmate Clark expressed an interest in receiving the Interferon dual therapy and signed the consent form for the treatment. (Symons Dec. par. 18)

19. On February 23, 2000, inmate Clark's serum iron levels were tested as part of the evaluation process. (Symons Dec. par. 19)

20. Pursuant to the protocol for Hepatitis C identification and treatment, on April 14, 2000, inmate Clark underwent psychiatric evaluation for treatment candidacy. At that time, inmate Clark was advised of the possible psychiatric consequences, including the possibility of serious depression and suicidal behavior from Interferon treatment. Based upon that evaluation, there were no psychiatric contraindications to

inmate Clark undergoing the Interferon treatment for his Hepatitis C. (Symons Dec. par. 20)

21. On May 5, 2000, inmate Clark's record was reviewed to determine his eligibility for Hepatitis C treatment regarding his minimum remaining sentence (must exceed 12 months) and the drug and alcohol criteria. (Symons Dec. par. 21)

22. On July 13, 2000, an ultrasound was performed on inmate Clark's liver and spleen. That ultrasound revealed that inmate Clark's spleen was not enlarged; the liver was mildly enlarged with dense texture; and the hepatic veins were normal. (Symons Dec. par. 22)

23. On August 16, 2000, inmate Clark was evaluated by Dr. Eggler who ordered viral load-quantitative PCR testing which showed that inmate Clark's Hepatitis C viral load was 678,000 international units. At that time, there were discussions regarding the distinct possibility that the Interferon treatment could worsen inmate Clark's psoriasis. (Symons Dec. par. 23)

24. On September 15, 2000, inmate Clark began receiving the Interferon dual therapy treatment. (Symons Dec. par. 24)

25. On November 15, 2000, another liver profile was performed on inmate Clark. That liver profile showed that inmate Clark's liver enzymes

7

were slightly elevated. This liver profile showed no significant interval change from the previous liver profiles performed on 11/01/00, 10/26/00, 9/26/00, 9/20/00, 5/04/00, 2/22/00, 10/15/99, 11/6/96 and 9/15/95. (Symons Dec. par. 25)

26.  Between September 2000 and February 2001, inmate Clark's condition continued to be evaluated and monitored through the Hepatitis C clinic and at sick call. He experienced considerable side effects from the Interferon dual therapy including increased serum iron levels, flu-like symptoms, nausea, weight loss and other symptoms. (Symons Dec. par. 26)

27.  On February 20, 2001, another viral load-quantitative PCR test was performed on inmate Clark which revealed that his Hepatitis C viral load was 267,000. The Interferon dual therapy was stopped at that point due to viralogic failure after discussion with the patient. To have been considered a successful treatment, inmate Clark's Hepatitis C viral load should have been under 300. (Symons Dec. par. 27)

28.  Following the discontinuance of drug therapy on February 28, 2000, Plaintiff underwent a series of phlebotomies to reduce his serum iron

levels and periodic lab work was performed to monitor his serum iron levels. (Symons Dec. par. 28)

29.  On July 2, 2001, inmate Clark met with Dr. Eidsvoog to discuss his liver disease. At that time, it was noted that the dual drug therapy treatment was a failure and that the patient had significant side effects from the treatment. At that time, it was discussed that inmate Clark would be evaluated for Pegylated Interferon once that drug was approved by the Food and Drug Administration. (Symons Dec. par. 29)

30.  On July 10, 2001, Dr. Symons submitted a consultation request to have a liver biopsy performed. That request was submitted to Wexford's Utilization Review Department which denied the liver biopsy as not medically warranted and offered an alternative plan to perform a viral genotype. That testing revealed that inmate Clark had genotype 1, the most common genotype/species of Hepatitis C and the most difficult to treat. The success rate for treatment of patients with genotype 1 is in the 20-25% range. (Symons Dec. par. 30)

31.  Between July 2001 and November 2002, Dr. Symons treated and/or evaluated inmate Clark on 19 occasions including 7/10/01, 8/07/01, 9/20/01, 10/29/01, 11/16/01, 12/28/01, 4/15/02, 5/23/02,

9

6/7/02, 7/24/02, 8/28/02, 9/5/02, 9/13/02, 10/02/02, 10/08/02, 10/15/02, 10/29/02, 11/19/02, and 11/25/02. Dr. Symons was on a temporary assignment to SCI-Huntingdon from January through mid-March, 2002 and during his absence, inmate Clark was evaluated by Dr. Roemer on 1/18/02 and 2/06/02. (Symons Dec. par. 31)

32. During that time, the medical department continued to monitor inmate Clark's liver enzyme levels and conduct viral load testing. (Symons Dec. par. 32)

33. In May 2002, Pegylated Interferon was approved by the Food and Drug Administration as a treatment for Hepatitis C. Due to the fact that the demand for Pegylated Interferon exceeded the supply from the manufacturer, the Pegylated Interferon was not immediately available for treatment. (Symons Dec. par. 33)

34. In July, 2002, inmate Clark was started on the Pegylated Interferon treatment. Inmate Clark, however, experienced significant side effects from the Pegylated Interferon including nausea, weight loss and significant problems with his platelet count. Based upon the foregoing, a decision was made on October 1, 2002 to reduce the dose of Pegylated Interferon in accordance with published guidelines. (Symons Dec. par. 34)

35. On September 6, 2002, inmate Clark was referred for an ultrasound of his liver and spleen which revealed no significant internal change from the previous ultrasound. (Symons Dec. par. 35)

36. Dr. Rowe is a doctor of osteopathic medicine licensed by the Commonwealth of Pennsylvania and has been so licensed in Pennsylvania continuously since August, 1962. Dr. Rowe is Board certified in family practice. (Rowe Dec. par. 1)

37. Dr. Rowe has served as the Chief Medical Officer for Wexford Health Sources, Inc. since May 1, 1999. (Rowe Dec. par. 3)

38. To ensure that all patients receive medically necessary and timely medical care at the appropriate level of service, Wexford Health Sources, Inc. has implemented utilization review policies and procedures. Pursuant to Wexford's Utilization Review Program, when the Medical Director at a facility, such as SCI-Rockview, determines that an inmate under the control and responsibility of Wexford may require the services of a provider located outside the correctional center (including all specialist consultations, diagnostic services, surgical procedures and prosthetic/braces), the Healthcare Unit Administrator will notify the

Wexford Utilization Review Department and provide necessary medical information to determine the appropriate level of care. (Rowe Dec. par. 5)

39. The consultation request will be reviewed and an authorization number will be assigned to each approved request and faxed back to the correctional facility. The site will also be notified of all requests which are not authorized and an explanation is provided to the site Medical Director by the Wexford Utilization Review Department. (Rowe Dec. par. 6)

40. In making decisions with regard to outside consultations or procedures, Wexford's Utilization Review Department utilizes, as a guide, community guidelines for healthcare management criteria of medical necessity, determination of level of care and normal length of stay. Wexford's Utilization Review Department denies requests for outside procedures or consultations considered to be medically unnecessary. (Rowe Dec. par. 7)

41. On July 10, 2001, a request for a consultation for a liver biopsy for inmate Clark was submitted to Wexford's Utilization Review Department which determined that said procedure was not medically warranted and an alternative plan to do afp and genotyping was transmitted to and scheduled by the facility. (Rowe Dec. par. 8)

42. In the fall of 1998, the Department of Corrections established a task force to address the issue of Hepatitis C identification and treatment for the inmate population. The Hepatitis C task force was comprised of members of a multi-disciplinary group that included staff from: the Bureau of Healthcare, various correctional institutions, representatives of the psychology field, representatives from the contracted medical providers (including Wexford), representatives of the Department of Health, and representatives of the Department of Welfare. The members were charged with the responsibility of working as a team to identify all the issues involved in the identification, education, treatment and follow-up care of those inmates who tested positive for Hepatitis C. They were also charged with the responsibility to ensure that the care provided in treating Hepatitis C positive inmates was consistent with community standards. (Rowe Dec. par. 9)

43. In January 2000, the Bureau of Healthcare Services, Pennsylvania Department of Corrections, implemented a protocol for Hepatitis C identification and treatment. (Rowe Dec. par. 10)

44. Wexford Health Sources, Inc. then implemented the protocol for Hepatitis C identification and treatment at the facilities where it serves

as the contracted medical provider, including SCI-Rockview. (Rowe Dec. par. 11)

45. The task force to address the issue of Hepatitis C identification and treatment has continued to meet and has developed a dynamic treatment protocol that is continually revised to keep pace with treatment advances in this area. (Rowe Dec. par. 12)

46. It is Dr. Rowe's professional opinion, within a reasonable degree of medical certainty, that inmate William M. Clark has received and is receiving appropriate treatment for his Hepatitis C condition. (Rowe Dec. par. 13)

47. Inmate Clark filed two grievances (ROC-0706-1999 and ROC-0641) pursuant to the Department of Corrections' Consolidated Inmate Grievance Review System pertaining to treatment for his Hepatitis C condition. Plaintiff admitted under oath in his deposition that he did not request monetary relief in either of those grievances. (Clark Dep. pp. 102-103)

48. Inmate Clark admitted in his deposition testimony that he was examined, evaluated and treated on an ongoing basis between October, 1999 and September, 2000, including blood work, psychiatric evaluations,

/

an ultrasound, and periodic monitoring by SCI-Rockview medical staff prior to being placed on the Interferon drug therapy. (Clark Dep. Pp. 103-105)

49. Inmate Clark acknowledged in his deposition and in his Answer to the Wexford Defendants' Interrogatories that he does not have an expert witness who will testify in support of his claim. (Clark Dep. p. 103; Plaintiff's Answers to Wexford Defendants' Expert Witness Interrogatories)

Respectfully submitted,

Lavery, Faherty, Young & Patterson, P.C.

By: _____
James D. Young, Esquire
Atty No. 53904
225 Market Street, Suite 304
P.O. Box 1245
Harrisburg, PA 17108-1245
Attys for Wexford Health Sources, Inc. and John Symons, M.D.

DATE: 1/02/2003

15

## CERTIFICATE OF SERVICE

I, Linda L. Gustin, an employee with the law firm of Lavery, Faherty, Young & Patterson, P.C., do hereby certify that on this 2nd day of January, 2003, I served a true and correct copy of the foregoing **Wexford Defendants' Statement of Undisputed Material Facts** via U.S. First Class mail, postage prepaid, addressed as follows:

William Clark
SCI-Rockview
Box A
Bellefonte, PA  16823-0820

John Talaber, Esquire
Office of Chief Counsel
PA Department of Corrections
55 Utley Drive
Camp Hill, PA  17011

_____
Linda L. Gustin