FILED
HARRISBURG, PA

JAN 0 2 2003

MARY E. D'ANDREA, CLERK
Per _____

# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CLARK, | : | NO.:  1:CV01-0764 |
| Plaintiff | : | |
| | : | (JUDGE CALDWELL) |
| v. | : | |
| | : | |
| MARTIN HORN, et al, | : | JURY TRIAL DEMANDED |
| Defendants | : | |

## APPENDIX OF EXHBITS IN SUPPORT OF WEXFORD DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Exhibit "A"       Unsworn Declaration of John Symons, M.D.

Exhibit "B"       Unsworn Declaration of David Rowe, D.O.

Exhibit "C"       Plaintiff's Answers to Wexford Defendants'
                  Expert Interrogatories

Exhibit "D"       Pertinent portions of Plaintiff's deposition
                  testimony.

Respectfully submitted,

Lavery, Faherty, Young &
Patterson, P.C.

By: _____
James D. Young, Esquire
Atty No. 53904
225 Market Street, Suite 304
P.O. Box 1245
Harrisburg, PA 17108-1245
Attys for Defendants,
Wexford Health Sources, Inc.
and John Symons, M.D.

DATE: ___1/02/2003___

2

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WILLIAM CLARK, | : | NO.: 1:CV01-0764 |
| Plaintiff | : | |
| | : | (JUDGE CALDWELL) |
| v. | : | |
| | : | |
| MARTIN HORN, et al, | : | JURY TRIAL DEMANDED |
| Defendants | : | |

**UNSWORN DECLARATION OF JOHN SYMONS, M.D.**

I, John Symons, M.D., do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct based upon my own personal knowledge:

1.     I am a medical doctor licensed by the Commonwealth of Pennsylvania and have been so licensed continuously since 1980.  I am Board certified in the field of family practice.

2.     Since September, 1996, Wexford Health Sources, Inc. has been the contracted medical provider at SCI-Rockview to provide medical



EXHIBIT
A

services to inmates at the facility, including utilization review and case management.

3.      I have served as the contract Medical Director at SCI-Rockview since September, 1998 and have provided medical services to inmates at SCI-Rockview.   Those services include the examination, diagnosis and treatment of inmates at the facility, as well as referral of inmates for consultations with outside physicians whenever medically necessary.

4.      It is the policy, practice and custom of Wexford Health Sources, Inc. that all inmates are to receive reasonable and medically necessary care in accordance with state and federal laws and the United States Constitution.

5.      In the ordinary course of business, SCI-Rockview maintains prison medical records on each of the inmates incarcerated at the facility, including the Plaintiff, William Clark.

6.      I am familiar with the standard practices and procedures utilized in compiling and maintaining the medical records at SCI-Rockview relating to the medical treatment afforded inmate Clark.

7.    I am personally familiar with inmate Clark's medical history as reflected in the medical records from SCI-Rockview, including the treatment provided to him by other treating professionals.

8.    The care provided to Mr. Clark at SCI-Rockview was at all times in accordance with acceptable medical standards and, based upon Clark's prison medical records, no Wexford Health Sources, Inc. personnel were deliberately indifferent to any serious medical need of inmate Clark, including, but not limited to, his Hepatitis C condition, while he was incarcerated at SCI-Rockview.

9.    In my professional medical opinion, Mr. Clark was provided with reasonable and appropriate medical attention on every occasion that a request was brought to the attention of medical personnel, or on every occasion that medical personnel deemed intervention necessary, whether or not initiated by a request from Mr. Clark while he was incarcerated at SCI-Rockview.

10.    At no time during Mr. Clark's incarceration at SCI-Rockview was I ever deliberately indifferent to any serious medical need of the Plaintiff. To the contrary, throughout his incarceration at SCI-Rockview,

Mr. Clark was evaluated, monitored, and treated appropriately by myself and other medical personnel at SCI-Rockview.

11.     As the contract Medical Director at SCI-Rockview, I am not responsible for nor do I have any personal involvement with the preparation and/or drafting of the protocol for Hepatitis C identification and treatment developed by the Pennsylvania Department of Corrections.

12.     I first saw inmate Clark on November 13, 1998 for evaluation of his psoriasis condition.  At that time, Plaintiff did not voice any complaints concerning fatigue, abdominal pain, jaundice or any other symptoms from his Hepatitis C condition.

13.     I evaluated and/or treated inmate Clark on December 8, 1998, January 13, January 26, March 5, April 20 and May 6, 1999 for his psoriasis condition.  During none of those evaluations did inmate Clark voice any complaint concerning fatigue, weight loss, abdominal pain, jaundice and/or other symptoms from his Hepatitis C condition.

14.     At inmate Clark's request, a liver profile was done on October 15, 1999 which confirmed the presence of HCV antibodies and showed that Plaintiff's liver enzymes were slightly elevated.

15.    On November 10, 1999, I saw inmate Clark and had a lengthy discussion with him at that time concerning his Hepatitis C condition.

16.    Inmate Clark was referred to the Hepatitis C clinic at SCI-Rockview.  He was seen at the clinic on December 1, 1999, and at that time, he denied fatigue, weight loss, abdominal pain, jaundice or other symptoms associated with his Hepatitis C.  He did, however, request moisturizing cream for his psoriasis.

17.    In January 2000, the Bureau of Healthcare Services, Pennsylvania Department of Corrections, implemented a protocol for Hepatitis C identification and treatment.  This protocol was provided to all medical vendors to be used as an evaluation and treatment guide for Hepatitis C in all Department of Corrections institutions, including SCI-Rockview.  Pursuant to that protocol, for those inmates/patients who meet criteria for treatment and are not excluded for medical, psychiatric or other reasons, several medications were available for use and treatment.  These medications were Interferon, either monotherapy or dual therapy.  However, the medications had limited effectiveness, had significant side effects and could not be used in the instance of ongoing substance abuse.  Accordingly, the protocol requires that potential recipients of the

medications are to undergo evaluation for treatment candidacy pursuant to the protocol for Hepatitis C identification and treatment.

18.     On February 17, 2000, inmate Clark was evaluated by Dr. Eggler and at that time inmate Clark expressed an interest in receiving the Interferon dual therapy and signed the consent form for the treatment.

19.     On February 23, 2000, inmate Clark's serum iron levels were tested as part of the evaluation process.

20.     Pursuant to the protocol for Hepatitis C identification and treatment, on April 14, 2000, inmate Clark underwent psychiatric evaluation for treatment candidacy.   At that time, inmate Clark was advised of the possible psychiatric consequences, including the possibility of serious depression and suicidal behavior from Interferon treatment. Based upon that evaluation, there were no psychiatric contraindications to inmate Clark undergoing the Interferon treatment for his Hepatitis C.

21.     On May 5, 2000, inmate Clark's record was reviewed to determine his eligibility for Hepatitis C treatment regarding his minimum remaining sentence (must exceed 12 months) and the drug and alcohol criteria.

22.    On July 13, 2000, an ultrasound was performed on inmate Clark's liver and spleen. That ultrasound revealed that inmate Clark's spleen was not enlarged; the liver was mildly enlarged with dense texture; and the hepatic veins were normal.

23.    On August 16, 2000, inmate Clark was evaluated by Dr. Eggler who ordered viral load-quantitative PCR testing which showed that inmate Clark's Hepatitis C viral load was 678,000 international units. At that time, there were discussions regarding the distinct possibility that the Interferon treatment could worsen inmate Clark's psoriasis.

24.    On September 15, 2000, inmate Clark began receiving the Interferon dual therapy treatment.

25.    On November 15, 2000, another liver profile was performed on inmate Clark. That liver profile showed that inmate Clark's liver enzymes were slightly elevated. This liver profile showed no significant interval change from the previous liver profiles performed on 11/01/00, 10/26/00, 9/26/00, 9/20/00, 5/04/00, 2/22/00, 10/15/99, 11/6/96 and 9/15/95.

26.    Between September 2000 and February 2001, inmate Clark's condition continued to be evaluated and monitored through the Hepatitis C clinic and at sick call. He experienced considerable side effects from the

Interferon dual therapy including increased serum iron levels, flu-like symptoms, nausea, weight loss and other symptoms.

27.    On February 20, 2001, another viral load-quantitative PCR test was performed on inmate Clark which revealed that his Hepatitis C viral load was 267,000.  The Interferon dual therapy was stopped at that point due to viralogic failure after discussion with the patient. To have been considered a successful treatment, inmate Clark's Hepatitis C viral load should have been under 300.

28.    Following the discontinuance of drug therapy on February 28, 2000, Plaintiff underwent a series of phlebotomies to reduce his serum iron levels and periodic lab work was performed to monitor his serum iron levels.

29.    On July 2, 2001, inmate Clark met with Dr. Eidsvoog to discuss his liver disease.  At that time, it was noted that the dual drug therapy treatment was a failure and that the patient had significant side effects from the treatment.  At that time, it was discussed that inmate Clark would be evaluated for Pegylated Interferon once that drug was approved by the Food and Drug Administration.

30.    On July 10, 2001, I submitted a consultation request to have a liver biopsy performed.    That request was submitted to Wexford's Utilization Review Department which denied the liver biopsy as not medically warranted and offered an alternative plan to perform a viral genotype.    That testing revealed that inmate Clark had genotype 1, the most common genotype/species of Hepatitis C and the most difficult to treat.    The success rate for treatment of patients with genotype 1 is in the 20-25% range.

31.    Between July 2001 and November 2002, I treated and/or evaluated inmate Clark on 19 occasions including 7/10/01, 8/07/01, 9/20/01, 10/29/01, 11/16/01, 12/28/01, 4/15/02, 5/23/02, 6/7/02, 7/24/02, 8/28/02, 9/5/02, 9/13/02, 10/02/02, 10/08/02, 10/15/02, 10/29/02, 11/19/02, and 11/25/02.    I was on a temporary assignment to SCI-Huntingdon from January through mid-March, 2002 and during my absence, inmate Clark was evaluated by Dr. Roemer on 1/18/02 and 2/06/02.

32.    During that time, we continued to monitor inmate Clark's liver enzyme levels and conduct viral load testing.

33.    In May 2002, Pegylated Interferon was approved by the Food and Drug Administration as a treatment for Hepatitis C.  Due to the fact that the demand for Pegylated Interferon exceeded the supply from the manufacturer, the Pegylated Interferon was not immediately available for treatment.

34.    In July, 2002, inmate Clark was started on the Pegylated Interferon treatment.  Inmate Clark, however, experienced significant side effects from the Pegylated Interferon including nausea, weight loss and significant problems with his platelet count.  Based upon the foregoing, a decision was made on October 1, 2002 to reduce the dose of Pegylated Interferon in accordance with published guidelines.

35.    On September 6, 2002, inmate Clark was referred for an ultrasound of his liver and spleen which revealed no significant internal change from the previous ultrasound.

Date: 1/2/03

John Symons, M.D.
Medical Director
SCI-Rockview

11

# IN THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CLARK, | : | NO.: 1:CV01-0764 |
| Plaintiff | : | |
| | : | (JUDGE CALDWELL) |
| v. | : | |
| | : | |
| MARTIN HORN, et al, | : | JURY TRIAL DEMANDED |
| Defendants | : | |

## UNSWORN DECLARATION OF DAVID ROWE, D.O.

I, David Rowe, D.O., do hereby state under penalty of perjury pursuant to 28 U.S.C. § 1746, that the following is true and correct based upon my own personal knowledge:

1.    I am a doctor of osteopathic medicine licensed by the Commonwealth of Pennsylvania and have been so licensed in Pennsylvania continuously since August, 1962. I am Board certified in family practice.



EXHIBIT

B

2.    Since September 1996, Wexford Health Sources, Inc. has been the contracted medical provider at SCI-Rockview to provide medical services to inmates at the facility, including utilization review and case management.

3.    I have served as the Chief Medical Officer for Wexford Health Sources, Inc. since May 1, 1999.

4.    It is the policy, practice and custom of Wexford Health Sources, Inc. that all inmates are to receive reasonable and medically necessary care in accordance with state and federal laws and the United States Constitution.

5.    To ensure that all patients receive medically necessary and timely medical care at the appropriate level of service, Wexford Health Sources, Inc. has implemented utilization review policies and procedures. Pursuant to Wexford's Utilization Review Program, when the Medical Director at a facility, such as SCI-Rockview, determines that an inmate under the control and responsibility of Wexford may require the services of a provider located outside the correctional center (including all specialist consultations, diagnostic services, surgical procedures and

prosthetic/braces), the Healthcare Unit Administrator will notify the Wexford Utilization Review Department and provide necessary medical information to determine the appropriate level of care.

6.    The consultation request will be reviewed and an authorization number will be assigned to each approved request and faxed back to the correctional facility. The site will also be notified of all requests which are not authorized and an explanation is provided to the site Medical Director by the Wexford Utilization Review Department.

7.    In making decisions with regard to outside consultations or procedures, Wexford's Utilization Review Department utilizes, as a guide, community guidelines for healthcare management criteria of medical necessity, determination of level of care and normal length of stay. Wexford's Utilization Review Department denies requests for outside procedures or consultations considered to be medically unnecessary.

8.    On July 10, 2001, a request for a consultation for a liver biopsy for inmate Clark was submitted to Wexford's Utilization Review Department which determined that said procedure was not medically

warranted and an alternative plan to do afp and genotyping was transmitted to and scheduled by the facility.

9.    In the fall of 1998, the Department of Corrections established a task force to address the issue of Hepatitis C identification and treatment for the inmate population.  The Hepatitis C task force was comprised of members of a multi-disciplinary group that included staff from:  the Bureau of Healthcare, various correctional institutions, representatives of the psychology field, representatives from the contracted medical providers (including Wexford), representatives of the Department of Health, and representatives of the Department of Welfare.  The members were charged with the responsibility of working as a team to identify all the issues involved in the identification, education, treatment and follow-up care of those inmates who tested positive for Hepatitis C.  They were also charged with the responsibility to ensure that the care provided in treating Hepatitis C positive inmates was consistent with community standards.

10.    In January 2000, the Bureau of Healthcare Services, Pennsylvania Department of Corrections, implemented a protocol for Hepatitis C identification and treatment.

11.    Wexford Health Sources, Inc. then implemented the protocol for Hepatitis C identification and treatment at the facilities where it serves as the contracted medical provider, including SCI-Rockview.

12.    The task force to address the issue of Hepatitis C identification and treatment has continued to meet and has developed a dynamic treatment protocol that is continually revised to keep pace with treatment advances in this area.

13.    It is my professional opinion, within a reasonable degree of medical certainty, that inmate William M. Clark has received and is receiving appropriate treatment for his Hepatitis C condition.

Date:_____ 2 January 2003 _____          _____ David E Rowe DO _____
                                              David Rowe, D.O.
                                              Chief Medical Officer
                                              Wexford Health Sources, Inc.

## IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CLARK, | : | NO. 1:CV-01-0764 |
| | : | |
| Plaintiff, | : | (JUDGE CALDWELL) |
| | : | |
| vs. | : | JURY TRIAL DEMANDED |
| | : | |
| MARTIN HORN, Secretary, | : | |
| Pennsylvania Department of | : | |
| Corrections; ROBERT MEYERS, | : | |
| Superintendent, State Correctional | : | |
| Institution at Rockview; | : | |
| WEXFORD HEALTH SOURCES, | : | |
| INC., Health Care Provider at | : | |
| the State correctional Institution | : | |
| at Rockview; JOHN SYMONS, | : | |
| M.D., Medical Director, State | : | |
| Correctional Institution at | : | |
| Rockview; LARRY LIDGETT, | : | |
| Health Care Administrator, | : | |
| State Correctional Institution at | : | |
| Rockview, | : | |
| | : | |
| Defendants. | : | |

0100-1287

## PLAINTIFF'S ANSWERS TO DEFENDANTS',
## WEXFORD HEALTH SOURCES, INC. AND JOHN SYMONS,
## M.D., EXPERT WITNESS INTERROGATORIES TO PLAINTIFF

NOW COMES the Plaintiff, WILLIAM CLARK, *pro* se, and pursuant to

Federal Rules of Civil Procedure, submits the following Answers to Defendants',

Wexford Health Sources, Inc. and John Symons, M.D. Expert Witness

Interrogatories:

1.    State the names and home and business addresses of all persons

whom you expect to call as expert witnesses at the trial of this matter.

**ANSWER:    No experts have been identified at this time. Plaintiff will**

**provide this information once it becomes available.**



EXHIBIT

C

2.    For all those persons named in the answer to Interrogatory No. 1, state their occupations, and if they specialize in any particular field, set forth their areas of specialization.

**ANSWER:    See Answer to #1 above.**

3.    Set forth the qualifications of each expert. In doing so, list: the schools each has attended, including years in attendance and degrees received; experience in particular fields, including names and addresses of employers with inclusive years of employment; and a list of all publications authored by said persons, including the title of the work, the name of the periodical or book in which it was printed, and the date of its printing. (If the persons listed in the answer to Interrogatory No. 1 print, mimeograph or otherwise reproduce a list of qualifications, you may attach a copy of same in lieu of answering this Interrogatory).

**ANSWER:    See Answer to #1 above.**

4.    Set forth the facts to which each such expert is expected to testify.

**ANSWER:    See Answer to #1 above.**

5.    Set forth the opinion to which each such expert is expected to testify.

**ANSWER:    See Answer to #1 above.**

6.    Set forth in detail the factual information and materials supplied to each such expert.

**ANSWER:    See Answer to #1 above.**

7.    Set forth a summary of the grounds (other than the facts requested in Interrogatory No. 1) for each such opinion, including ,but not limited to any tests or experiments conducted and any text material upon which the expert witness will rely. Identify all such texts, including names, author, edition and page.

**ANSWER:    See Answer to #1 above.**

8.    As to all persons listed in the answer to Interrogatory No. 1, state the full captions of all cases in which that person has testified as an expert witness in the past five (5) years.  If the full captions are unavailable, give the names of the cases and state the names of each court in which they were tried, as well as the approximate date of each trial.

**ANSWER:    See Answer to #1 above.**

_(signature)_

**WILLIAM CLARK**

Subscribed and sworn to before me
this 11ᵀᴴ day of OCTOBER , 2001

_(signature)_ RS,

Notary Public

In and for the County of _____
My Commission Expires: _____

NOTARIAL SEAL
HILARY J. SCHENK,   Notary Public
Benner Township, Centre County, Pa.
My Commission Expires Oct. 27, 2003



1
          IN THE UNITED STATES DISTRICT COURT
          FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

2

3   WILLIAM CLARK,         :  NO. 1:CV-01-0764
           PLAINTIFF   :

4                   :

          VS          :
5

   MARTIN HORN, ROBERT MEYERS, :
6   LARRY LIDGETT,        :
           DEFENDANTS  :

7                   :

          VS          :
8

   WEXFORD HEALTH SOURCES, INC., :
9   WEXFORD MEDICAL DIRECTOR   :
   DR. JOHN SYMONS,       :
10      ADDITIONAL DEFENDANTS  :



RECEIVED
OCT - 4 2002
0100-1287

11

12

13

14          DEPOSITION OF: WILLIAM CLARK

15          TAKEN BY:    DEFENDANTS

16          BEFORE:     BETH A. KRUPA, REPORTER
                   NOTARY PUBLIC
17

          DATE:       SEPTEMBER 19, 2002, 10:20 A.M.
18

          PLACE:      SCI ROCKVIEW
19                   BELLEFONTE, PENNSYLVANIA

20

21

22

23

24

25

EXHIBIT
D

102

```
 1        A         I'm not aware of what they were doing.

 2        Q         But it's possible that they were doing

 3   something?

 4        A         I guess, yes.

 5        Q         Okay.  Suffice it to say --

 6        A         I mean all I can do is go by what my answers

 7   were back from those individuals.

 8        Q         Okay.  So your universe, so to speak, was

 9   what was going on here at SCI Rockview?

10        A         Right.

11        Q         And it would be an inaccuracy to say that

12   they were doing nothing for the hepatitis C problem?

13        A         Yes, I couldn't answer that.

14        Q         You don't know for sure?

15        A         Right.

16        Q         Okay.

17                  MR. TALABER:  I have nothing further.

18                  MR. YOUNG:  Just a couple more follow-ups.

19

20                       RECROSS-EXAMINATION

21

22   BY MR. YOUNG:

23        Q         According to your response to our request

24   for production of documents, my understanding that you

25   filed two inmate grievances for the treatment to your
```

103

1    hepatitis C?

2        A        Yes.

3        Q        And those grievances would be Rockview 0641

4    of 2001 and Rockview 0706 of 1999?

5        A        That sounds about right.

6        Q        In neither of those grievances did you

7    request that you be provided with monetary relief, in other

8    words, money damages?

9        A        I wasn't asking for money at the time, no.

10       Q        Okay.

11       A        I was asking for treatment.

12       Q        Who are you going to call as witnesses if

13   this case goes to trial?

14       A        I don't know.  I don't have expert

15   witnesses.

16       Q        With respect to your claims against Dr.

17   Symons, you're not alleging that he, as the medical

18   director at SCI Rockview, had any responsibility for

19   developing a statewide protocol for hepatitis C; is that

20   correct?  Do you understand the question, it's not the

21   clearest?

22       A        I'm not saying that he's solely responsible

23   for putting a protocol together.  I didn't say that.

24       Q        He's just a medical director here, right?

25       A        He's a medical director, right.

104

1    Q        Was it your understanding in early 2000 that

2  all of the inmates here at SCI Rockview who were hepatitis

3  C positive were being evaluated for the appropriateness of

4  beginning the drug therapy treatment?

5    A        I was aware that some guys were coming and

6  asking about the treatment.

7    Q        Okay.  Was it your understanding that it was

8  a number of individuals at SCI Rockview not just you?

9    A        Yes.

10   Q        And you would agree that there was, you had

11 various blood work done prior to being prescribed the drug

12 therapy?

13   A        Some blood work was taken, yes.

14   Q        And that would be reflected in your medical

15 records?

16   A        Um-hum.

17   Q        You had at least one, if not two psychiatric

18 evaluations before being prescribed the drug therapy?

19   A        Yes, one that I know of, that I recall.

20   Q        Okay.  My recollection was April 14th of

21 2000 and September 13th of 2000 just two days before you

22 started on the drug therapy?

23   A        Right, and one had nothing to do with the

24 Interferon.

25   Q        Okay.  You were also given a sonogram?

105

1    A        Yes.

2    Q        Prior to beginning the drug therapy?

3    A        I don't recall the date of that.

4    Q        Okay.

5    A        I think it was before that.

6    Q        And you were monitored periodically by the

7    medical staff here at Rockview prior to being placed on the

8    drug therapy?

9    A        Was -- yes.

10   Q        In other words, you were examined, evaluated

11   or treated on an ongoing basis between October of '99 and

12   September of 2000?

13   A        Yes.

14            MR. YOUNG:  That's all I have.

15            MR. TALABER:  That's all I have.

16            (The deposition was concluded at 12:53 p.m.)

17

18

19

20

21

22

23

24

25

106

1    COUNTY OF CLEARFIELD          :
                                   :  ss.
2    COMMONWEALTH OF PENNSYLVANIA  :

3

4            I, Beth A. Krupa, a Reporter Notary-Public,
     authorized to administer oaths within and for the
5    Commonwealth of Pennsylvania and take depositions in the
     trial of causes, do hereby certify that the foregoing is
6    the testimony of WILLIAM M. CLARK.

7                I further certify that before the taking of
     said deposition, the witness was duly sworn; that the
8    questions and answers were taken down stenographically by
     the said Beth A. Krupa, a Reporter Notary-Public, approved
9    and agreed to, and afterwards reduced to typewriting under
     the direction of the said Reporter.

10

11               I further certify that the proceedings and
     evidence contained fully and accurately in the notes by me
     on the within deposition, and that this copy is a correct
12   transcript of the same.

13               In testimony whereof, I have hereunto
     subscribed my hand this 30th day of September, 2002.

14

15

16

17                              _Beth A Krupa_

18                              Beth A. Krupa, Reporter
                                Notary Public
19

20

21

22   My commission expires
     on April 27, 2006.
23

24

25

## CERTIFICATE OF SERVICE

I, Linda L. Gustin, an employee with the law firm of Lavery, Faherty, Young & Patterson, P.C., do hereby certify that on this 2nd day of January, 2003, I served a true and correct copy of the foregoing **Appendix of Exhibits in Support of Wexford Defendants' Motion for Summary Judgment** via U.S. First Class mail, postage prepaid, addressed as follows:

William Clark
SCI-Rockview
Box A
Bellefonte, PA  16823-0820

John Talaber, Esquire
Office of Chief Counsel
PA Department of Corrections
55 Utley Drive
Camp Hill, PA  17011

_Linda L. Gustin_
Linda L. Gustin