

(100)
RB 1/13/0

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

Docket No. 01-CV-0764

WILLIAM CLARK,

Plaintiff,

v.

LARRY LIDGETT, et al.,

Defendants.

**FILED**
HARRISBURG, PA

JAN 1 0 2003

MARY E. D'ANDREA, CLERK
Per_____
Deputy Clerk

---

## CORRECTIONS DEFENDANTS' BRIEF IN SUPPORT TO THEIR MOTION FOR SUMMARY JUDGMENT

---

James M. Sheehan
General Counsel
Commonwealth of Pennsylvania

Michael A. Farnan, Chief Counsel
John J. Talaber, Assistant Counsel
Supreme Court I.D. No. 83279

Pennsylvania Department of Corrections
55 Utley Drive
Camp Hill, PA  17011
(717) 731-0444
(Counsel for Defendants)

Dated:       January 10, 2003

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................i

STATEMENT OF THE CASE .......................................................................1

STATEMENT OF THE QUESTIONS PRESENTED ........................................14

ARGUMENT ..........................................................................................15

I.    THE CORRECTIONS DEFENDANTS ARE ENTITLED TO
      SUMMARY JUDGEMENT BECAUSE THERE ARE NO
      DISPUTES OF GENUINE MATERIAL FACT SHOWING
      RECKLESS DISREGARD TO CLARK OBTAINING MEDICAL
      TREATMENT FOR HIS ILLNESS WHILE INCARCERATED .........15

II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE
      CORRECTIONS DEFENDANTS BECAUSE CLARK ADMITTED
      THEY WERE NOT PERSONALLY INVOLVED IN HIS MEDICAL
      TREATMENT..........................................................................17

III.  THE COURT, PURSUANT TO 42 U.S.C. 1997(E)(A), SHOULD
      PRECLUDE MONETARY DAMAGES IN THIS CASE BECAUSE
      CLARK DID NOT SEEK THIS AVAILABLE REMEDY THROUGH
      THE DEPARTMENT OF CORRECTION'S GRIEVANCE PROCESS
      PRIOR TO FILING HIS PRISON CONDITION ACTION..................18

IV.   THIS ACTION AGAINST THE CORRECTIONS DEFENDANTS IN
      THEIR OFFICIAL CAPACITIES FOR DAMAGES IS BARRED BY
      THE ELEVENTH AMENDMENT .............................................18

V.    CLARK'S DELIBERATE INDIFFERENCE CLAIM AGAINST THE
      CORRECTIONS DEFENDANTS IS BARRED BY QUALIFIED
      IMMUNITY ...........................................................................20

VI.   CLARK FAILED TO STATE PENDENT CLAIMS OF MEDICAL
      MALPRACTICE AGAINST THE CORRECTIONS DEFENDANTS
      SUCH THAT SUMMARY JUDGMENT SHOULD BE GRANTED ON
      THEIR BEHALF ......................................................................23

CONCLUSION .......................................................................................24

# TABLE OF AUTHORITIES

**CASES**                                                                              **Page(s)**

Anderson v. Creighton, 483 U.S. 635, 107 S.Ct. 3034,
     97 L.Ed.2d 523 (1987) ................................................................... 20, 21

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) ............................. 3

Bednar v. County of Schuylkill, 29 F.Supp.2d 250 (E.D. Pa. 1998) ...................... 16

Boring v. Kozakiewicz, 833 F.2d 468 (3d Cir.1987) ............................................. 16

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ............................................. 3

Doe v. County of Centre, 242 F.3d 437 (3d. Cir. 2001) ......................................... 21

Durmer v. O'Carroll, 991 F.2d 64 (3d Cir. 1993) ................................................... 16

Estelle v. Gamble, 429 U.S. 97 (1976) ................................................................. 16

Hampton v. Holmesburg Prison Officials, 546 F.2d 1077 (3d Cir. 1976) .............. 18

Hans v. Louisiana, 134 U.S. 1 (1890) .................................................................... 19

Harlow v. Fitzgerald, 457 U.S. 800 (1982) ............................................................ 20

Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754 (3d Cir. 1979) ............. 15

Jermosen v. Smith, 945 F.2d 547 (2d Cir. 1991), cert. denied,
     503 U.S. 962 (1992) ..................................................................................... 20

Matsushita Electric Industrial Co. v. Zenith Radio, 474 U.S. 574 (1986) ............... 3

McAleese v. Owens, 770 F. Supp. 255 (M.D. Pa. 1991) ...................................... 15

Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658 (1978) ................... 19

Monmouth County Correctional Institutional Inmates v. Lanzaro,
     834 F.2d 326 (3d Cir. 1987) ....................................................................... 16

Moor v. County of Alameda, 411 U.S. 693 (1973)...................................................... 19

Promubol v. Hackett, 686 A.2d 417 (Pa. Super. 1996),
    appeal denied, 548 Pa. 672, 698 A.2d 595 (1997)................................................. 23

Quern v. Jordan, 440 U.S. 332 (1979) ...................................................................... 19

Rouse v. Plantier, 182 F. 3d. 192 (3d. Cir. 1999) .................................................... 21

Sheldon v. Pezley, 49 F.3d 1312 (8th Cir. 1995)...................................................... 15

Tomko v. Marks, 602 A.2d 890 (Pa. Super 1992) .................................................... 23

Tunnell v. Office of Public Defender, 583 F. Supp. 762, 769 (E.D. N.Y. 1984) ... 19

Turner v. Schering-Plough Corp., 901 F.2d 335 (3d Cir. 1990)................................3

Will v. Michigan Dept. of State Police, 491 U.S. 58 (1989) .................................... 19

## **STATUTES**

42 U.S.C. §1983 ................................................................................................... 1, 19

42 U.S.C. §1997(e)................................................................................................ 2, 18

42 Pa. C.S. § 5929 ..................................................................................................... 22

Fed.R.Civ.P. 56(c).........................................................................................................2

Fed.R.Civ.P. 56(e).........................................................................................................3

Fed.R.Evid. 201 ............................................................................................................3

## STATEMENT OF THE CASE

**A.    Identity of the Parties and Statement of Claim**

Plaintiff William Clark is an inmate currently incarcerated at the State

Correctional Institution at Rockview ("SCI-Rockview").[1]  The Department of

Corrections employees named as defendants ("Corrections Defendants") are:

(1) former Secretary of the Department, Martin Horn; (2) SCI-Rockview

Superintendent, Robert Meyers; and (3) former Corrections Health Care

Administrator, Larry Lidgett.[2]  Additionally, Clark named Wexford Health

Sources, Inc. ("Wexford"), and Wexford Medical Director, Dr. John Symons as

defendants[3].

This is a 42 U.S.C. §1983 *pro se* action alleging deliberate indifference to

the treatment of Clark's Hepatitis C ("HCV") condition in violation of his Eighth

and Fourteenth Amendment rights to the United States Constitution.[4]  Clark is

suing the Defendants in their official and individual capacities, and has pendent

state claims of medical malpractice.[5]  Clark seeks declaratory and injunctive relief,

as well as, compensatory and punitive damages.[6]

---

[1]    <u>See</u> Complaint (doc. 1), ¶ 2.
[2]    <u>See</u> Complaint, ¶¶ 3,4, 7.
[3]    The non Corrections Defendants are represented by James D. Young , Esquire.  <u>See</u> Entry of Appearance (doc. 11).
[4]    <u>See</u> Complaint, ¶¶ 8-58.
[5]    <u>See</u> Complaint, p.1 "Preliminary Statement"
[6]    <u>See</u> Complaint, Relief Requested, pp. 10-11.

1

**B.     Relevant Procedural History**

Clark filed his Complaint on May 2, 2001.[7]  All Defendants waived service

of summons on August 13, 2001.[8]  All Defendants waived their right to reply to the

Complaint, pursuant to 42 U.S.C. §1997(e) in September 2001.  On September 10,

2001, Defendants Wexford and Dr. Symons waived reply to the Complaint

pursuant to 42 U.S.C. §1997(e).[9]  Discovery between the parties is now complete.

All Defendants have filed motions for summary judgment, and with the

submission, their supporting Briefs.  The Court, by order dated January 7, 2003,

directed Clark to file his motion for summary judgment and statement of material

facts on or before January 15, 2003.

**C.     Standard of Review**:

Summary judgment is appropriate "if the pleadings, depositions, answers to

interrogatories and admissions on file, together with affidavits, if any, show that

there is no genuine dispute as to any material facts and the moving party is entitled

to judgment as a matter of law."[10]  An issue of material fact is genuine if it has a

real basis in the record, and "[o]nly disputes over facts that might affect the

---

[7]     See Complaint (doc. 1).
[8]     See Waiver of Summons (doc. 12).
[9]     See Waiver of Reply to Complaint (docs. 13, 14)(this provision  .
[10]    Fed.R.Civ.P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335,
340(3d Cir. 1990); accord Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48
(1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Matsushita Electric
Industrial Co. v. Zenith Radio, 474 U.S. 574, 586 (1986)(setting the well
established standards applicable to summary judgment);

2

outcome of the suit under the governing law will properly preclude the entry of summary judgment."[11] A court considering a motion for summary judgment must view all the facts in the light most favorable to the non-moving party, here Clark, and give him the benefit of all reasonable inferences that can be drawn from the facts.[12]

When the moving party, here the Defendants, designate for the Court portions of the record that show a lack of genuine issues, the opposing party must do more than simply show that there is some metaphysical doubt as to the material facts; specifically, he must go beyond the pleadings, and by affidavit, depositions, answers to interrogatories, or admissions on file designate facts showing a genuine issue for trial.[13] The trial court, without weighing the evidence or determining the truth of the matter, must assess the adequacy of Clark's admissible evidence and determine whether that showing would be sufficient to carry his burden of proof

---

[11]   See Matsushita Elec. Indus., 475 U.S. at 586-87; Anderson, 477 U.S. at 248.
[12]   See Matsushita, 475 U.S. at 587.
[13]   See Fed.R.Civ.P. 56(e); Celotex, 477 U.S. at 324.  Additionally, pursuant to Fed.R.Evid. 201, in relevant part, a court can judicially notice of a fact, at any stage in the proceeding, if it is "not subject to reasonable dispute in that it is either generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."  Further, "[a] court shall take judicial notice if requested by a party and supplied with the necessary information" however "[a] party is entitled upon timely request to an opportunity to be heard as to the propriety of taking judicial notice and the tenor of the matter noticed."

such that a reasonable jury could return a verdict in his favor.[14]  Further if Clark, as the Plaintiff, fails to make a sufficient showing on essential elements of his deliberate indifference, medical malpractice, or negligence claims, then the Defendants are entitled to judgment as a matter of law.[15]

**D.    Statement of Material Facts:[16]**

Plaintiff William M. Clark ("Clark") was born on September 11, 1954 in Vineland, New Jersey, and at the time this action was filed in April 2001, he was 47 years old.  Clark graduated from High School in 1972, but does not possess medical training as a nurse, physician's assistant, or physician.  Clark admits that beginning when he was eighteen (18) he started using illegal drugs such as marijuana, alcohol, later progressed to met amphetamine, and culminated to trying it all and doing it all, including intravenous drugs.

On August 27, 1985, then Honorable Edward G. Beister of the Bucks County Court of Common Pleas sentenced plaintiff William Martin Clark ("Clark") to a term of imprisonment in a state correctional institution for five (5) to fifteen (15) years based on his conviction at Criminal Action Number 3538-1985.

---

[14]    See Anderson, 477 U.S. at 248; Celotex, 477 U.S. at 322.
[15]    See Celotex, 477 U.S. at 323.
[16]    The Corrections Defendants have provided precise citations to the record in their accompanying *Statement of Material Facts*, and respectfully request that the Court take notice of specific portions of the record through the citations contained within the aforementioned document, that substantially mirrors in form the presentation of the facts contained herein.

Clark was incarcerated at the State Correctional Institution at Graterford ("SCI-Graterford") from August 28, 1985 until he was paroled on his minimum sentence date of November 28, 1989. Clark, on March 20, 1992, was recommitted to SCI-Graterford as a technical parole violator based on "hot urine" through his use of cocaine. Clark remained in SCI-Graterford for six (6) months until he was re-paroled on September 6, 1992. Clark described his overall health during this time period as: (a) feeling alright; and (b) agreed that there was not anything going on with his body that indicated to him something was wrong. Clark states that the Complaint, ¶ 11, is factually incorrect in that he did not receive a Hepatitis C test in 1992, and instead should state that he had high enzymes in 1992.

On September 15, 1995, Clark returned to SCI-Graterford for a parole violation because he was in possession of cocaine during a traffic stop. Clark remained in SCI-Graterford for six (6) months until he was re-paroled on April 28, 1996. Clark was re-incarcerated at SCI-Graterford on November 6, 1996, as a convicted parole violator. On March 10, 1997, Clark transferred from SCI-Graterford to the State Correctional Institution at Rockview ("SCI-Rockview") where he currently resides. Clark's new maximum sentence, resulting from his conviction as a parole violator, is October 26, 2005.

**Defendant Martin F. Horn:**

Defendant Martin F. Horn, from March 1, 1995 until December 30, 2000, was the Secretary of the Department of Corrections ("Department"), an executive agency in the Commonwealth of Pennsylvania.[17]  Defendant Martin F. Horn is not a physician, and accordingly, did not provide Clark with medical treatment in the capacity of a medical professional while he was Secretary of the Department. Clark admits that his only interaction with Defendant Secretary Horn was through the Department of Corrections, administrative grievance process.

**Defendant Robert Meyers:**

Defendant Robert W. Meyers is the currently the Superintendent at SCI-Rockview and has been employed in that capacity since February 1998.  During Superintendent Meyers tenure, SCI-Rockview has housed thousands of inmates. Defendant Robert W. Meyers is not a physician, and accordingly, did not provide

---

[17]    Generally, the Secretary of the Department of Corrections is responsible in a supervisory capacity for the overall management and operation of the Department in fulfilling its mission of protecting the public by confining persons committed to the Department's custody in safe secure facilities, and providing opportunities for inmates to acquire the skills and values necessary to become productive law abiding citizens; while respecting the rights of crime victims.  Geographically, the Department is comprised of twenty-five (25) state correctional institutions, fifteen (15) community correction centers, and one (1) motivational boot camp that are located throughout the Commonwealth.  The Secretary is responsible in a supervisory role for the safety and security of fifteen thousand (15,000) employees and directly supervises five (5) Deputy Secretaries who also oversee the operation of the Department.  Further, during Defendant Horn's tenure as Secretary, there were approximately thirty six thousand (36,000) inmates incarcerated within the Department's correctional institutions.

Clark with medical treatment in the capacity of a medical professional as the

Superintendent at SCI-Rockview.  Clark admits that his only interaction with

Defendant Superintendent Meyers was through the Department of Corrections

administrative grievance process.

**Defendant Larry L. Lidgett:**

Defendant Larry L. Lidgett is the former Corrections Health Care

Administrator ("CHCA") at SCI-Rockview who voluntarily retired from

Commonwealth employment in September 2001.  Defendant Lidgett graduated

from the Phillipsburg State General Hospital and began working there as a nurse

on June 5, 1972.  In November 1982, Defendant Lidgett began working at SCI-

Rockview as a staff nurse.  In 1985, Defendant Lidgett was promoted to Nurse

Supervisor, and worked in that capacity until June 1994 when he was promoted to

CHCA at SCI-Rockview.

Defendant Lidgett, as the Corrections Health Care Administrator, was

generally responsible for managing the health care of inmates in SCI-Rockview.

Defendant Lidgett's duties included overseeing the screening for diseases of

inmates, the administration of routine and emergency treatment, managing a

multidisciplinary health care staff, and monitoring the services of a contracted

medical vendor.  Defendant Larry L. Lidgett is not a physician, and accordingly,

did not provide Clark with hands-on medical treatment in his capacity of a medical

professional.   Clark admits that his only interaction with Defendant Corrections Health Care Administrator Lidgett was through the Department of Corrections administrative grievance process.

**The Hepatitis C Virus:**

Hepatitis C is a blood borne virus that causes an inflammation of the liver. Prior to the discovery of the Hepatitis C virus, this type of infectious hepatitis was referred to as "non-A, non-B" hepatitis.  When the liver becomes injured through substances (e.g. alcohol) or through infections (e.g. hepatitis) it is prevented from performing its vital functions.  The result is that liver cells are killed or scarred over time that leads to a condition called cirrhosis. [18]  The virus is passed through razors, needles, toothbrushes, nail file, tattooing, body piercing, and unprotected sex.  It is estimated that approximately 85% of Hepatitis C cases may become chronic (long lasting and gradually developing) culminating in severe liver disease (cirrhosis).  Clinically, chronic Hepatitis C is diagnosed when the infection does not clear up within six (6) months.  The disease can take twenty (20) to thirty (30)

---

[18]     A liver with cirrhosis reduces blood to flow through it.  The overall effect on the human body is staggering.  First, limited blood flow in the liver sometimes causes pressure in blood vessels in the stomach and lower throat, and may lead to enlargement of the spleen. Additionally, because the liver assists in the ability for blood to clot, a damaged liver sometimes leads to the body having the inability to stop bleeding.  The liver will also have trouble filtering drugs from the bloodstream and clear waste products from the blood.  Ultimately the condition can develop into a form of liver cancer.

years to progress, with the result being complete liver failure.  At this point, a liver transplant is the only available option.[19]

The community standard of care for treatment of Hepatitis C from the early 1990's until 1997 was in a state of flux.  In May 1990, the first routine anti-body test for Hepatitis C became available, followed with a better test in July 1992.  The blood test for Hepatitis C provides physicians with a means of monitoring liver function.[20]  A drug known as Interferon was approved by the United States Food and Drug Administration in 1991 to treat patients with chronic Hepatitis C; however, it could not eradicate the disease, and was used to reduce the amount of the virus in the body and to slow down liver damage.[21]

---

[19]    Each year about thirty thousand (30,000) Americans contract Hepatitis C which is a frequent cause of chronic liver disease.  As many as four (4) million people are believed to be infected with Hepatitis C.  Nationally, about ten thousand (10,000) people will die from the Hepatitis C virus, with that number expected to triple by 2010.  In 2001, seventeen percent (17%) of the DOC's one-hundred twenty four (124) inmate deaths were related to complications for Hepatitis C.

[20]    Basically, the liver releases enzymes when liver cells are injured or die; accordingly, liver enzyme levels fluctuate throughout the illness, and while high enzyme levels may mean liver damage, they cannot predict the severity of the liver injury.

[21]    Interferon works by protecting healthy, unaffected cells from being taken over by the virus, and boost the body's immune response against the virus and infected cells.  Interferon is usually given three (3) times a week, and would take anywhere from twelve (12) months to two (2) years for treatment to be completed.  Interferon has significant side effects: (a) flu-like symptoms, (b) fatigue; (c) irritability, depression, and anxiety; (d) loss of appetite; (e) nausea and diarrhea; and (f) mild hair loss.  In 1998, the U.S. Food and Drug Administration approved the use of Rebetron (a combination of two drugs called ribaviron and intron) ("Dual Therapy") to treat patients with chronic Hepatitis C who did not respond

In 1997, the National Institutes of Health Consensus Development

Conference Panel Statement: Management of Hepatitis C recommended that while:

> All patients with chronic hepatitis C are potential candidates for specific therapy . . . given the current status of therapies for hepatitis C, treatment is clearly recommended in only a selected group of patients.  In others, treatment decisions are less clear and should be made on an individual basis or in the context of clinical trials.

It is true that the Department of Corrections did not have a state-wide treatment

plan ("Protocol") for Hepatitis C until 1999, however, inmates such as Clark were

provided with access to physicians who could, and did, prescribe the appropriate

drugs for treating Hepatitis C.[22]

---

successfully to therapy with interferon alone.  The side effects for Rebetron are similar to those with single therapy.

[22]    The DOC has a constitutional duty in its delivery of health care to provide inmates with access to care, care that is ordered, and professional medical judgment.  The DOC contracts medical services for its twenty-five (25) institutions.  Contracted medical services reduces the Department's fiscal liability because costs are set at a constant daily rate per inmate regardless of the level of care needed.  Additionally, a private contractor has greater ease and flexibility to recruit competent clinical staff, and is able to negotiate large discounts with hospitals and vendors, resulting in reduced costs to the contractor. Further, the DOC closely monitors the contracted vendors to ensure that the care provided is consistent with community standards.  Inmates are routinely provided access to physicians that rival if not excel access provided to a non-incarcerated inmate.  For example, in fiscal year 2000, there were 277,102 inmate doctors visits, with 180,444 of these visits initiated by the inmate through normal sick call procedures, with the remaining 96,658 visits initiated by DOC staff.  In the area of disease management, inmates are tested for HIV/AIDs, given annual tuberculosis tests, and are screened for the Hepatitis C virus.  As of early 2002, all inmates in the DOC have been screened for the virus, with new inmates receiving the Hepatitis C test at the beginning of their incarceration.

## Department's Hepatitis C Protocol:[23]

In the Pennsylvania DOC, about twenty-three percent (23%) of the inmate population (approximately 37,000) are Hepatitis C positive. This percentage is comparable to the incidence rate in other state prison systems throughout the nation: Virginia (39%); Maryland (38%); California (35%); and Massachusetts (31%). The cost of one time treatment, which may slow down the progress of the virus, is between six-thousand ($6,000) and twelve thousand dollars ($12,000) per inmate. However, the costs to treat liver failure are approximately fifty-thousand ($50,000) to two hundred and fifty thousand ($250,000) per inmate. Currently in the Pennsylvania DOC, about one thousand two hundred (1,200) inmates are at some stage in the Hepatitis C treatment at an annual cost to taxpayers of approximately $8.7 million dollars.

Secretary Horn, in the fall of 1999, established a task force to address the issue of Hepatitis C identification and treatment for the inmate population. The Hepatitis C Task Force was comprised on members if a multi-disciplinary group that included staff from: (a) the Department's Bureau of Health Care; (b) various corrections institutions; (c) representatives of the psychology field; (d) representatives from the Department's contracted medical vendors (including Wexford Health Sources, inc.); (e) representatives from the Department of Health;

---

[23]    A "Protocol" is an algorithm to follow to treat a specific disease entity.

11

(f) and representatives of the Department of Welfare.[24]  A 1999 study of Hepatitis

C in State Correctional Facilities, found that the Commonwealth of Pennsylvania

was included with a substantial majority of states that did not routinely screen

inmates for Hepatitis C; but was one of the few states in the U.S. that was

developing a statement treatment Protocol for managing treatment and costs

associated with Hepatitis C.

**Clark's Medical Condition:**

In 1992, while Clark was incarcerated at SCI-Graterford, his blood-work

indicated that his liver enzyme levels were high.  In 1995, when Clark was

transferred to SCI-Rockview, Clark admits that liver profile blood work was

provided and indicated that his liver enzyme profiles were normal at that time.

Sometime in 1998, Clark noticed that he was getting tired an exhausted more

easily and had a pain on his side, but does not recall notifying any of the medical

staff at SCI-Rockview.

Clark admits he met with Dr. Symons on November 13, 1998, December 28,

1998, January 13, 1999, and January 26, 1999, he did not mention any problems of

---

[24]    The members were charged with the responsibility of working as a team to identify all the issues involved in identification, education, treatment, and follow-up care of those inmates who tested positive for Hepatitis C.  The Hepatitis C Task Force was also charged with the responsibility to insure that the care provided in treating Hepatitis C positive inmate was consistent with community standards. The Hepatitis C task Force has met since early 1999, and continues to meet to fulfill its obligations.

weight loss, fatigue, abdominal pains, or jaundice, but was being treated for his psoriasis condition. On October 22, 1999, Clark was added to the SCI-Rockview Hepatitis C clinic. Clark admits that he was not surprised when he was told that he had Hepatitis C because of his lifestyle, he felt lucky that he did not have anything else. Defendant Dr. Symons met with Clark on November 10, 1999 and discussed the treatment options available for Hepatitis C.

Clark admits that on numerous occasions while incarcerated under the care, custody and control of the Department of Corrections, medical personnel examined him and nobody interfered with his ability to see doctors. Clark admits that since December 1, 1999, he has seen "a million" physician assistants during that time and agreed that since he was first diagnosed with Hepatitis C, he was seen by medical personnel rather frequently. In reality, through reviewing Clark's Medical Records dating back to 1992, during his incarcerations he was examined approximately 220 times by multiple medical personnel including sixteen (16) different Physicians, and eight different Physician's Assistants. Clark admits that before filing this civil rights action, he never asked to review his Department of Correction's Inmate Medical Record to verify the claims contained therein.

13

## STATEMENT OF QUESTIONS PRESENTED

I.    ARE THE CORRECTIONS DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE ARE NO DISPUTES OF GENUINE MATERIAL FACT SHOWING RECKLESS DISREGARD TO CLARK OBTAINING MEDICAL TREATMENT FOR HIS ILLNESS WHILE INCARCERATED?

      Suggested Answer:    Yes

II.    ARE THE CORRECTIONS DEFENDANTS ENTITLED TO SUMMARY JUDGMENT BECAUSE THEY WERE NOT PERSONALLY INVOLVED IN HIS MEDICAL TREATMENT?

      Suggested Answer:    Yes

III.    SHOULD CLARK BE PRECLUDED FROM OBTAINING MONETARY DAMAGES ON HIS FEDERAL CLAIMS BECAUSE HE FAILED TO SEEK AVAILABLE MONETRARY ADMINISTRATIVE RELIEF BEFORE FILING THIS PRISON CONDITIONS CIVIL RIGHTS ACTION?

      Suggested Answer:    Yes

IV.    IS THIS ACTION AGAINST THE CORRECTIONS DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR DAMAGES BARRED BY THE ELEVENTH AMENDMENT?

      Suggested Answer:    Yes

V.    IS CLARK'S DELIBERATE INDIFFERENCE CLAIM AGAINST THE CORRECTIONS DEFENDANTS BARRED BY QUALIFIED IMMUNITY?
      Suggested Answer:    Yes

VI.    DID CLARK FAIL TO STATE PENDENT CLAIMS OF NEGLIGENCE AND MEDICAL MALPRACTICE AGAINST THE CORRECTIONS DEFENDANTS SUCH THAT SUMMARY JUDGMENT SHOULD BE GRANTED ON THEIR BEHALF?
      Suggested Answer: Yes

**ARGUMENT**

I.    **THE CORRECTIONS DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE ARE NO DISPUTES OF GENUINE MATERIAL FACT SHOWING RECKLESS DISREGARD TO CLARK OBTAINING MEDICAL TREATMENT FOR HIS ILLNESS WHILE INCARCERATED.**

A "serious medical need" has been defined as "one that has been diagnosed by a physician, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention."[25]  On its face, the alleged serious medical need in this case does not qualify as one apparent to even a layperson. The diagnosis of HCV is not one that is readily apparent to laymen.  Indeed, Clark's own allegations indicate that he was diagnosed only after a "blood test."[26]

Determining the propriety of treatment for HCV (which is at the heart of Clark's action), as contrasted with a bleeding wound, opens the door for impermissible, second guessing of the course of treatment that a trained physician provided.  Courts disavow any attempt to second-guess a particular course of treatment, which remains a question of sound professional judgment.[27]  A disagreement between the doctor and a plaintiff as to the medical diagnosis and

---

[25]    See Sheldon v. Pezley, 49 F.3d 1312, 1316 (8th Cir. 1995).

[26]    See Complaint, ¶¶ 10-12.

[27]    See Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979); McAleese v. Owens, 770 F. Supp. 255, 258 (M.D. Pa. 1991).

treatment does not constitute deliberate indifference.[28]   Yet, this is precisely what Clark attempts to do through this 1983 action:[29] Clark inappropriately asks this Court to substitute its judgment for the trained medical personnel who regularly saw him during the relevant times of his incarceration.

Moreover, the Third Circuit has established that "a non-physician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when he is already receiving treatment by the prison's medical staff."[30] No is no genuine dispute of material fact that any of the Corrections Defendants are physicians, or that they are treating Clark in a professional capacity.[31] Rather, Clark admits numerous times throughout his Complaint that he was provided with access to a physician.[32] Therefore, the Corrections Defendants met their Constitutional obligations to provide medical care to Clark and the Complaint against them should be dismissed with prejudice.[33]

---

[28]    See Boring v. Kozakiewicz, 833 F.2d 468, 473 (3d Cir.1987).  Bednar v. County of Schuylkill, 29 F.Supp.2d 250, 253 (E.D. Pa. 1998).  Accord Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 346 (3d Cir. 1987).

[29]    See Plaintiff's Answers to the Corrections Defendants interrogatories to Plaintiff, Responses 1, 13, attached to the Supporting Documents as Exhibit 2.

[30]    See Chimenti, slip. op. at 17, (citing Durmer v. O'Carroll, 991 F.2d 64, 69 (3d Cir. 1993)).  A copy of Chimenti is attached hereto pursuant to Pa. MDLR 7.8(a) as Exhibit A.

[31]    See Complaint, pp. 1-11.

[32]    See Complaint (doc. 1), ¶¶ 10, 14, 21, 26, 30-33.

[33]    See Estelle v. Gamble, 429 U.S. 97 (1976) (holding the government has an obligation to provide medical care to those it is punishing by incarceration).

## II.   THE COURT SHOULD GRANT SUMMARY JUDGMENT TO THE CORRECTIONS DEFENDANTS BECAUSE CLARK ADMITTED THEY WERE NOT PERSONALLY INVOLVED IN HIS MEDICAL TREATMENT.

A section 1983 action must allege that the defendant actually participated in or had actual knowledge of and acquiesced in the events forming the basis of the claims.[34]   Clark fails to link the Corrections Defendants to the central acts that he complains about:  The failure to inform <u>him</u> of his diagnosis of HCV, and to have in place a HCV protocol to treat his illness.  Instead, his allegations against the Corrections Defendants offer no basis for liability other than one based upon their respective supervisory positions as the Secretary, Superintendent, and Corrections Health Care Administrator:  *Respondeat superior* alone cannot be a basis for a

---

[34]    <u>See</u> <u>Chimenti v. Kimber</u>, Civil No. 3:CV-01-0273, slip op. at 15, 16 (M.D. Pa. Mar. 15, 2002)(Vanaskie, C.J.)(finding "[t]he mere fact that the Commonwealth Defendants [that included Secretary Horn, a Superintendent, and two nurses] responded to [the inmate's] grievances does not support an inference that they were deliberately indifferent to his medical needs.  They were entitled to rely upon the advise of health are professionals.") (citing <u>Johnson v. Harding</u>, Civil No. 3:CV-99-977, slip op. at p.8)(M.D. Pa. Feb. 29, 2000)(Vanaskie, C.J.)(finding that is there no constitutional right to a grievance procedure and to the extent Plaintiff contends the Commonwealth Defendants violated his constitutional rights by not taking corrective action on medical complaints, said allegations fail to state a claim upon which relief may be granted)(citation omitted)).  A copy of <u>Chimenti</u> is attached hereto pursuant to Pa.MDLR 7.8(a) as Exhibit A.  <u>See</u> <u>also</u> <u>Thomas v. Meyers</u>, Civil No. 3:CV-00-1887, slip op. at 8, 9 (M.D. Pa. Mar. 25, 2002)(Caputo, J.)(finding in a claim factually and legally on point with Clark's Complaint that Defendants Meyers and Lidgett should be dismissed from the action).  A copy of Thomas is attached to the Wexford Defendants' Supporting Brief (doc. 94) as Exhibit A.

Section 1983 suit.[35]   Therefore, summary judgment should be granted to the Corrections Defendants as a matter of law and the claims against them dismissed with prejudice.

**III.   THE COURT, PURSUANT TO 42 U.S.C. 1997(E)(A), SHOULD PRECLUDE MONETARY DAMAGES IN THIS CASE BECAUSE CLARK DID NOT SEEK THIS AVAILABLE REMEDY THROUGH THE DEPARTMENT OF CORRECTION'S GRIEVANCE PROCESS PRIOR TO FILING HIS PRISON CONDITION ACTION.**

The Corrections Defendant join in the Wexford Defendants' argument as stated within their Supporting Brief to their Motion Summary Judgment, pp. 4-7. The Corrections Defendants submit, following the same rationale that any monetary damages against the Corrections Defendants should be precluded.

**IV.   THIS ACTION AGAINST THE CORRECTIONS DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR DAMAGES IS BARRED BY THE ELEVENTH AMENDMENT.**

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the citizens of the United States by citizens of another State, or by Subjects of any foreign State."[36]   The Supreme Court has interpreted the Amendment to bar damage suits in federal court against a state by its own

---

[35]     See Hampton v. Holmesburg Prison Officials, 546 F.2d 1077, 1082 (3d Cir. 1976).
[36]     See U.S. Const. Amend XI.

18

citizens unless the State has waived its immunity or "Congress has exercised its

undoubted power under §5 of the Fourteenth Amendment to override that

immunity."[37]  Plaintiff's federal cause of action is based on a 42 U.S.C. §1983

claim.[38]  Under the Eleventh Amendment, Clark cannot sustain a claim for money

damages against the Department of Corrections as an agency of the state.[39]

Similarly, to the extent that the Defendants are sued in their official capacities, the

State is the real party in interest.[40]  Therefore, the Eleventh Amendment also bars

Clark's § 1983 claim for damages against the Corrections Defendants to the extent

that they are sued in their official capacities.  The official capacity claims against

the Corrections Defendants should be dismissed with prejudice.

---

[37]    See Hans v. Louisiana, 134 U.S. 1 (1890); see also Will v. Michigan Dept. of State Police, 491 U.S. 58, 66 (1989).

[38]    Section 1983 provides, in relevant part, that: "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States  . . . to the deprivation of any rights, privileges, or laws, shall be liable to the party injured in an action at law . . . ."

[39]    See Will, 491 U.S. at 66; Quern v. Jordan, 440 U.S. 332, 342 (1979).

[40]    Moreover, states, their agencies, and officials sued in their official capacities are not "persons" within the meaning of §1983. Cf. Monell v. New York City Dept. of Soc. Servs., 436 U.S. 658, 688 (1978)(finding that municipalities are persons within §1983); Moor v. County of Alameda, 411 U.S. 693 (1973)(holding that municipalities are not shielded by the Eleventh Amendment). Cf. Tunnell v. Office of Public Defender, 583 F. Supp. 762, 769 (E.D. N.Y. 1984)(noting "Monell, [which established liability based on a custom and policy basis and a failure to train and/or supervise basis] involved claims against a municipality, not a state or state official, and hence is not pertinent."). This too supports dismissal of the claims against the Corrections Defendants in their official capacities.

## V.  CLARK'S DELIBERATE INDIFFERENCE CLAIM AGAINST THE CORRECTIONS DEFENDANTS IS BARRED BY QUALIFIED IMMUNITY.

The United States Supreme Court has held that defendants may invoke qualified immunity from liability for damages claims "insofar as their conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[41]  Here, the Corrections Defendants are entitled to qualified immunity because there is no clearly established law now, nor at any relevant time, that they (as Corrections Administrators) had an obligation to inform Clark of his positive HCV test.

The qualified immunity doctrine recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."[42]  A defendant is immune from a Section 1983 claim if a reasonable person in his position could have believed that his actions were proper in light of the existing law and should be denied only if, in light of the existing law, the unlawfulness should have been apparent.[43]

---

[41]    See Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

[42]    Id. at 807 (internal quotations and citation omitted).

[43]    See Anderson v. Creighton, 483 U.S. 635, 639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987) (internal quotation marks omitted)." See also Jermosen v. Smith, 945 F.2d 547, 550 (2d Cir. 1991), cert. denied, 503 U.S. 962 (1992).

"The availability of the defense turns on the 'objective legal reasonableness' of the allegedly unlawful official action 'assessed in light of the legal rules that were clearly established at the time it was taken.'"[44] The qualified immunity analysis is: "(1) Whether the plaintiffs allege a violation of their statutory or constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official should have known that the alleged action violated the plaintiffs' rights."[45]

Following the Supreme Court's lead, the Third Circuit directed that the right in question must be defined with particularity rather than abstractly.[46] Thus, the questions presented here are:

> (1) between 1992 and 1999, was it clearly established that a supervisory corrections official had a duty to notify an inmate that he had been diagnosed with HCV (assuming for purposes of the argument that the Corrections Defendants indeed knew of the diagnosis);

> (2) between 1992 and 1999, was it clearly established that a supervisory corrections official had a duty to have a HCV treatment protocol in place; and

> (3) between 1992 and 2001, was it clearly established that a supervisory corrections official had a duty to have a HCV protocol in place requiring a physician to utilize a

---

[44] See Anderson, 483 U.S. at 640.

[45] Id. (citing Rouse v. Plantier, 182 F. 3d. 192, 196-97 (3d. Cir. 1999)).

[46] See Doe v. County of Centre, 242 F.3d 437, 454-55 (3d. Cir. 2001)

21

> liver biopsy prior to treating an inmate with the drug
> Interferon.

Clearly, supervisory corrections officials are not medical providers, nor are there any allegations that a physician-patient relationship existed between the Corrections Defendants and Clark from 1992-2001. There is no genuine dispute of fact that Clark was provided with access to and treated by medical personnel throughout his incarceration. Further, there is no dispute of fact that it was the treating medical personnel, and not corrections administrators with direct knowledge of an inmate's medical condition. To survive qualified immunity, it must have been clearly established that a correction official, such as three Corrections Defendants in this case, had not only a right, but also a duty to violate a patient's privacy in his medical records in order to advise him of a positive Hepatitis test. No Court has so held. This is a novel legal issue just like the issue in the Doe case.[47] Summary Judgment should be granted for the Corrections Defendants on the basis of qualified immunity.

---

[47]    Further, just as the county in Doe had a separate legal duty to protect the health of its foster children, which conflicted with the purported right of the plaintiff, correction officials are bound by the duty not to violate a patient's privacy in the confidentiality of their medical records. See 42 Pa. C.S. § 5929 (the physician/patient privilege requires that "[n]o physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on

## VI.    CLARK FAILED TO STATE PENDENT CLAIMS OF MEDICAL MALPRACTICE AGAINST THE CORRECTIONS DEFENDANTS SUCH THAT SUMMARY JUDGMENT SHOULD BE GRANTED ON THEIR BEHALF.

There is no genuine dispute of material fact that any of the Corrections Defendants were in a physician patient relationship with Clark, such as is required to prove medical malpractice.[48]  The Corrections Defendants' roles were administrative.  They are not physicians.  They did not provide hands on treatment to Clark, nor could they do so.  In no way can it be said that the Corrections Defendants had a duty of care, in a treatment capacity, to Clark's Hepatitis C condition.  Therefore, because Clark is unable to establish an essential element for his pendent medical malpractice claims, the Corrections Defendants are entitled to Summary Judgment on their behalf.

---

account of personal injuries.")  Here, as in Doe, because the right in question was not clearly established at the time, the Corrections Defendants are entitled to qualified immunity as a matter of law, and Clark's Complaint against them should be dismissed with prejudice.

[48]    See Promubol v. Hackett, 686 A.2d 417, 420 (Pa. Super. 1996), appeal denied, 548 Pa. 672, 698 A.2d 595 (1997)(duty owed by physician arises from physician patient relationship); Tomko v. Marks, 602 A.2d 890, 892 (Pa. Super 1992).

## CONCLUSION

**WHEREFORE**, for the above-stated reasons, this Honorable Court should grant summary judgment in favor of the Corrections Defendants and dismiss the claims against them with prejudice.

Respectfully submitted,
Office of General Counsel

BY:

John J. Talaber
Assistant Counsel