FILED
HARRISBURG, PA

JAN 1 0 2003

MARY E. D'ANDREA, CLERK
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CLARK, | : | |
| | : | |
| Plaintiff, | : | |
| | : | Civil No. 01-0764 |
| | : | |
| v. | : | (Judge William W. Caldwell) |
| | : | |
| LARRY LIDGETT, et al., | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

### THE CORRECTIONS DEFENDANTS'
### STATEMENT OF MATERIAL FACTS

Defendants Martin Horn, Robert Meyers, and Larry Lidgett ("Corrections Defendants"), by and through their undersigned attorney and in accordance with Local Rule 56.1 of the United States District Court for the Middle District of Pennsylvania, hereby set forth the following statement of material facts believed not in dispute between the parties:

**Plaintiff William M. Clark:**

1.    Plaintiff William M. Clark ("Clark") was born on September 11, 1954 in Vineland, New Jersey, and at the time this action was filed in April 2001, he was 47 years old.  (Deposition of William M. Clark dated September 19, 2002 ("Clark Deposition"), pp. 7, 8, attached to the Corrections Defendants

Supporting Documents to Their Motion for Summary Judgment ("Supporting Documents"), Volume I, Exhibit 2).

2.    Clark admits that beginning when he was eighteen (18) he started using illegal drugs such as marijuana, alcohol, later progressed to met amphetamine, and culminated to trying it all and doing it all, including intravenous drugs.  (Clark Deposition, pp. 16, 17).

3.    On August 27, 1985, then Honorable Edward G. Beister of the Bucks County Court of Common Pleas sentenced plaintiff William Martin Clark ("Clark") to a term of imprisonment in a state correctional institution for five (5) to fifteen (15) years based on his conviction at Criminal Action Number 3538-1985.  (Declaration of Thomas J. Sturniolo ("Sturniolo Declaration") dated December 30, 2002, p. 1-3 (citing Court Commitment dated August 27, 1985, pp. 1-2; Sentence Status Summary, p.1)(attached to the Supporting Documents, Vol. I, Exhibit 1); see also Complaint, ¶8).

4.    Clark was incarcerated at the State Correctional Institution at Graterford ("SCI-Graterford") from August 28, 1985 until he was paroled on his minimum sentence date of November 28, 1989.  (Sturniolo Declaration, p.2; Clark Deposition, pp. 20, 21; Complaint, ¶9).

5.    Clark, on March 20, 1992, was recommitted to SCI-Graterford as a technical parole violator based on "hot urine" through his use of cocaine. (Sturniolo Declaration, p.2; Clark Deposition, p.21; Complaint, ¶10).

6.    Clark remained in SCI-Graterford for six (6) months until he was re-paroled on September 6, 1992. (Sturniolo Declaration, p.2.; Clark Deposition, p.23; Complaint, ¶15).

7.    Clark described his overall health during this time period as: (a) feeling alright; and (b) agreed that there was not anything going on with his body that indicated to him something was wrong. (Clark Deposition, p.30).

8.    Clark states that the Complaint, ¶11,is factually incorrect in that he did not receive a Hepatitis C test in 1992, and instead should state that he had high enzymes in 1992. (Clark Deposition, pp. 48, 49).

9.    On September 15, 1995, Clark returned to SCI-Graterford for a parole violation because he was in possession of cocaine during a traffic stop. (Sturniolo Declaration, p.2; Clark Deposition, pp. 28, 30-33; Complaint, ¶20).

10.    Clark remained in SCI-Graterford for six (6) months until he was re-paroled on April 28, 1996. (Sturniolo Declaration, p.2; Complaint, ¶20).

11.    Clark was re-incarcerated at SCI-Graterford on November 6, 1996, as a convicted parole violator. (Sturniolo Declaration, p.2; Complaint, ¶20).

3

12.     On March 10, 1997, Clark was transferred from SCI-Graterford to the State
        Correctional Institution at Rockview ("SCI-Rockview") where he currently
        resides.  (Sturniolo Declaration, p.2.; Complaint, ¶2).

13.     Clark's new maximum sentence, resulting from his conviction as a parole
        violator, is October 26, 2005.  (Sturniolo Declaration, p.2)

14.     Clark graduated from High School in 1972, but does not possess medical
        training as a nurse, physician's assistant, or physician.  (Plaintiff's Verified
        Answers to Corrections Defendants' Interrogatories dated October 11, 2001,
        p.1)(attached to the Supporting Documents, Vol. II, Exhibit 13); see also
        (Clark Deposition, p. 86).

**Grievance History:**

15.     During the relevant times that Clark filed his grievances, the Pennsylvania
        Department of Corrections had a policy entitled, "Inmate Grievance
        System."  (Declaration of Thomas James ("James Declaration") dated
        January 2, 2003, p. 1, ¶26, Exhibits 1 & 2 )(attached to the Supporting
        Documents, Vol. II, Exhibit 14).

16.     Through the Department of Correction's Inmate Handbook inmates are
        provided with notice of the Policy.  (James Declaration, p. 2, ¶4).

17.     The Department of Corrections Chief Grievance Coordinator for the
        Secretary's Office of Inmate Grievances and Appeals reviewed the records

of the Office and confirmed that Plaintiff William M. Clark (AY-5585) appealed two grievances to the Office for final review (relating to his medical condition) under the Grievance Policy. (James Declaration, p. 2, ¶4).

18.   On December 1, 1999, Clark filed an inmate grievance at SCI-Rockview that was given the number ROC-0706-99 requesting treatment for his HCV condition. (James Declaration, p.2, ¶6, Exhibit 3).

19.   On December 14, 1999, the SCI-Rockview Grievance Coordinator provided Clark with a response and information regarding the treatment he was receiving for HCV. (James Declaration, p.3 ¶7, Exhibit 3).

20.   On December 16, 1999, Clark filed an appeal to Superintendent Meyers disagreeing with the December 15, 1999 response. (James Declaration, p.3 ¶8, Exhibit 3).

21.   On December 20, 1999, Superintendent Meyers responded to Clark's appeal and agreed with the Grievance Coordinator's response. (James Declaration, p.3 ¶9, Exhibit 3).

22.   On December 24, 1999, Clark appealed Superintendent Meyers' decision to the Department of Corrections Chief Hearing Examiner. (James Declaration, p.3 ¶10, Exhibit 3).

23.  On January 4, 2000, the Chief Hearing Examiner upheld the decision of Superintendent Meyers.  (James Declaration, p.3 ¶11, Exhibit 3).

24.  On August 10, 2001, Clark filed an inmate grievance at SCI-Rockview that was given the number ROC-0641-01 requesting treatment for his HCV condition.  (James Declaration, p.3 ¶12, Exhibit 4).

25.  On August 22, 2001, the SCI-Rockview Grievance Coordinator provided Clark with a response and information regarding the treatment he was receiving for HCV.  (James Declaration, p.3 ¶13, Exhibit 4).

26.  On August 26, 2001, Clark filed an appeal to Superintendent Meyers disagreeing with the December 15, 1999 response.  (James Declaration, p.3 ¶14, Exhibit 4).

27.  On September 5, 2001, Superintendent Meyers responded to Clark's appeal and agreed with the Grievance Coordinator's response.  (James Declaration, p.3 ¶15, Exhibit 4).

28.  On September 9, 2001, Clark appealed Superintendent Meyers' decision to the Department of Corrections Chief Grievance Coordinator.  (James Declaration, p.3 ¶16, Exhibit 4).

29.  On October 10, 2001, the Chief Grievance Coordinator upheld the decision of Superintendent Meyers.  (James Declaration, p4 ¶17, Exhibit 4).

30.     Clark did not request monetary damages in grievance 0706-99 or 0641–01. (James Declaration, p.3 ¶18, Exhibits 3 and 4; Clark Deposition, pp. 102, 103).

31.     If Clark had sought monetary damages from the Department in his grievances, as he could through the Department's grievance process, the Chief Grievance Coordinator would have brought this issue to the attention of senior Department of Corrections staff for their consideration as part of the available administrative process before this lawsuit was filed.  (James Declaration, p. 5, ¶19).

**Defendant Martin F. Horn:**

32.     Defendant Martin F. Horn, from March 1, 1995 until December 30, 2000, was the Secretary of the Department of Corrections ("Department"), an executive agency in the Commonwealth of Pennsylvania.  (Defendants' Horn and Meyers Verified Answers to Plaintiff's First Set of Interrogatories, p.5, no. 4; Complaint, ¶3)(attached to the Supporting Documents, Vol. II, Exhibit 11).

33.     The present Secretary of the Department, who succeeded Defendant Horn on December 30, 2000, is Jeffrey A. Beard, Ph.D., who served as the Executive Deputy Secretary during most of Defendant Horn's tenure as Secretary. (Declaration of Jeffrey A. Beard, Ph.D ("Dr. Beard Declaration") dated

August 16, 2002, p.1, ¶¶1-3)(attached to the Supporting Documents, Vol. II, Exhibit 4).

34.    Generally, the Secretary of the Department of Corrections is responsible in a supervisory capacity for the overall management and operation of the Department in fulfilling its mission of protecting the public by confining persons committed to the Department's custody in safe secure facilities, and providing opportunities for inmates to acquire the skills and values necessary to become productive law abiding citizens; while respecting the rights of crime victims.  (Dr. Beard Declaration, p.2, ¶4.)

35.    Geographically, the Department is comprised of twenty-five (25) state correctional institutions, fifteen (15) community correction centers, and one (1) motivational boot camp that are located throughout the Commonwealth. (Dr. Beard Declaration, p.2, ¶5).

36.    The Secretary is responsible in a supervisory role for the safety and security of fifteen thousand (15,000) employees and directly supervises five (5) Deputy Secretaries who also oversee the operation of the Department.  (Dr. Beard Declaration , p.2, ¶6).

37.    During Defendant Horn's tenure as Secretary, there were approximately thirty six thousand (36,000) inmates incarcerated within the Department's

correctional institutions. (Defendants' Horn and Meyers Verified Answers to Plaintiff's First Set of Interrogatories, pp. 3,4, no. 3).

38.   Defendant Martin F. Horn is not a physician, and accordingly, did not provide Clark with medical treatment in the capacity of a medical professional while he was Secretary of the Department. (Defendants' Horn and Meyers Verified Answers to Plaintiff's First Set of Interrogatories, pp. 3,4, no. 3; Clark Deposition, pp. 52-53, 98, 100-102).

39.   Clark admits that his only interaction with Defendant Secretary Horn was through the Department of Corrections, administrative grievance process. (Clark Deposition, pp. 43, 44).

**Defendant Robert Meyers:**

40.   Defendant Robert W. Meyers is the currently the Superintendent at SCI-Rockview and has been employed in that capacity since February 1998. (Defendants' Horn and Meyers Verified Answers to Plaintiff's First Set of Interrogatories, p.5, no.4).

41.   During Superintendent Meyers tenure, SCI-Rockview has housed thousands of inmates. (Defendants' Horn and Meyers Verified Answers to Plaintiff's First Set of Interrogatories, p.4, no. 3; Complaint, ¶3).

42.   Defendant Robert W. Meyers is not a physician, and accordingly, did not provide Clark with medical treatment in the capacity of a medical

professional as the Superintendent at SCI-Rockview. (Defendants' Horn and Meyers Verified Answers to Plaintiff's First Set of Interrogatories, p.5, no. 4; Complaint, ¶3; Clark Deposition, pp.53, 98, 100-102).

43.    Clark admits that his only interaction with Defendant Superintendent Meyers was through the Department of Corrections administrative grievance process.  (Clark Deposition, p. 44).

**Defendant Larry L. Lidgett:**

44.    Defendant Larry L. Lidgett is the former Corrections Health Care Administrator ("CHCA") at SCI-Rockview who voluntarily retired from Commonwealth employment in September 2001.  (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3 )(attached to the Supporting Documents, Vol. II, Exhibit 12).

45.    Defendant Lidgett graduated from the Phillipsburg State General Hospital and began working there as a nurse on June 5, 1972.  (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3).

46.    In November 1982, Defendant Lidgett began working at SCI-Rockview as a staff nurse.  (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3).

47.   In 1985, Defendant Lidgett was promoted to Nurse Supervisor, and worked in that capacity until June 1994 when he was promoted to CHCA at SCI-Rockview.  (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3).

48.   Defendant Lidgett, as the Corrections Health Care Administrator, was generally responsible for managing the health care of inmates in SCI-Rockview.  (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3).

49.   Defendant Lidgett's duties included overseeing the screening for diseases of inmates, the administration of routine and emergency treatment, managing a multidisciplinary health care staff, and monitoring the services of a contracted medical vendor.  (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3).

50.   Defendant Lidgett's nursing license has never been suspended, nor has he ever been involved in a disciplinary action relating to his nursing license. (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 2, no. 2, p.3, no.3).

51.   Defendant Larry L. Lidgett is not a physician, and accordingly, did not provide Clark with hands-on medical treatment in his capacity of a medical

11

professional. (Defendant Lidgett's Verified Answers to Plaintiff's First Set of Interrogatories dated August 2, 2002, p. 26, no. 24(c) & (d);Clark Deposition, p. 53, p. 99, 100; Complaint ¶7).

52. Clark admits that his only interaction with Defendant Corrections Health Care Administrator Lidgett was through the Department of Corrections administrative grievance process. (Clark Deposition, p. 53).

**The Hepatitis C Virus:**

53. Hepatitis C is a blood borne virus that causes an inflammation of the liver. (Declaration of Dr. Berel B. Arrow("Dr. Arrow Declaration") dated December 30, 2002, p. 3, ¶9) (attached to the Supporting Documents, Vol. I, Exhibit 3).

54. The human liver is the second largest organ in your body (second only to skin), weighs about three (3) pounds, and is divided into three sections called lobes. (Dr. Arrow Declaration, p.2 , ¶4).

55. The liver is an important passageway for substances moving along from the stomach to the intestines, and finally to the blood stream. Specifically, the liver transforms food into many chemical parts for use in other parts of the body. The liver also stores sugar and vitamins in the body for later use, and also acts as a filtering system taking waste and poisons out of the bloodstream. (Dr. Arrow Declaration p.2, ¶5 (citing  Howard J. Worman,

M.D., The Liver Disorders Sourcebook, Figure 1.2 (1999), attached thereto as Exhibit C, showing a diagram of the liver in relation to other body organs.))

56. When the liver becomes injured through substances (e.g. alcohol) or through infections (e.g. hepatitis) it is prevented from performing its vital functions. (Dr. Arrow Declaration, p.2 , ¶6).

57. The result is that liver cells are killed or scarred over time that leads to a condition called cirrhosis. (Dr. Arrow Declaration,. P. 2, ¶7).

58. A liver with cirrhosis reduces blood to flow through it. The overall effect on the human body is staggering. First, limited blood flow in the liver sometimes causes pressure in blood vessels in the stomach and lower throat, and may lead to enlargement of the spleen. Additionally, because the liver assists in the ability for blood to clot, a damaged liver sometimes leads to the body having the inability to stop bleeding. The liver will also have trouble filtering drugs from the bloodstream and clear waste products from the blood. Ultimately the condition can develop into a form of liver cancer. (Dr. Arrow Declaration,. pp. 2,3, ¶8).

59. The virus is passed through razors, needles, toothbrushes, nail file, tattooing, body piercing, and unprotected sex. (Dr. Arrow Declaration,. pp.3, ¶10).

60.    The hepatitis C virus was discovered in 1989 by workers at the

biotechnology company Chiron Corporation relying entirely on the

discipline of molecular biology.  (Dr. Arrow Declaration, p.3, ¶11 (citing

Howard J. Worman, M.D., The Liver Disorders Sourcebook, pp. 136-144,

137 (1999), attached thereto as Exhibit D)).

61.    Prior to the discovery of the Hepatitis C virus, this type of infectious

hepatitis was referred to as "non-A, non-B" hepatitis.  (Dr. Arrow

Declaration, p. 3, ¶12).

62.    In May 1990, the first routine anti-body test for Hepatitis C became

available, followed with a better test in July 1992.  (Dr. Arrow Declaration,

pp. 3,4, ¶13 (citing Medscape from WebMD: Diagnosis of Hepatitis C

(1994-2002), available at http://www.medscape.com/viewarticle/431761_4,

a copy of which is attached thereto as Exhibit E)).

63.    The blood test for Hepatitis C provides physicians with a means of

monitoring liver function.  Basically, the liver releases enzymes when liver

cells are injured or die; accordingly, liver enzyme levels fluctuate throughout

the illness, and while high enzyme levels may mean liver damage, they

cannot predict the severity of the liver injury.  (Dr. Arrow Declaration, p.4,

¶14).

64.    It is estimated that approximately 85% of Hepatitis C cases may become chronic (long lasting and gradually developing) culminating in severe liver disease (cirrhosis).  (Dr. Arrow Declaration, p.4, ¶15).

65.    Clinically, chronic Hepatitis C is diagnosed when the infection does not clear up within six (6) months.  (Dr. Arrow Declaration, p.4, ¶16).

66.    The disease can take twenty (20) to thirty (30) years to progress, with the result being complete liver failure.  At this point, a liver transplant is the only available option.  (Dr. Arrow Declaration, p.4, ¶17).

**Overview of DOC Health Care Services:**

67.    The DOC has a constitutional duty in its delivery of health care to provide inmates with access to care, care that is ordered, and professional medical judgment.  The DOC is committed to providing quality health care consistent with community standards.  (Dr. Arrow Declaration, p.4, ¶18).

68.    Efficient and effective health care is delivered to inmates under the care, custody, and control, of the DOC through quality improvement processes, administrative supervision of contract medical vendors, comprehensive policies and procedures, adequate staffing, preventive and specialty services, dental services, chronic care clinics, and infection control.  (Dr. Arrow Declaration, pp. 4,5, ¶19).

69.  The DOC contracts medical services for its twenty-five (25) institutions. Contracted medical services reduces the Department's fiscal liability because costs are set at a constant daily rate per inmate regardless of the level of care needed.  Additionally, a private contractor has greater ease and flexibility to recruit competent clinical staff, and is able to negotiate large discounts with hospitals and vendors, resulting in reduced costs to the contractor.  (Dr. Arrow Declaration, , p.5, ¶20)

70.  The DOC closely monitors the contracted vendors to ensure that the care provided is consistent with community standards.  (Dr. Arrow Declaration, p.5, ¶21 (citing Quality Improvement Policy Statement 13.1.3, dated June 30, 1995, attached thereto as Exhibit F; see also Quality Improvement Bulletin 13.1.3-1, attached thereto as Exhibit G)).

71.  Inmates are routinely provided access to physicians that rival if not excel access provided to a non-incarcerated inmate.  For example, in fiscal year 2000, there were 277,102 inmate doctors visits, with 180,444 of these visits initiated by the inmate through normal sick call procedures, with the remaining 96,658 visits initiated by DOC staff.  (Dr. Arrow Declaration,pp.5,6, ¶22).

72.  Inmates are also given preventive health care with physical examination given to inmates when they are first incarcerated, and the comprehensive

medical examinations annually for inmates of fifty (50) years, and bi-annually for inmates under fifty years old.  (Dr. Arrow Declaration, p.6, ¶23).

73.    The DOC also uses "telemedicine" practices using modern technology primarily for psychiatric, dermatology, and infectious disease consultations with outside physicians while the inmate remains safely incarcerated.  (Dr. Arrow Declaration, p. 6, ¶24).

74.    In the area of disease management, inmates are tested for HIV/AIDs, given annual tuberculosis tests, and are screened for the Hepatitis C virus.  As of early 2002, all inmates in the DOC have been screened for the virus, with new inmates receiving the Hepatitis C test at the beginning of their incarceration.  (Dr. Arrow Declaration, p.6, ¶25).

**Hepatitis C Statistics:**

75.    Each year about thirty thousand (30,000) Americans contract Hepatitis C which is a frequent cause of chronic liver disease.  As many as four (4) million people are believed to be infected with Hepatitis C.  Nationally, about ten thousand (10,000) people will die from the Hepatitis C virus, with that number expected to triple by 2010.  In 2001, seventeen percent (17%) of the DOC's one-hundred twenty four (124) inmate deaths were related to complications for Hepatitis C.  (Dr. Arrow Declaration, pp. 6,7, ¶26).

76.   In the Pennsylvania DOC, about twenty-three percent (23%) of the inmate population (approximately 37,000) are Hepatitis C positive.  This percentage is comparable to the incidence rate in other state prison systems throughout the nation: Virginia (39%); Maryland (38%); California (35%); and Massachusetts (31%).  (Dr. Arrow Declaration, p.7, ¶27).

77.   The cost of one time treatment, which may slow down the progress of the virus, is between six-thousand ($6,000) and twelve thousand dollars ($12,000) per inmate.  However, the costs to treat liver failure are approximately fifty-thousand ($50,000) to two hundred and fifty thousand ($250,000) per inmate.  (Dr. Arrow Declaration, p.7, ¶28).

78.   Currently in the Pennsylvania DOC, about one thousand two hundred (1,200) inmates are at some stage in the Hepatitis C treatment at an annual cost to taxpayers of approximately $8.7 million dollars.  (Dr. Arrow Declaration, p.7, ¶29; Dr. Beard Declaration, p.5,¶14).

**The Evolution of Treating Hepatitis C:**

79.   As a practicing physician in this field, the community standard of care for treatment of Hepatitis C from the early 1990's until 1997 was in a state of flux.  (Dr. Arrow Declaration, p.8, ¶32; see also Mary Hager and Larry Reibstein, *Do You Have Hepatitis C?* NEWSWEEK, May 4, 1998, at 83) (attached to the Supporting Documents, Vol. II, Exhibit 15); Julie R. Smith,

MHS, PA-C, and Jorge L. Herrera, MD, *Hepatitis C-Who Should Be*

*Treated?,* pp.1-4 (Dec 31, 2002) *at*

http://www.hcvadovacte.org/Medical_Writers_Circle/who_treated.htm.

(attached to the Supporting Documents, Vol. II, Exhibit 16); *Doctors, Prison*

*Administrators, Inmate Advocates Debate How To Handle Hepatitis C in*

*Prisons*, Baltimore Sun, Sept. 5, 2001 (attached to the Supporting

Documents, Vol II, Exhibit 17).

80.    A drug known as Interferon was approved by the United States Food and

Drug Administration in 1991 to treat patients with chronic Hepatitis C;

however, it could not eradicate the disease, and was used to reduce the

amount of the virus in the body and to slow down liver damage.  (Dr. Arrow

Declaration, p.8, ¶ 33).

81.    Interferon works by protecting healthy, unaffected cells from being taken

over by the virus, and boost the body's immune response against the virus

and infected cells.  (Dr. Arrow Declaration, p.8, ¶34).

82.    Interferon is usually given three (3) times a week, and would take anywhere

from twelve (12) months to two (2) years for treatment to be completed.

(Dr. Arrow Declaration, p.8, ¶35).

83.    However, Interferon has significant side effects: (a) flu-like symptoms, (b)

fatigue; (c) irritability, depression, and anxiety; (d) loss of appetite; (e)

nausea and diarrhea; and (f) mild hair loss.  (Dr. Arrow Declaration, p.8,

¶36).

84.    In 1998, the U.S. Food and Drug Administration approved the use of

Rebetron (a combination of two drugs called ribaviron and intron) ("Dual

Therapy") to treat patients with chronic Hepatitis C who did not respond

successfully to therapy with interferon alone.  The side effects are similar to

those stated in paragraph 95, supra.  (Dr. Arrow Declaration, pp. 8,9, ¶ 37).

85.    The National Institutes of Health Consensus Development Conference Panel

Statement: Management of Hepatitis C recommended in 1997 that while

"[a]ll patients with chronic hepatitis C are potential candidates for specific

therapy . . . given the current status of therapies for hepatitis C, treatment is

clearly recommended in only a selected group of patients.  In others,

treatment decisions are less clear and should be made on an individual basis

or in the context of clinical trials."  (Dr. Arrow Declaration, ¶9, ¶38) (citing

NIH Consensus Statement, available at http://consensus.nih.gov, a copy of

which is attached thereto as Exhibit H)).

86.    While the Department of Corrections did not have a state-wide treatment

plan ("Protocol") for Hepatitis C until 1999, inmates such as Clark were

provided with access to physicians who could, and did, prescribe the

aforementioned drugs for Hepatitis C treatment. (Dr. Arrow Declaration, p.9, ¶39).

87.    A "Protocol" is an algorithm to follow to treat a specific disease entity. (Dr. Arrow's Testimony in *Commonwealth v. Thomas Whiting*, Nos. 8501-0045, 8802-2140, Philadelphia County Court of Common Pleas, First Judicial District of Pennsylvania, Trial Division-Criminal Section, August 26, 2002, Hearing before the Honorable Joseph A Dysch, pp. 1-47 (a copy of the transcript is attached to the Supporting Documents, Vol. II, Exhibit 18); see generally *Commonwealth v. Thomas Whiting*, Nos. 8501-0045, 8802-2140, Philadelphia County Court of Common Pleas, First Judicial District of Pennsylvania, Trial Division-Criminal Section, Memorandum Opinion of the Honorable Joseph A Dysch dated December 26, 2002, pp. 1-4 (finding that the Department of Corrections was providing appropriate treatment for the inmate's Hepatitis C condition when compared to the community standards.)(a copy of the decision is attached to the Supporting Documents, Vol. II, Exhibit 19.)

88.    Secretary Horn, in the fall of 1999, established a task force to address the issue of Hepatitis C identification and treatment for the inmate population. (Dr. Beard Declaration, p.4,¶12).

89.    The Hepatitis C Task Force was comprised on members if a multi-disciplinary group that included staff from: (a) the Department's Bureau of Health Care; (b) various corrections institutions; (c) representatives of the psychology field; (d) representatives from the Department's contracted medical vendors (including Wexford Health Sources, inc.); (e) representatives from the Department of Health; (f) and representatives of the Department of Welfare.  .  (Dr. Beard Declaration, p.4,¶12).

90.    The members were charged with the responsibility of working as a team to identify all the issues involved in identification, education, treatment, and follow-up care of those inmates who tested positive for Hepatitis C.  .  (Dr. Beard Declaration, p.4,¶12).

91.    The Hepatitis C Task Force was also charged with the responsibility to insure that the care provided in treating Hepatitis C positive inmate was consistent with community standards.  (Dr. Beard Declaration, p.4,¶12).

92.    The Hepatitis C task Force has met since early 1999, and continues to meet to fulfill its obligations.  (Dr. Beard Declaration, p.4,¶12).

93.    A 1999 study of Hepatitis C in State Correctional Facilities, found that the Commonwealth of Pennsylvania was included with a substantial majority of states that did not routinely screen inmates for Hepatitis C; but was one of the few states in the U.S. that was developing a statement treatment Protocol

for managing treatment and costs associated with Hepatitis C.  (Dr. Arrow Declaration, p.9, ¶40 (citing Anne Spaulding, M.D., Hepatitis C in State Correctional Facilities, p.95, attached thereto as Exhibit I)).

94.     The Pennsylvania DOC is well within the community standards in managing the care of inmates infected with the Hepatitis C virus, and has developed a dynamic treatment protocol that is continually revised to keep pace with treatment advances and our growing understanding of the disease.  This Protocol, guides contracted vendor decision-making in determining the appropriate course of treatment for a specific inmate.  (Dr. Arrow Declaration, p.10, ¶41 (copies of the Department's Hepatitis C Protocols, dating back to December 1999, and including the current (Sixth Version) are attached thereto as Exhibit J)).

**Clark's Medical Condition:**

95.     In 1992, while Clark was incarcerated at SCI-Graterford, his blood-work indicated that his liver enzyme levels were high.  (Clark Deposition, p. 63).

96.     In 1995, when Clark was transferred to SCI-Rockview, Clark admits that liver profile blood work was provided and indicated that his liver enzyme profiles were normal at that time.  (Clark Deposition, p. 64).

97.    Sometime in 1998, Clark noticed that he was getting tired an exhausted more

easily and had a pain on his side, but does not recall notifying any of the

medical staff at SCI-Rockview.  (Clark Deposition, p.37).

98.    Plaintiff admits he met with Dr. Symons on November 13, 1998, December

28, 1998, January 13, 1999, and January 26, 1999, he did not mention any

problems of weight loss, fatigue, abdominal pains, or jaundice, but was

being treated for his psoriasis condition.  (Clark Deposition, p. 66).

99.    Plaintiff admits that he was seen again by Dr. Symons on March 5, 1999,

April 20, 1999, and May 6, 1999 for psoriasis, but is unsure if he mentioned

any problems of weight loss, fatigue, abdominal pain, or jaundice.  (Clark

Deposition, p. 67).

100.    On October 22, 1999, Clark was added to the SCI-Rockview Hepatitis C

clinic.  (Clark Deposition, p. 71).

101.    On October 13, 1999, Clark admits that he saw physician assistant Billie

Burk and requested an HIV test and to have his lover checked because he

had a history of IV drug use.  (Clark Deposition, p. 74; see also Clark

Deposition, pp. 38-39).

102.    On December 1, 1999, Clark was examined by a physician assistant at SCI-

Rockview.  (Clark Deposition, pp. 71-72).

103. Clark admits that he was not surprised when he was told that he had Hepatitis C because of his lifestyle, he felt lucky that he did not have anything else. (Clark Deposition, p. 40).

104. Defendant Dr. Symons met with Clark on November 10, 1999 and discussed the treatment options available for Hepatitis C. (Clark Deposition, pp. 40-41, pp. 68-71).

105. Clark disagreed with Dr. Symons decision not to treat him with the drug Interferon. (Clark Deposition, pp. 42-43).

106. Clark admits on February 17, 2000 he signed an informed consent with respect to being interested in wanting dual drug therapy treatment for his Hepatitis C. (Clark Deposition, p. 75).

107. Clark was given a liver profile test on February 22, 2000. (Clark Deposition, p. 76)

108. Clark admits that a psychiatrist, Dr. Burk, examined him on April 14, 2000, who indicated that there was nothing from a psychiatric point of view that he could not be treated with Interferon. (Clark Deposition, p. 76).

109. Clark was given another liver profile test on May 4, 2000, that indicated his liver enzyme levels were essentially unchanged from the previous test. (Clark Deposition, p. 77).

110.  In June of 2000, Clark was provided with special blood chemistry work to check for feto protein or tumor markers.  (Clark Deposition, p. 77).

111.  On July 13, 2000, Clark was provided with an ultrasound of his liver and spleen to determine the appropriateness of giving him Interferon and Ribaviron dual drug therapy.  (Clark Deposition, p. 77 ,78).

112.  On August 16, 2000, a blood test was provided to check Clark's viral load for Hepatitis C.  (Clark Deposition, p.78)

113.  Prior to Clark's dual therapy treatment in September 2000, his liver enzyme level viral load was 678,000.  (Clark Deposition, p. 78).

114.  The psychiatrist, Dr. Burk on September 15, 2000, again examined Clark, the same day he began his dual therapy treatment.  (Clark Deposition, p. 79).

115.  Dr. Dunee, a dermatologist for psoriasis and itching, examined Clark in October 2000.  (Clark Deposition, p. 79).

116.  While Clark was being treated with dual therapy for his Hepatitis C condition. He was provided with weekly or bi-weekly liver profiles.  (Clark Deposition, pp. 79-80).

117.  In December 2000, at Clark's request, his Interferon injection was changed to a nighttime injection.  (Clark Deposition, p. 80).

118.  In January 2001, Clark was provided with special chemistry blood work for the Alpha Feto protein.  (Clark Deposition, p. 80).

119. In February 2001, Clark's viral load was again tested with the result indicating a decrease in his viral load count to 267,000. (Clark Deposition, pp. 80-81).

120. Sometime in February or March 2001, Dr. Symons was no longer Clark's primary caregiver, rather Dr. Eidsvoog and Dr. Eggler were working with Clark, and at that time Clark's dual therapy was discontinued because it was considered a failure. (Clark Deposition, p. 82).

121. In July 2001, Dr. Symons approved Clark for an outside consultation for a liver biopsy; however that plan was not approved by Wexford. (Clark Deposition, p. 83).

122. Instead, Clark was provided with a genotype test that was conducted in August or September 2001. (Clark Deposition, p.85).

123. Between August of 2001 and August of 2002, Clark was provided with blood work to monitor his liver enzemye levels. (Clark Deposition, p. 85).

124. As of September 19, 2002, Clark does not have an expert witness to support his medical claims against the Defendants. (Clark Deposition, pp. 86-87).

125. Clark admits that on numerous occasions while incarcerated under the care, custody and control of the Department of Corrections, medical personnel examined him and nobody interfered with his ability to see doctors. (Clark Deposition, pp. 45-46, 54-55, pp. 85-86; accord Clark Deposition pp. 71-72