ORIGINAL
COPY

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WILLIAM CLARK, | : | NO.: 1:CV01-0764 |
| Plaintiff | : | |
| | : | (JUDGE CALDWELL) |
| v. | : | |
| | : | |
| MARTIN HORN, et al, | : | JURY TRIAL DEMANDED |
| Defendants | : | |

**FILED**
HARRISBURG, PA

FEB 2 4 2003

MARY E. D'ANDREA, CLERK
Per _____

### Plaintiff's Brief In Support Of Opposition To Wexford Defendants' Summary Judgment/Plaintiff's Summary Judgment.
Nunc Pro Tunc .

Now comes, the Plaintiff, William Clark, Pro Se, and hereby in support of "Motion For Summary Judgment" represents the Following:

### Statement of Case

### Identity Of Parties

Plaintiff, William Clark, Pro Se, is currently incarcerated at the State Correctional Facility at Rockview.

The Department Of Corrections employees named as Defendants are, Martin Horn, Robert Meyers, and Larry Lidgett, by and through their attorney, John J. Talaber, Assistant Counsel for the Department Of Corrections.

Additional Defendants, named Wexford Health Sources, Inc., and Wexford Medical Director, Dr. John Symons, by and through their attorney, James D. Young, Esq.

### Procedural History

Plaintiff, William Clark, Pro Se, initiated this Civil action § 1983, the Grievance arises out of conditions of "Confinement and Medical Treatment for Hepatitis C (HCV).

(1)

"Confinement and Medical Treatment for Hepatitis C (HCV). Plaintiff claims Violations of Eighth and Fourteenth Amendment Rights as well as pendent State Claims of Negligence and Medical Malpractice.

## Questions Presented

A. Standard Of Review.

B. Opposition To Wexford's Summary Judgment

C. Whether Plaintiff is entitled to Summary Judgment as a Matter Of Law, Due to Defendants Wexford's Failure to Administer and have in effect the Proper means necessary to efficaciously treat and provide appropriate care consistent with methods and procedures available to the general community.

D. Whether Plaintiff is entitled to Summary Judgment as a Matter Of Law, according to record, Material Facts, as well as Other Claims set forth of Record in evidence to establish "Deliberate Indifference" to Plaintiff's serious Medical Needs.

## Argument

A. Standard Of Review.

1. Federal Rule Of Civil Procedure 56(c) states the procedure for granting Summary Judgment and in pertinent part: [T]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

2. In considering a Motion For Summary Judgment, the Court must view the facts and all inference to be drawn therefrom in the light most favoravable to the non - moving party. 60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (1987).

(2)

3.     A Court should dismiss a claim pursuant to Rule 12(b)(6) for failure to state a cause of action only if it appears certain that no relief could be granted under any set of facts which could be proved. <u>Hison v. King & Spalding</u>, 104 S.CT. 2229 (1984).  <u>Schrob   v. Catterson</u>,   948   F.2d   1402,   1405 (3rd. Cir. 1991).

4.     Moreover, a Pro Se Complaint must be liberally construed and held to less stringent standard than formal pleadings. <u>Estelle v. Gamble</u>, 97 S.CT. 285 (1976).

5.     Plaintiff avers, the Material Facts presented, Claims set forth in this instant complaint, as well as unresolved discovery and Plaintiff's "lack of Expert Medical Witnesses" due to His lack of Counsel, disadvantages Him and is placed in a "prejudiced" position.  These aforementioned deficiencies if remedied, might very well effect the outcome of this suit. <u>Anderson v. Liberty Lobby Inc.</u>, 106 S.CT. 2505 (1986).

6.      Plaintiff avers, He has exhausted available Administrative Remedies, the inmate handbook is not comprehensive, the inmate grievance form at no place suggests that by law "one" must claim monetary damages in order to prevail or exhaust remedies.

7.     The terminology of "May" as opposed to "shall" in Federal Law pertaining to "Mandatory Language," "SHALL" represents a mandatory obligation. (Refer to Index of Exhibits, GRIEVANCE POLICY)

8.     Plaintiff claims that upon the initial filing of the inmate grievance, "Medical Attention" was the reason for filing and subsequently was compelled to file § 1983 in order to secure his Constitutional Rights as well as Remedy and Relief.

9.     Plaintiff avers, an "inmate grievance" cannot procure monetary damages and Wexford Defendants "beg" for Summary Judgment with their claim of "Failure To Exhaust."

10.    Plaintiff avers, "Wexford Health Sources, Inc.," is not "Department Of Corrections" <u>but</u> a "Private Health Source" contracted by DOC and Plaintiff "need not file a grievance" in

(3)

order to bring suit against Wexford.

11.    Plaintiff avers, if in fact this claim were subject to prevail, then the Ex Post Facto Clause or "Doctrine" thereof should exclude such implementation of claim, in that: The actions that are proceeding, are activated and triggered by the "execution and incarceration" of and relating to Plaintiff's Underlying Offense, and any new "burdens or obligations" which were not in effect previously, and which disadvantage or cause detriment to the underlying offense" are <u>forbidden</u> by the Ex Post Facto Clause.

## Deliberate Indifference To A Serious Medical Need

12.    The Center For Disease Control sets the parameters and procedures for the methods to proceed in the arresting of the HCV Disease.(Exh.'s A,F)

13.    Until recently the Wexford Defendants/Corrections Defendants' Did Not treat "HCV" but only screened for the disease. This is "DOC Statement" or the consensus as presented by statements in the article presented.    (see Exhibit #<u>C,G,I</u>)

14.    This previous statement in "itself" is shocking to say the least.

15.    Recently the attitude and policy has changed towards "Treatment" by Defendants in light of the HCV epidemic among incarcerated prisoners. ( See Exh.'s D, J, G )

16.    Plaintiff avers, "this change," does not change the treatment Plaintiff Was Afforded, nor the "Deliberate Indifference " He was subjected to in "the facts" that: Proper Medical Treatment available to society in general and the community at large, was not afforded Plaintiff, nor administered at the "importune, proper and opportune time."

17.    Plaintiff was set aside maliciously and denied and delayed proper medical treatment which was designated by the Center For Disease Control and was available.(Exh.'s D,H,K,O,also see Index of Exhibits - Treatment Delay + Cost)

(4)

18.    Plaintiff makes these claims in  good  faith, and in averment, Counsel as well as Expert Medical Witnesses are necessary to present and affirm such claims as numerous complex issues, and information have not been represented and must still be marshalled in order to proceed for Trial.

19.    The very lack of any Medical Expert Investigation and Witnesses, or testimony to rebut and or affirm in "offensive or defensive averment, whereby with "such help" effectively proceed or withstand "Summary Judgment" against Defendants: "Evince severe disadvantage," lacking Plaintiff's ability to represent and effectively accomplish "summary judgment's marshalling of facts nad pertinent processes" which can only sustain that: Plaintiff has not received and been granted proper treatment and "remains on biased ground and "one in a position of being prejudiced."

20.    Plaintiff has not been granted proper "Discovery" and Defendants' evasive and nullifying stratagem of "discovery" and processes of litigation as well as exclusive control over Plaintiff and items shielded, evince the Court's Sound Reasoning should, that if: Material Facts sustain in the least, Plaintiff should be granted Summary Judgment in His favor, or otherwise, "Trial By Jury" should be set to proceed and Plaintiff granted Counsel in the interest of the fair administration of justice.

21.    Summary Judgment "granted to Defendants" would be prejudicial without the aforementioned secured and available for Plaintiff to present such claims.

22.    Plaintiff's need of Expert Medical Witnesses are not only to serve the purpose of affirming His claims, but to expose the insufficiency of treatment "made available to Plaintiff", as opposed to that which was available "Medically" in the Community at large, as well as the availability throughout "the inadequate treatment Plaintiff received":  Which Defendants "claim to be adequate."(See EXH.'s D,H,K,L)

23.    Plaintiff needs "such voice" as well as this Honorable

Court: "A SECOND OPINION."

24.     The HCV epidemic now "full blown" within the Pennsylvania
Prison System, evinces the inadequacy of "preventative measures"
as well as "proper measures" of treatment, exhibiting the "want
and lack" in proper care, and "that which was supplied" on
Defendants' Part:   Thus exhibiting "Deliberate Indifference" to
the needs and care of Plaintiff. (See Index of Exh.'s - DELIBERATE
Indifference)
25.       Wexford Defendants cannot escape "Responsibility" and
place it upon someone else, in that they have had a part in the
entire process.
26.       Wexford Defendants have a duty and obligation to the
Medical Profession and the Hippocratic Oath.

27.       Plaintiff originally filed to remedy what had been
Respondents Deliberate Indifference, and although defendants
have questionably "changed" their policy, They cannot change the
Material   Facts   and   the   "prior   treatment"   inadequately
administered and provided to Plaintiff's serious medical needs.
28.       The reasons of initiation of the grievance was due to
Defendants'  disregard  for  proper  care  of  Plaintiff,  William
Clark's health, prior to the change  and implementing of some
offer to respond to His suffering.

29.       Johnson v. Bushy, 953 F.2d 349 (8th Cir. 1991).  The
District Court properly instructed the jury that serious medical
needs are... "One that has been diagnosed by a physician  as
requiring treatment..."
30.     To date, a Liver Biopsy which was untimely submitted Two
(2) Times as diagnosis and proper procedure  to evaluate and
treat Plaintiff, has not been accomplished and the underlying
reason Plaintiff avers is:  Monetary Reasoning. (See Exh.'s B2, B11 E, F,
31.     With "medical treatment available" Index of Exh.'s - BIOPSY; BIOPSY, REFUSAL OF)
lack of any treatment supplied" prior to the implementing of a
"protocol and treatment" of prisoners, Plaintiff avers money was
associated with the delay and lack thereof. (See Exh.'s G, N)

(6)

32.    The "changed" policy and new "policy pronouncements" as a result of the epidemic, have turned to a "reasoning to treat now because of "money."(See EXH.'s G,N)

33.    Defendants' "Wexford and Corrections" were aware of the problem or should have been aware of the problem through "testing" and means at their dispoasal and it is Their "Sole" responsibility to provide medical attention  towards those in their care and who are "restrained" with serious medical needs.

34.    In both cases they are responsible and without excuse in that, "delaying and denying care" for whatever reason, "money or otherwise" their  disregard  exhibits  deliberate  indifference towards the interests of Plaintiff as well as Society.(See Index of EXH.'s - DELIBERATE INDIFFERENCE)

35.    Plaintiff needs Expert Medical  Witnesses as well as Counsel to present issues, one being a "time frame" of proper care to be supplied to a patient diagnosed with HCV.

36.    Defendants' "Time Frame" of implementation as well as procedures are an example of disregard towards treatment of a known "serious medical need" and the dates are outlined in Defendants' Statement Of Undisputed Material Facts.

37.    According to Source, DOC spends $11,594 per inmate for a Forty - eight (48) week treatment concerning HCV.(See EXH. G)

38.    Delaying treatments that were available and known to be designated treatments, treatments being used and administered in the  community "in light of a diagnosed and serious medical condition", could only be "considered to have been decided" with deliberate  indifference to the medical  needs  and  care  of Plaintiff.  Johnson (See Index of EXH.'s - DELIBERATE INDIFFERENCE)

39.    Plaintiff avers, if medical protocol and treatments were implemented and directed by the Center For Disease Control and were properly being administered to the community at  large: Then Treatment was "ready and available" for prisoners at that time, as they are citizens and a protocol should have been implemented and proper treatment provided. The absence of such was a severe disadvantage, was malicious, and "deliberately

(7)

indifferent" to the <u>needs</u> and <u>treatment</u> of <u>Plaintiff</u>. (See Index of EXH.'s - NO PROTOCOL - DELIBERATE INDIFFERENCE - BIOPSY, REFUSAL OF)

40.    One major "road block" that could possibly have stopped the concern for the health and welfare of Plaintiff and Society, must have been:  The appropriation of funds. (See EXH.'s G, N)

41.    Plaintiff outlined the need for "discovery" of Drafts, prior drafts of protocol etc. in His "Motions for/and to Compel Discovery" wherein these would show the "Candid" evaluations and over all analysis towards the actual implementing of "such protocol," as well as the "reasons for delay" of the "**implementation of treatment.**"

42.    Wexford Defendants as well as Corrections Defendants were both involved and responsible, **"To and For"** the active implementation of "a protocol for medical treatment of HCV."

43.    Wesford Defendants are a "Health Source" and an Administrator of "Health Services." They have claimed "Executive Privilege" and commissioned by Corrections Defendants, they are responsible to the Inmates welfare as well as societies welfare as a "health Source in Their Administration of 'Health Services'."

44.    <u>Association For Reduction Of Violence v. Hall</u>, 743 F.2d 63 (1984). Previously in Plaintiff's "Motions to Compel

45.    There is no purpose to implement "Executive Document Privilege", the scope of a "privilege" is limited by its underlying purpose and should not be applied when that purpose would not be served. <u>Roviaro v. U.S.</u>, 77 S.CT. 623 (1957).

46.    Certain documents and "drafts", candidly or not will show many things essential to Plaintiff's claims that have been presented, inferred, and were in the process of being perfected. Most importantly: **"Cost Analysis."**

47.    Presented is Exhibit # <u>G, N</u>, and what can be derived from this article by laymen and one suffering from such a condition is:  **Money** is an ultimate variable in relation to "Treatment", and what "Policy" would be adopted. Money consideration

(8)

certainly effected "Policy Consideration" concerning "treatment of HCV."

48.     Plaintiff must be allowed opportunity to "show" and present His claims properly. This "Article" sheds light upon the surrounding considerations affecting the institution and adoption of the "then drafts", prior drafts, and all phases concerning the implementation of "said treatment for HCV."

49.     Plaintiff has no doubt Defendants would like to keep candid as well as "drafts and cost analysis" and other mechanics used to "decide and implement protocol for treatment" from the eyes of the Court, and any knowledge or discussion of Money as a "privileged source." (See EXH.'s G,N)

50.     Money held off or saved is a "premium", and holding off protocol and implementation of a comprehensive treatment for a day, a month, or a year or longer, "Amounts To Millions Of Dollars In The Coffer."

51.     Plaintiff has stated what the expectation of "Society" is concerning the diagnosis and treatment of HCV and that Plaintiff is not to be provided with any less efficacious or otherwise treatment as if He were worthless and to be treated of less value as a Human Being.


52.     <u>Johnson v. Lockhart</u>, 941 F.2d 705 (8th Cir.). At 707, "Abdication of policy - making and oversight responsibilities can reach the level of deliberate indifference and result in the unnecessary and wanton infliction of pain to the prisoners when tacit authorization of subordinates misconduct causes constitutional injury."


53.     Plaintiff avers:

    1. Defendants were in a position to deprive Plaintiff of proper medical treatment.

    2. Plaintiff was diagnosed and had a serious medical condition. (EXH. M)

    3. Treatment was necessary and needed.

    4. Defendants prevented Plaintiff from receiving the

(9)

needed and recommended medical treatment.

5.    Defendants failed to implement a "protocol for treatment" when a **known serious disease** was present.

6.    Defendants failed "to act and attempt to treat" Plaintiff despite knowledge of a serious illness and a substantial risk of serious harm.

7.    Defendants' systematic Failure to provide a "Constitutionally adequate level" of medical care reflects Deliberate Indifference to Plaintiff's serious medical needs.

8.    Defendants' "actions and inactions" are contrary to "contemporary standards of decency" within the Medical Community or otherwise.

9.    Defendants "in Their 'failure and delay' to treat Plaintiff": Exhibit a reckless and conscious disregard of risk for Plaintiff's health in regards to His HCV disease.

54.    Administrative remedies through Department of Corrections Grievance Process "support denial and refusal of Plaintiff's request for treatment as well as other claims set forth herein.

55.    Plaintiff avers, this being a part of the claims (See EXH.'s B1,B2) of this instant grievance, "preventative care" as well as care for sickness, is a Duty of the Defendants and a Right of the Plaintiff. This should be considered a genuine issue which very well might affect the outcome of this litigation.

56.    Although "Money" may be one reasoning, Plaintiff would shutter to think of other reasoning not to grant treatment to someone ill and suffering with a life threatening disease, however that is the issue before this Court to decide.

57.    Defendants were "Deliberately Indifferent" to Plaintiff's medical needs, He suffers, has suffered and continues to suffer as a result of Defendants' actions and inactions concerning His health, whereby: Plaintiff's Constitutional Rights as well as His immediate medical needs have not been sufficiently and efficaciously been supplied, administered, nor met and

(10)

accomplished.

58.    Plaintiff's claims set forth and the material facts, one being that Defendants' have failed, even to date to "order" a Liver Biopsy, and in the application of proper preventative care and investigation:  Are claims at the core of this suit. (See EXH.'s E,F,K,M,N, INDEX OF EXH.'s - BIOPSY, REFUSAL OF)

59.    Harris v. Thigpen, 941 F.2d 1495 (11th Cir. 1991).  At 1505, "In institutional level challenges to prison health care such as this one, systemic deficiencies can provide the basis for a finding of deliberate indifference...Deliberate indifference to inmates health needs may be shown, for example, by providing that there are "such systemic" and gross deficiencies in staffing, facilities, equipment, or procedures that the inmate population is effectively denied access to adequate medical care." (emphasis added)

60.    Inadequate care and procedure is the essence of Plaintiff's claims.

61.    The very nature of portions of Plaintiff's claims wherein, between October 1999 and Present Date, "verbal and written requests for treatment were refused."

62.    Plaintiff's claims substantiate reason for Summary Judgment to be "denied to Defendants" and "Reason For Summary Judgment" be Granted to Plaintiff.

63.    Smith v. Jenkins, 919 F.2d 90 (8th Cir. 1990).  "The deliberate indifference standard can be met by showing, "grossly incompetent or inadequate care."  A doctor's decision to take an easier or less efficacious course of treatment, or medical care so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care."  At 93.(See EXH.'s E,J,K,L,M)

64.    Plaintiff in this case was entitled to prove His case by establishing that Defendants' "course of treatment, or lack thereof, so deviated from professional standards that it amounted to deliberate indifference. (See EXH.'s, Index of - DELIBERATE INDIFFERENCE)

65.     _Degido v. Pung_, 920 F.2d 525 (8th Cir. 1990). "A separate finding of deliberate indifference does not require a showing of intent; it is sufficient to show that Defendants have **disregarded a known or obvious risk** that is very likely to result in the violation of prisoners constitutional rights...A consistent pattern of reckless or negligent conduct is sufficient to establish deliberate indifference to serious medical needs." (emphasis added)

66.     The Districts Court's findings of deliberate indifference was supported by evidence that the prison "lacked adequate organization and control in the administration of Health Services" until hiring a Medical Director with Public Health Training in 1986. There was no written protocol concerning TB testing and control. Defendants' ignorance and lack of Administrative Guidance "caused delayed diagnosis of cases to be discovered." Neglect in the treatment of several individual cases is described, along with the inadequate methods of investigation and treatment of the TB disease.

67.     Plaintiff avers, this case is parallel and His claims are within the "Scope of _Degido_."

68.     The very lack of Protocol For Treatment, any treatment administered prior, and the delay in activating or offering any treatment to the suffering illness: Shows Systemic Deficiencies and "Deliberate Indifference" towards the needs of Plaintiff and those suffering from the disease.

69.     Administrative remedies through Department of Corrections Grievance Process "support" denial and refusal of Plaintiff's request for treatment.

70.     Plaintiff avers, the absurd mention of a technical claim by Defendants concerning "claiming money damages" in the grievance process in "order to prevail", would not have changed the outcome of the Deliberate Indifference asserted by the Defendants.

71.     The Ex Post Facto Clause Provisions safeguard a wide

(12)

margin of disadvantages concerning the "mechanics" of punishment
and the disadvantages "forbidden" in Violation Of Constitutional
Rights.

72.    <u>Rodriquez v. United States Parole Comm'n</u>, 579 F.2d 170,
176 (7th Cir. 1979).    "Refused to permit the retrospective
application of new or amended administrative rules."

73.    <u>Akins v. Snow</u>, 922 F.2d 1558 (11th Cir 1991).    Rules and
Regulations have the force and effect of law."

74.    Defendants assert the "Word" may has a force and effect
of law to mandatorily compell Plaintiff to in fact claim
monetary damages from the initial grievance when that was not
presented for Him to "mandatorily comply" in order to prevail.

75.    Plaintiff avers, these reasoning is erroneous and cannot
be applied to Plaintiff to disadvantage Him in this present
litigation.(See Index of EXH.'s - GRIEVANCES, POLICY OF)

76.    Plaintiff avers, if in fact this word "may" is used to
legally compel and attempt to "nullify" this present litigation
which is a direct result and attached to His underlying offense,
then:    It must be a disadvantage and the Court must consider it
"in light" of the Ex Post Facto Clause Provisions.

77.    <u>Landgraf v. USI Film Products</u>, 114 S.CT. 1403 (1994).    At
1499, "Every statute, which takes or impairs vested rights
acquired under existing laws. or creates a new obligation,
imposes a new duty, or attaches a new disability, in respect to
transactions or considerations already past, must be deemed
retrospective." Citing <u>Calder v. Bull</u>, 3 U.S. (Dall) 386, 390
(1798).

78.    These provisions hold equally true to the implementation
of Administrative Rules which add detriment and disadvantage to
Plaintiff's underlying sentence.

79.    This attempt on Defendants' part to "technically
disqualify" and prejudice Him, thereby severely disadvantaging
Plaintiff, must be "considered retrospective" as well as an
Administrative "disqualification" forbidden by the Ex Post Facto
Clause.

(13)

80.    Plaintiff avers, there are numerous incidents and situations wherein: Defendants have used less "efficacious" methods and or have continuously not had on hand that which was necessary to be administered on a daily basis or as directed by a physician. (See Exhibits, Index of - DELIBERATE INDIFFERENCE)

81.    Defendants have been Deliberately Indifferent in that they have at the onset, ignored a condition, subsequently "ignored Their own Medical Doctor's instructions" that a "BIOPSY" was the preferred method of investigation and analysis concerning Plaintiff's "treatment and sound procedure."

82.    Plaintiff avers, these incidents and overall disregard for the HCV disease, should nullify "Wexford Health Source, Inc.'s": Statement of Material Facts.

83.    Defendants' "material facts" are based upon a slanted perspective which is exposed by what is brought to the "fore front" in the most recent announcements and policy pronouncements concerning Hepatitis C and the "full blown" epidemic which the Department of Corrections is compelled to face and finally address. See Exhibit Attached to "Material Facts."

84.    Defendants actions and inactions have posed a serious and unreasonable risk to Plaintiff's health as presented herein this continuing litigation.

85.    All claims including "Material Facts" should be considered as fully set forth in this instant Grievance.

86.    Helling v. McKinney, 113 S.CT. 2475, at 2480. "It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the 8th Amendment."

87.    The Amendments Protection would be available even though the effects might not be manifested for sometime.

88.    Wexford Defendants would present that because on one particular day Plaintiff did not express certain symptoms that

(14)

they are any less present and they are excluded from responsibility.

89.    As affirmed by Wexford Defendants, "Plaintiff is not a Doctor," Wexford Defendants are the "Health Source" and are responsible to the well being and processing of tests as well as the "interest" in properly "pursuing" what those tests indicate Plaintiff's condition is, will develop to, and the seriousness of that condition.

90.    Wexford Defendants are responsible for testing, Blood Work, and follow up testing in a condition such as HCV.

91.    HCV is a serious condition to a persons health and the parameters of treatment have been established in the Medical Community.

92.    Defendants cannot hold to the "Statement" that there are no evident effects, when certain conditions have materialized and others may yet manifest and be found.

93.    This may very well be yet another reason to "delay and deny" a biopsy.

94.    "Biopsy" has been an established sound procedure of investigation and in the diagnosis and treatment, and or "to show how and whether to treat the disease in a certain fashion, method, procedure, or whether not to treat.

95.    Previously improper or less efficacious methods were used in the diagnosis and treating of Plaintiff's condition.(See EXH.'s E,K,M,N)

96.    In the least, "less efficacious methods of discovery have been used, or methods that will not or cannot produce a desired investigation or effect.

97.    Plaintiff reaffirms His need of Counsel and Expert Medical Witnesses, but also avers, that the "Material Facts" are sufficiently substantial on His behalf to Have Summary Judgment "Granted" in His favor.

98.    Plaintiff avers, in the least, more than enough Merit is

(15)

exhibited to "Defeat" Defendants' "Motion For Summary Judgment" and warrant Plaintiff's request for Counsel and that this Honorable Court "Order" this instant matter proceed to Jury Trial.

99.    Plaintiff's "Petition For Appointment Of Counsel" as well as "Material Facts and This Instant Brief In Support Of Opposition To Summary Judgment/Plaintiff's Summary Judgment" presents merit to be decided in Plaintiff's Favor.

### CONCLUSION

100.    Wherefore, the reasons set forth herein and Plaintiff's "Statement Of Material Facts," Plaintiff respectfully requests this Honorable Court Grant Plaintiff's "Motion In Opposition To Wexford Defendants' Summary Judgment/And Plaintiff's Summary Judgment, Nunc Pro Tunc."

Date Mailed: _FEB. 24, 2003_

Respectfully Submitted,

_William Clark_

William Clark, Pro Se
AY-5585
Box A
Bellefonte, Pa. 16823

(16)

## CERTIFICATE OF SERVICE

Plaintiff, William Clark, Pro Se, hereby certifies that the "Captioned" matter, "Plaintiff's Motion In Opposition To Wexford Defendants' Summary Judgment/And Plaintiff's Summary Judgment", And "Brief in Support Thereof", was served upon the persons listed below, by first - class mail, postage prepaid, addressed as follows:

John J. Talaber, Esq.
Pennsylvania Department Of Corrections
55 Utley Drive
Camp Hill, Pa. 17011

James D. Young, Esq.
225 Market Street, Suite 304
P.O. Box 1245
Harrisburg, Pa. 17108-1245

Date mailed: _FEB. 24, 2003_

William Clark, Pro Se

ORIGINAL
COPY

# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM CLARK,               :    NO.: 1:CV01-0764
      Plaintiff        :

                :    (JUDGE CALDWELL)
     v.                   :

                :
MARTIN HORN, et al,          :    JURY TRIAL DEMANDED
      Defendants        :

## Plaintiff's Statements Of Material Facts

        And now, comes Plaintiff, William Clark, Pro Se, and represents this Statement Of Material Facts and avers the following:

1.    Plaintiff William Clark is currently incarcerated at the State Correctional Facility at Rockview.

2.    In October of 1999, after two (2) months of feeling listless and constant fatigue, a request was placed to the medical department requesting HIV and Hepatitis C testing. (See Exh.'s D,H,J, M)

3.    Later in October, Plaintiff was called to the medical department to see staff and was told that the tests were "negative" for HIV, <u>but</u> that the tests were probable for Hepatitis C and more tests would be conducted.(See Exh.'s H,M)

4.    Subsequently Plaintiff was called and informed that He in fact "had Hepatitis A and B, but had fought them off, <u>but</u> was positive tested as having Hepatitis C.

5.    Plaintiff was also told at this time it was very likely He had Hepatitis C as early as 1992, as the enzymes level "was high at that time." (See Exb. M, LAB RESULTS; Index of Exh.'s - EARLY SCREENING)

6.    Subsequently Plaintiff was told a scheduling to see Dr. Symons would transpire in the future.

7.    In November of 1999, Plaintiff was scheduled to see Dr. Symons on an unrelated matter concerning "Psoriasis."

(1)

8.    Dr. Symons at that time noted "Blood Results" and gave Plaintiff some information on Hepatitis C.

9.    Subsequent to November 1999, Plaintiff has found that "psoriasis" is correlated to HCV. (EXH.'s F, F1)

10.    In December of 1999, Plaintiff was called to medical department to have a Hepatitis C Awareness Consult. Plaintiff asked for "Follow Up" blood test and was told that the next test would be in April of 2000, Six (6) months from the first test. Also at this time was informed that they would check "iron and viral loads" and it would "probably be <u>May of 2000</u> before there would be a decision of <u>who</u> would be eligible for treatment. (See EXH.'s D, E, F, H, K, L, N, O, S, J, A, M, Y, *3)

11.    Plaintiff subsequent to this information filed inmate grievance on December 1, 1999, (see DC-804-ROC-0706-99 Court Record) which started the process leading to this grievance of this present day. (EXH. B1)

12.    Plaintiff avers, that statement of material facts are numerous in that they have been on "an ongoing process" from day to day in the disregard of proper medical attention.

13.    On August 10, 2001, Plaintiff filed an "Official Inmate Grievance" (see DC-804-ROC-0641-01 Court Record), wherein "Liver Biopsy", was "Ordered and requested" by Dr. Symons and was <u>Denied</u>, with no alternative nor reason given.

14.    Approximately three (3) days later, Dr. Symons "Appealed" this decision and it was "again Denied."

15.    An alternate plan of "genotype" was authorized in place of "negating the direction" of the physician treating and having direct observation and contact with Plaintiff. (See Index of EXH.'s - GENOTYPING)

16.    "Genotype" is not an efficacious method of procedure to determine the extent of damage to the "liver."

17.    Plaintiff avers, "Neither Biopsy nor Genotype" were considered nor used as an investigative procedure concerning the condition of Plaintiff and regards to the liver and it's condition and or damage before "initial treatments began."

18.    See grievance August 10, 2001, continued statements of material facts surrounding the treatment of, or lack thereof

(2)

proper treatment concerning Plaintiff.(See EXH. B2)

19.     Department Of Corrections and Wexford Health Sources Inc., did not implement a Protocol for Hepatitis C "identification and treatment" until January of 2000.

20.     As stated in Wexford Defendants "Material Facts" January 2, 2003, Page 13, in the fall of "1998" the Department of Corrections established a task force to address the issue of Hepatitis C identification and treatment for the inmate population. Therein listing all involved with the responsibility towards the Hepatitis C problem.

21.     Plaintiff did not receive any treatment concerning Hepatitis C until September 15, 2000, almost One (1) year from the date of the actual verified "Positive Result" for the Hepatitis C.

22.     When Plaintiff was sick and complained of His condition and was found to be suffering from Hepatitis C, there was NO "implemented protocol nor treatment for Hepatitis C", wherein He being restrained from obtaining proper treatment Himself, the community at large had the proper treatment and procedures were already verified.

23.     Plaintiff avers:

    1.  Defendants were in a position to deprive Plaintiff of proper medical treatment.

    2.  Plaintiff had a serious medical condition.

    3.  Treatment was necessary and needed.

    4.  Defendants prevented Plaintiff from receiving the needed and recommended medical treatment.

    5.  Defendants failed to act and attempt to treat Plaintiff despite knowledge of a serious illness and a substantial risk of serious harm.

    6.  Defendants' systematic Failure to provide a Constitutionally "adequate level" of medical care reflects Deliberate Indifference to Plaintiff's serious medical needs.

    7.  Defendants' "actions or inactions" are contrary to "contemporary standards of decency" within the Medical Community or otherwise.

(3)

8.    Defendants "in Their failure and delay to treat Plaintiff:    Exhibit a reckless and concious disregard of risk to Plaintiff's health in regards to His HCV disease.

24.    Proper treatment and procedure was designated and verified and approved by the Center For Disease Control.

25.    According to the American College Of Physicians (ACP), the American Correctional Health Services Association (ACHSA), and the National Commission On Correctional Health Care (NCCHC), in their article, "the crisis in correctional health care, the group asserts that people in prison and jails "must" receive health care that meets the currently accepted standard of care in the community and adequate resources must be "dedicated" to providing that care. No less can be tolerated, Ethically or Legally."

26.    More than a year previous to Plaintiff experiencing the adverse effects of the HCV disease, Correction Defendants' as well as Wexford Defendants', were aware and had knowledge of the HCV Problem.

27.    Although other claims relate to the dismissal of knowledge or lack or indifference to Plaintiff's prior "Blood Work", once diagnosed Plaintiff received no proper treatment or efficacious treatment to bring His HCV in check until September 15, 2000.

28.    Plaintiff is not an attorney, and has not had the opportunity to have Counsel "marshall facts and expert medical testimony and witnesses to lay a foundation of the most basic means.

29.    Plaintiff is not a medical doctor and has limited access to being able to procure and contact outside sources to help investigate and marshall pertinent information, documents, discovery and presentation of what is necessary in such a complex case.

30.    Plaintiff is severely disadvantaged and prejudiced in His availability of pertinent materials and processes which form the basic necessity to present this litigation properly.

31.    Plaintiff has plead, or in - artfully plead to the best

(4)

of His ability in light of the disadvantage and position wherein, the issues and mechanics of this litigation and its complexity, lacks the fundamental needs of outside sources, namely Expert Medical Witnesses and Counsel necessary to proceed properly.

32.    Defendants have been "Deliberately Indifferent" in that among other actions or inactions, in ignoring a condition, subsequently ignored "Their" own Medical Doctor's "instruction that BIOPSY was the preferred method of investigation and analysis concerning Plaintiff's treatment and sound procedure, even if untimely at that point."(See EXH.'s E, K, M, N, Y)

33.    Plaintiff avers, there are numerous incidents and situations wherein:  Defendants have used "less efficacious" methods and or have continuously not had on hand that which was necessary to be administered on a daily basis or as directed by a physician.  (see attached exhibits D, E, F, H, K, L, M, N, O)

34.    Plaintiff avers, in claims set forth herein this instant grievance as well as between October 1999 and present date, "verbal and written" requests as well as complaints have been made concerning His fatigue and other symptoms of the HCV disease.  Just because on any particular day someone does not voice a certain symptom does not make the disease any less serious and life threatening.(See Index of EXH.'s-WHAT IS HEPATITIS C)

35.    To date, a "Liver Biopsy" which was untimely submitted Two (2) Times as a diagnosis and proper procedure to evaluate and treat Plaintiff, had not been accomplished and the underlying reason Plaintiff avers, is and has been:  Monetary Reasoning.(See EXH.'s E, K, M, N)

36.    According to Source, Department Of Corrections spends $11,594 per inmate for a 48 - week treatment for HCV.(See EXH.'s G, N)

37.    Plaintiff avers, the initial grievance was filed properly and was exhaused of remedies otherwise He would not have been allowed to proceed in this present litigation.

38.    Plaintiff avers, "mandatory" language in "Statute"(EXH.B1) or otherwise is designated by the word "Shall."

39.    Plaintiff avers, He is disadvantaged and is in "need of

(5)

Counsel and Expert Medical Witnesses" to proceed and perfect this instant matter, whereby they will process information and secure evaluations of pertinent documents among other processes, as well as give a "second opinion" in the Medical Field.

40.     Plaintiff avers, Defendants were and have been "deliberately Indifferent" of His needs. Plaintiff suffers, has suffered, and continues to suffer as a result, of Defendants actions and inactions concerning His health, Whereby:  His Constitutional Rights as well as His immediate medical needs have not sufficiently and efficaciously been supplied, administered, nor met and accomplished.


Date Mailed: _FEB. 24, 2003_          Respectfully Submitted,

                                      _William Clark_
                                      William Clark, Pro Se
                                      AY-5585
                                      Box A
                                      Bellefonte, Pa.  16823


(6)

## CERTIFICATE OF SERVICE

Plaintiff, William Clark, Pro Se, hereby certifies that the "Captioned" matter, "Plaintiff's Statements Of Material Facts", was served upon the persons listed below, by first - class mail, postage prepaid, addressed as follows:

John J. Talaber, Esq.
Pennsylvania Department Of Corrections
55 Utley Drive
Camp Hill, Pa. 17011

James D. Young, Esq.
225 Market Street, Suite 304
P.O. Box 1245
Harrisburg, Pa. 17108-1245

Date mailed: FEB. 24, 2003

William Clark, Pro Se

## INDEX & SYNOPSIS OF EXHIBITS

### HEPATITIS C VIRUS (HCV) and:

- ADVERSE REACTION TO TREATMENT:(EXH.'s A,J,L+ PG. 3, this Index)

- ALPHA-FETOPROTEIN (AFP): described in a Medical Diagnosis Book
  found at Rockview's prison library as:

  AFP in adults- AFP is produced in certain abnormal tissues.
  Levels are commonly raised in patients with hepatoma (liver can-
  cer) and in those with malignant teratoma of the testes. Some
  patients with cancer....Because it is present in abnormal Quan-
  tities in some cancers, AFP is known as a "tumor marker". How-
  ever, AFP levels are also raised in some benign conditions, in-
  cluding viral & alcoholic hepatitis, and in cirrhosis, (see
  EXH.'s J,M,R)

- BIOPSY, LIVER - ABSOLUTE REQUIREMENT: Used to diagnose the cause
  of chronic liver disease that results in elevated liver tests or an
  enlarged liver....used to confirm the diagnosis, as well as deter-
  mine the amount of damage to the liver. Primary risk of: bleeding
  from site of needle entry,....occurs in less than 1% of patients...
  ...Are quite accurate....SOURCE: National Digestive Information
  Clearinghouse - "Diagnostic Tests For Liver Disease", October,
  1999. (See EXH.'s A,E,F,M,N,R,Y)

- BIOPSY, LIVER, DEFENDANTS REFUSAL OF: (See EXH.'s $B_1$,$B_2$,K,M,J)
  Plaintiff told on numerous occasions that the "risks" involved
  with biopsy outweighed any other consideration by Drs. Eggler,
  Eidsvoog and Symons. When Dr. Symons changed his mind and order-
  ed a biopsy on July 10, 2001, it was denied by a Review Comm-
  ittee, (at least partially made up of both D.O.C. and Wexford
  defendants).

- DELIBERATE INDIFFERENCE By Defendants To Plaintiffs Serious Medical
  Needs: (See EXH.'s A,$B_1$,N,$B_2$,C,D,F,H,J,K,L,M,O,P,Y,#3): As a result
  of Defendants indifference, carelessness, questionable medical de-
  cisions, lack of follow-up to lab results, etc., Plaintiff has no way
  of knowing if he has transmitted HCV to sex partners, most notably,
  his ex-wife; unknowingly put others at risk to his serious chronic
  condition, especially considering the fact plaintiff had been test-

(1)

ed for HIV, but ⬛ educated about HCV,(see ⬛.'s F,pg. 10 & P);
the lack of follow-up tests pertain to Liver Function Tests (LFT);
elevated liver enzymes, complete blood counts(CBC); and "auto-
immune related" lab results, which basically "KEPT PLAINTIFF IN
THE DARK" on three (3) separate occasions (releases from prison
in 1992,1995,1996) and up until October, 1999, when plaintiff re-
quested HCV and HIV testing. He had "no clue" as to the dangerous
virus he carried, resulting in not being able to "warn" loved ones
and friends, sex partners; and not giving any serious thought to
bleeding around family, friends, fellow employees, etc. Plaintiff
was denied the right to choose to make ANY decisions regarding
changing his lifestyle, abstaining from drug & alcohol consumption,
informing others about the risks of HCV, changes in diet & exercise
and MOST NOTABLY, to seek earlier medical attention & treatment
for his chronic liver condition. There is a great likelihood that
defendants indifference led to other serious medical problems,
such as an **iron overload (I/O)** condition, (see I/O,this index).
Other conditions plaintiff now suffers from and worries about con-
stantly are his elevated levels of **alpha-fetoprotein (AFP)**, (see
AFP,this index); **psoriasis**, (see Index); and **tuberculosis exposure**,
(TB), inability to treat re: HCV, (see TB, this index).

- PROTOCOL, lack of before January,2000,(see EXH.P).
- DIET, denial of and insufficiency of,(see EXH.'s J,M,W).
- D.O.C.'s denial of medical records to Lewisburg Prison Project,(see EXH.U).
- medical care by multiple doctors, differing opinions, (see M,J).
- numerous mentions of plaintiff's crime; does that make him any
  less deserving of proper medical treatment? (See Defendants
  Motions & Briefs, also EXH.M)

"Time is of the essence for patients with liver disease since
early intervention can often prevent life-threatening complica-
tions."

"In addition to liver biochemistry tests, a routine ferritin level
should be done at the initial screening exam to rule out iron
overload." - Def.'s were aware of I/O as early as Feb., 2000 and
began the treatment with interferon and ribavarin, despite the
fact I/O has a negative effect to treatment and the horrendous
adverse reactions these medications can cause, (see EXH.'s M, and

(2)

ADVERSE REACTION, (This Index) - After six (6) months of horrible side effects, including but not limited to: flu-like symptoms, chills, unbearable itching that kept plaintiff up at night, no appetite (lost 20 lbs.), migraine headaches, decline of platelet levels to dangerous lows, memory loss, dizziness, anxiety, muscle cramps, irritability, worsening of psoriasis, cold feeling, nausea, shaking and depression. (Refer to EXH.J, PLAINTIFF'S JOURNAL)

 "...Also test for HCV antibody...in every patient with an elevated AST or ALT level."

What's Abnormal?

 When your considering the results of liver function testing, it's important to look closely at any laboratory value above the upper limit of normal.... (Refer to EXH. M, Medical Records, marked XX, YY & ZZ, liver function levels for 1992, 1995 & 1996)

 ...It's also important to pay attention to patients whose results are at the upper limits of normal...

 ...slight elevations and upper normal limits - should repeat the test. If results still abnormal or even borderline, further testing...

 "NO INCREASE SHOULD BE IGNORED..."

SOURCE: National Digestive Diseases Information Clearinghouse -
  "DIAGNOSTIC TESTS FOR LIVER DISEASE", October, 1999.

- "DISCOVERY" request by Defendants of Plaintiff-"NO SHOW" - Plaintiff received a letter from D.O.C.'s attorney stating that the Litigation Coordinator for Rockview, Jeffrey Rackovan, would be contacting plaintiff for "Discovery Requests" to plaintiff, in order to have copies of same run off. Plaintiff was never contacted. (letter available upon request)

- EARLY SCREENING (EXH.'s I,S,X, also see "What's Abnormal?", above)

- EXPOSURE TO-Plaintiff Unsure, (EXHIBIT A)

- GENOTYPING: "ALTERNATIVE TO BIOPSY?", (See EXH.'s E,F,J2/8-10-01,K, M,N) - "NO VALUE WHATSOEVER TO SEVERITY OF LIVER DAMAGE"-Supposed to be done before treatment in order to make a correct assessment of treatment. Started treatment on 9/15/00, genotyping done 8/9/01.

(3)

(refer to EXH.B2, Official Inmate Grievance (O.I.G.), dated 8/10/01, see EXH. J, page 5, 11/2/00) - Plaintiff is "stymied" by the rationale of Larry Lidgett, former Corrections Health Care Administrator for S.C.I. Rockview, in so far as stating on 8/22/01 that "Blood work for genotyping <u>was done</u> August 9, 2001." Plaintiff knew full well genotyping was done, and to this day does not understand that response. Was a non-answer to plaintiff's request. [See EXH.B2, "O.I.G.", Initial Review Response & Appeal of Grievance, dated 8/26/01), for plaintiff's response.)

   "GENOTYPE DOES NOT CHANGE" (See Exhibit #3)

-- HCV INFORMATION PUBLICATIONS: (See EXH.'s A,F,N,R,S,T,V,X,Y,Z,#3)

-- GRIEVANCES: (See EXH.'s B1,B2)

-- GRIEVANCE POLICY OF D.O.C.: "ADHERING TO RULES OF DIRECTIVE DC-804" of <u>what Inmate Handbook?</u> - Referral to any other Inmate Handbook but 2002 Edition is <u>pointless</u>, to say the least, as it was mandated to all inmates in "A" Bldg. at Rockview, that they <u>must</u> turn in previous handbook for 2002 edition. Nowhere in the 2002 edition states you <u>must</u> ask for money damages. It states, "You <u>may</u> ask for money or any other legal relief available from a court." - If "must" or "shall" <u>were</u> used, would the Court consider an Appeal of an Inmate Grievance? "Monetary damages were not plaintiffs primary concern, <u>HIS HEALTH WAS</u>.- Plaintiff's grievances were pleas for specific medical procedures not being done, some of which ARE PROTOCOL now. All the money in the world was not going to provide plaintiff the relief sought at the time, while incarcerated. When he began getting symptoms, and after testing positive for HCV and being told he had probably had it since at least 1992, and realizing NOTHING had been done, did he get angry. After being advised there was a recourse, plaintiff made the decision to seek monetary damages, as his medical pleas were and are still being denied. In so far as the word "MAY" goes, plaintiff has always construed usage of that word as something he does <u>IF HE WANTS TO</u>. The word "MAY" is defined as a "WISH" or "PERMISSION". Plaintiff admits he recalls the word "MUST" being used in the "Appeal" phase of DC-804 in <u>some</u> Inmate Hanbook. As plaintiff was then seeking relief "medically"and <u>NOT</u> "monetarily" in his grievances, filing an Appeal would have resulted in an <u>incorrect procedure</u>, (refer to Inmate

(4)

Handbook, 2002 Edition, pg. 11, para. 7 & pg. 12, para. 3, "You
may only      appeal issues that were raised in your grievance...")
see also "Corrections Defendant's Supporting Documents To Their
Motion For Summary Judgement", Vol. II, Tab #14, EXH. 1, pg. 4,
para. D, last two lines & Unsworn Declaration of Thomas James, pgs.
4 & 5, No.'s 18 & 19 and EXH.'s B1 & B2.)

- Inability to work: (EXH.'s J,K,M,#2)

- Initial Results of blood tests indicating: March 23, 1992-(EXH.M-XX)

- Inmate Education of: (See EXH.'s P,X,#3)

- IRON OVERLOAD: Elevated counts and non-response to treatment(Inter-
  feron & Ribavarin, I/R), Dr. Symons concurring when asked by plain-
  tiff, (see EXH.'s J & specifically pg. 11-01/12 & J2-1/3/01, A,I,M,
  Q,#1) TREATMENT OF: When levels get too high, phlebotomies are
  administered until iron levels reach the low end of normal.(EXHS.J,
  K,M,#1)

- JOURNAL: (see EXH.J)

- LAB RESULTS: (see EXH.M)

- LYMPHOCYTES: (see EXH.'s J2-8/12,M,R)

- MEDICAL RECORDS: (1992 to Aug.,2002); Consultations, lab results,
  medications, etc. (EXH. M)

- "NO PROTOCOL" BEFORE January,2000, (EXH.'s P,S)

- PSORIASIS, effects of;correlation to: (see EXH.'s F,Fl,J,M,O,#1)

- RATIO OF INMATES with HCV to those being treated: (EXH. V)

- TREATMENT COST & DELAY: (see EXH.'s A,D,G,H,J,K,M,N,O,S,U,Y)

- TUBERCULOSIS EXPOSURE: Plaintiff was recently informed of exposure
  to TB; Dr. Symons then advised him he would be unable to take the
  medication available due to its toxicity to the liver. (EXH.#4,
  previous TB testing)

- WHAT IS HEPATITIS (SYMPTOMS): (see EXH.'s A,J,M,T,Z,#3)

- WHEN IDENTIFIED: (EXH.S)

## VERIFICATION

Plaintiff, William Clark, hereby certifies that the Index/-Synopsis enclosed herein, is based on fact and that they are true to the best of his knowledge and belief.

Plaintiff is without benefit of Expert Witnesses at this time.

Date: February 24, 2003

William Clark

EXh-A


CDC
CENTERS FOR DISEASE CONTROL
AND PREVENTION

October 16, 1998 / Vol. 47 / No. RR-19


MMWR™

*Recommendations
and
Reports*

MORBIDITY AND MORTALITY WEEKLY REPORT

*Inside: Continuing Medical Education for U.S. Physicians*

# Recommendations for Prevention and Control of Hepatitis C Virus (HCV) Infection and HCV-Related Chronic Disease

**U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES**
Centers for Disease Control and Prevention (CDC)
Atlanta, Georgia 30333



**The following CDC staff members prepared this report:**

Miriam J. Alter, Ph.D.
Harold S. Margolis, M.D.

**and**

Beth P. Bell, M.D., M.P.H.
Steven D. Bice, M.Ed.
Joanna Buffington, M.D., M.P.H.
Mary Chamberland, M.D.
Patrick J. Coleman, Ph.D.
Beverley A. Cummings, M.P.H.
Catherine M. Dentinger, M.S.
Richard S. Garfein, Ph.D.
Wesley Hodgson, M.P.A.
Kirsten Braatz Ivie, M.P.H.
Mack G. Kelly
Rima Khabbaz, M.D.
Rob Lyerla, Ph.D.
Lisa D. Mahoney, M.P.H.
Eric E. Mast, M.D., M.P.H.
Linda A. Moyer
Keith M. Sabin, Ph.D., M.P.H., M.S.
Craig N. Shapiro, M.D.
Linda V. Venczel, Ph.D.
Annemarie Wasley, Sc.D.
Ian A. Williams, Ph.D., M.S.

**with support from**

Steven C. Bloom
Monica Brittian
Kimberly A. Clark
Diane Ivey
Carlisle A. Quantrell
Delray Smith
Goldie S. Tillman
*Division of Viral and Rickettsial Diseases*
*National Center for Infectious Diseases*

**in consultation with**
Helene D. Gayle, M.D., M.P.H.
*National Center for HIV, STD, and TB Prevention*

**and**
Edward L. Baker, M.D., M.P.H.
*Public Health Practice Program Office*

Case 1:01-cv-00764-WWC-PT    Document 112    Filed 02/24/2003    Page 33 of 50

TABLE 1. Estimated average prevalence of hepatitis C virus (HCV) infection in the United States by various characteristics and estimated prevalence of persons with these characteristics in the population

| Characteristic | HCV-infection prevalence | | Prevalence of persons with characteristic, % |
|---|---|---|---|
| | % | (range,%) | |
| Persons with hemophilia treated with products made before 1987 | 87 | (74–90) | <0.01 |
| Injecting-drug users | | | |
| current | 79 | (72–86) | 0.5 |
| history of prior use | No Data | | 5 |
| Persons with abnormal alanine aminotransferase levels | 15 | (10–18) | 5 |
| Chronic hemodialysis patients | 10 | (0–64) | 0.1 |
| Persons with multiple sex partners (lifetime) | | | |
| ≥50 | 9 | (6–16) | 4 |
| 10–49 | 3 | (3–4) | 22 |
| 2–9 | 2 | (1–2) | 52 |
| Persons reporting a history of sexually transmitted diseases | 6 | (1–10) | 17 |
| Persons receiving blood transfusions before 1990 | 6 | (5–9) | 6 |
| Infants born to infected mothers | 5 | (0–25) | 0.1 |
| Men who have sex with men | 4 | (2–18) | 5 |
| General population | 1.8 | (1.5–2.3) | NA* |
| Health-care workers | 1 | (1–2) | 9 |
| Pregnant women | 1 | — | 1.5 |
| Military personnel | 0.3 | (0.2–0.4) | 0.5 |
| Volunteer blood donors | 0.16 | — | 5 |

*Not applicable.

hemophilia who were treated with products before inactivation of those products have prevalence rates of HCV infection as high as 90% (20–22). Although plasma derivatives (e.g., albumin and immune globulin [IG] for intramuscular [IM] administration) have not been associated with transmission of HCV infection in the United States, intravenous (IV) IG that was not virally inactivated was the source of one outbreak of hepatitis C during 1993–1994 (45,46). Since December 1994, all IG products — IV and IM — commercially available in the United States must undergo an inactivation procedure or be negative for HCV RNA (ribonucleic acid) before release.

Transplantation of organs (e.g., heart, kidney, or liver) from infectious donors to the organ recipient also carried a high risk for transmitting HCV infection before donor screening (47,48). Limited studies of recipients of transplanted tissue have implicated transmission of HCV only from nonirradiated bone tissue of unscreened donors (49,50). As with blood-donor screening, use of anti-HCV–negative organ and tissue donors has virtually eliminated risks for HCV transmission from transplantation.

**Injecting and Other Illegal Drug Use.** Although the number of cases of acute hepatitis C among injecting-drug users has declined dramatically since 1989, both incidence and prevalence of HCV infection remain high in this group (51,52). Injecting-drug use currently accounts for most HCV transmission in the United States, and has accounted for a substantial proportion of HCV infections during past decades (2,5,53). Many persons with chronic HCV infection might have acquired their infection 20–30 years ago as a result of limited or occasional illegal drug injecting. Injecting-drug

Case 1:01-cv-00764-WWC-PT    Document 112    Filed 02/24/2003    Page 34 of 50

## Screening and Diagnostic Tests

### Serologic Assays

The only tests currently approved by the U.S. Food and Drug Administration (FDA) for diagnosis of HCV infection are those that measure anti-HCV (Table 2) (*107*). These tests detect anti-HCV in ≥97% of infected patients, but do not distinguish between acute, chronic, or resolved infection. As with any screening test, positive predictive value of enzyme immunoassay (EIA) for anti-HCV varies depending on prevalence of infection in the population and is low in populations with an HCV-infection prevalence of <10% (*1,34*). Supplemental testing with a more specific assay (i.e., recombinant immunoblot assay [RIBA™ ]) of a specimen with a positive EIA result prevents reporting of false-positive results, particularly in settings where asymptomatic persons are being tested.

Supplemental test results might be reported as positive, negative, or indeterminate. An anti-HCV–positive person is defined as one whose serologic results are EIA-test–positive and supplemental-test–positive. Persons with a negative EIA test result or a positive EIA and a negative supplemental test result are considered unin- fected, unless other evidence exists to indicate HCV infection (e.g., abnormal ALT levels in immunocompromised persons or persons with no other etiology for their liver disease). Indeterminate supplemental test results have been observed in recently infected persons who are in the process of seroconversion, as well as in persons chronically infected with HCV. Indeterminate anti-HCV results also might indicate a false-positive result, particularly in those persons at low risk for HCV infection.

### Nucleic Acid Detection

The diagnosis of HCV infection also can be made by qualitatively detecting HCV RNA using gene amplification techniques (e.g., RT-PCR) (Table 2) (*108*). HCV RNA can be detected in serum or plasma within 1–2 weeks after exposure to the virus and weeks before the onset of alanine aminotransferase (ALT) elevations or the appearance of anti-HCV. Rarely, detection of HCV RNA might be the only evidence of HCV infection. Although RT-PCR assay kits for HCV RNA are available for research purposes from various manufacturers of diagnostic reagents, none have been approved by FDA. In addition, numerous laboratories perform RT-PCR using in-house laboratory methods and reagents.

Although not FDA-approved, RT-PCR assays for HCV infection are used commonly in clinical practice. Most RT-PCR assays have a lower limit of detection of 100–1,000 viral genome copies/mL. With adequate optimization of RT-PCR assays, 75%–85% of persons who are anti-HCV–positive and >95% of persons with acute or chronic hepatitis C will test positive for HCV RNA. Some HCV-infected persons might be only intermittently HCV RNA-positive, particularly those with acute hepatitis C or with end-stage liver disease caused by hepatitis C. To minimize false-negative results, serum must be separated from cellular components within 2–4 hours after collection, and preferably stored frozen at -20 C or -70 C (*109*). If shipping is required, frozen samples should be protected from thawing. Because of assay variability, rigorous quality assurance and control should be in place in clinical laboratories performing this assay, and proficiency testing is recommended.



The course of acute hepatitis C is variable, although elevations in serum ALT levels, often in a fluctuating pattern, are its most characteristic feature. Normalization of ALT levels might occur and suggests full recovery, but this is frequently followed by ALT elevations that indicate progression to chronic disease (*14*). Fulminant hepatic failure following acute hepatitis C is rare (*120,121*).

### Chronic HCV Infection

After acute infection, 15%–25% of persons appear to resolve their infection without sequelae as defined by sustained absence of HCV RNA in serum and normalization of ALT levels (*122; personal communication, LB Seeff, M.D., Senior Scientist [Hepatitis C], National Institute of Diabetes and Digestive and Kidney Diseases, National Institutes of Health, Bethesda, MD, July 1998*). Chronic HCV infection develops in most persons (75%–85%)(*14,122–124*), with persistent or fluctuating ALT elevations indicating active liver disease developing in 60%–70% of chronically infected persons (*12–15,116,122–124*). In the remaining 30%–40% of chronically infected persons, ALT levels are normal. No clinical or epidemiologic features among patients with acute infection have been found to be predictive of either persistent infection or chronic liver disease. Moreover, various ALT patterns have been observed in these patients during follow-up, and patients might have prolonged periods (≥12 months) of normal ALT activity even though they have histologic-confirmed chronic hepatitis (*14*). Thus, a single ALT determination cannot be used to exclude ongoing hepatic injury, and long-term follow-up of patients with HCV infection is required to determine their clinical outcome or prognosis.

The course of chronic liver disease is usually insidious, progressing at a slow rate without symptoms or physical signs in the majority of patients during the first two or more decades after infection. Frequently, chronic hepatitis C is not recognized until asymptomatic persons are identified as HCV-positive during blood-donor screening, or elevated ALT levels are detected during routine physical examinations. Most studies have reported that cirrhosis develops in 10%–20% of persons with chronic hepatitis C over a period of 20–30 years, and HCC in 1%–5%, with striking geographic variations in rates of this disease (*124–128*). However, when cirrhosis is established, the rate of development of HCC might be as high as 1%–4%/year. In contrast, a study of >200 women 17 years after they received HCV-contaminated Rh factor IG reported that only 2.4% had evidence of cirrhosis and none had died (*129*). Thus, longer term follow-up studies are needed to assess lifetime consequences of chronic hepatitis C, particularly among those who acquired their infection at young ages.

Although factors predicting severity of liver disease have not been well-defined, recent data indicate that increased alcohol intake, being aged >40 years at infection, and being male are associated with more severe liver disease (*130*). In particular, among persons with alcoholic liver disease and HCV infection, liver disease progresses more rapidly; among those with cirrhosis, a higher risk for development of HCC exists (*131*). Furthermore, even intake of moderate amounts (>10 g/day) of alcohol in patients with chronic hepatitis C might enhance disease progression. More severe liver injury observed in persons with alcoholic liver disease and HCV infection possibly is attributable to alcohol-induced enhancement of viral replication or increased susceptibility of cells to viral injury. In addition, persons who have chronic liver disease are at increased risk for fulminant hepatitis A (*132*).

Extrahepatic manifestations of chronic HCV infection are considered to be of immunologic origin and include cryoglobulinemia, membranoproliferative glomerulonephritis, and porphyria cutanea tarda (*131*). Other extrahepatic conditions have been reported, but definitive associations of these conditions with HCV infection have not been established. These include seronegative arthritis, Sjögren syndrome, autoimmune thyroiditis, lichen planus, Mooren corneal ulcers, idiopathic pulmonary fibrosis (Hamman-Rich syndrome), polyarteritis nodosa, aplastic anemia, and B-cell lymphomas.

## Clinical Management and Treatment

HCV-positive patients should be evaluated for presence and severity of chronic liver disease (*133*). Initial evaluation for presence of disease should include multiple measurements of ALT at regular intervals, because ALT activity fluctuates in persons with chronic hepatitis C. Patients with chronic hepatitis C should be evaluated for severity of their liver disease and for possible treatment (*133–135*).

Antiviral therapy is recommended for patients with chronic hepatitis C who are at greatest risk for progression to cirrhosis (*133*). These persons include anti-HCV–positive patients with persistently elevated ALT levels, detectable HCV RNA, and a liver biopsy that indicates either portal or bridging fibrosis or at least moderate degrees of inflammation and necrosis.

In patients with less severe histologic changes, indications for treatment are less clear, and careful clinical follow-up might be an acceptable alternative to treatment with antiviral therapy (e.g., interferon) because progression to cirrhosis is likely to be slow, if it occurs at all. Similarly, patients with compensated cirrhosis (without jaundice, ascites, variceal hemorrhage, or encephalopathy) might not benefit from interferon therapy. Careful assessment should be made, and the risks and benefits of therapy should be thoroughly discussed with the patient.

Patients with persistently normal ALT values should not be treated with interferon outside of clinical trials because treatment might actually induce liver enzyme abnormalities (*136*). Patients with advanced cirrhosis who might be at risk for decompensation with therapy and pregnant women also should not be treated. Interferon treatment is not FDA-approved for patients aged <18 years, and more data are needed regarding treatment of persons aged <18 years or >60 years. Treatment of patients who are drinking excessive amounts of alcohol or who are injecting illegal drugs should be delayed until these behaviors have been discontinued for ≥6 months. Contraindications to treatment with interferon include major depressive illness, cytopenias, hyperthyroidism, renal transplantation, and evidence of autoimmune disease.

Most clinical trials of treatment for chronic hepatitis C have been conducted using alpha-interferon (*134,135,137,138*). When the recommended regimen of 3 million units administered subcutaneously 3 times/week for 12 months is used, approximately 50% of treated patients have normalization of serum ALT activity (biochemical response), and 33% have a loss of detectable HCV RNA in serum (virologic response) at the end of therapy. However, ≥50% of these patients relapse when therapy is stopped. Thus, 15%–25% have a sustained response as measured by testing for ALT and HCV RNA ≥1 years after therapy is stopped, many of whom also have histologic

Vol. 47 / No. RR-19                    MMWR

improvement. For patients who do not respond by the end of therapy, retreatment with a standard dose of interferon is rarely effective. Patients who have persistently abnormal ALT levels and detectable HCV RNA in serum after 3 months of interferon are unlikely to respond to treatment, and interferon treatment should be discontinued. These persons might be considered for participation in clinical trials of alternative treatments. Decreased interferon response rates (<15%) have been found in patients with higher serum HCV RNA titers and HCV genotype 1 (the most common strain of HCV in the United States); however, treatment should not be withheld based solely on these findings.

Therapy for hepatitis C is a rapidly changing area of clinical practice. Combination therapy with interferon and ribavirin, a nucleoside analogue, is now FDA-approved for treatment of chronic hepatitis C in patients who have relapsed following interferon treatment and might be approved soon for patients who have not been treated previously. Studies of patients treated with a combination of ribavirin and interferon have demonstrated a substantial increase in sustained response rates, reaching 40%–50%, compared with response rates of 15%–25% with interferon alone (*139,140*). However, as with interferon alone, combination therapy in patients with genotype 1 is not as successful, and sustained response rates among these patients are still <30%.

Most patients receiving interferon experience flu-like symptoms early in treatment, but these symptoms diminish with continued treatment. Later side effects include fatigue, bone marrow suppression, and neuropsychiatric effects (e.g., apathy, cognitive changes, irritability, and depression). Interferon dosage must be reduced in 10%–40% of patients and discontinued in 5%–15% because of severe side effects. Ribavirin can induce hemolytic anemia and can be problematic for patients with preexisting anemia, bone marrow suppression, or renal failure. In these patients, combination therapy should be avoided or attempts should be made to correct the anemia. Hemolytic anemia caused by ribavirin also can be life-threatening for patients with ischemic heart disease or cerebral vascular disease. Ribavirin is teratogenic, and female patients should avoid becoming pregnant during therapy.

Other treatments, including corticosteroids, ursodiol, and thymosin, have not been effective. High iron levels in the liver might reduce the efficacy of interferon. Use of iron-reduction therapy (phlebotomy or chelation) in combination with interferon has been studied, but results have been inconclusive. Because patients are becoming more interested in alternative therapies (e.g., traditional Chinese medicine, antioxidants, naturopathy, and homeopathy), physicians should be prepared to address questions regarding these topics.

## Postexposure Prophylaxis and Follow-Up

Available data regarding the prevention of HCV infection with IG indicate that IG is not effective for postexposure prophylaxis of hepatitis C (*67,141*). No assessments have been made of postexposure use of antiviral agents (e.g., interferon) to prevent HCV infection. Mechanisms of the effect of interferon in treating patients with hepatitis C are poorly understood, and an established infection might need to be present for interferon to be an effective treatment (*142*). As of the publication of this report, interferon is FDA-approved only for treatment of chronic hepatitis C.

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

*EXH. B₁*

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. _____

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| Lt. Kushwera Acting Assistant to the Sup | SCI-Rockview | 12/1/99 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| WILLIAM M. CLARK   AY-5585 | William M. Clark | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| HORSE DETAIL | CB 1-43 | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

I asked to be tested for HIV, HCV in October 99 because of my lifestyle on the street. I was then informed by Mary Jo Hayes that I was positive for HCV in Oct. and that my liver enzymes were elevated. She also noted my liver enzymes were elevated back in 92. I was then called to see the Physicians Assistant on 12-1-99. She told me I am not here to accept or deny treatment for HCV. That I'm only being informed I will be checked again in April of 2000, and that the DOC will make a decision on who gets treatment sometime in may of 2000. I know other inmates receiving treatment for HCV with Interferon Why am I being denied treatment. According to the American Liver Foundation I should have A liver biopsy and a viral load test.

B. Actions taken and staff you have contacted before submitting this grievance:

I spoke to medical Staff on several occasions and submitted request to Lidgett Health Care Administrator, no response

Your grievance has been received and will be processed in accordance with DC-ADM 804.

_____
Signature of Grievance Coordinator
V. W. KUSHWARA

fer LIDGETT DUE 12-10
12-3-99
12-17-99 MEDICAL
Date

**WHITE**—Grievance Coordinator Copy    **CANARY**—File Copy    **PINK**—Action Return Copy    **GOLDENROD**—Inmate Co

DC-804
PART II

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA 17001**

**OFFICIAL INMATE GRIEVANCE**
**INITIAL REVIEW RESPONSE**

GRIEVANCE NO.    #ROC0706-

| TO: (Name & DC No.) | INSTITUTION | QUARTERS | GRIEVANCE DATE |
|---|---|---|---|
| William M. Clark, AY5585 | SCIR | Bldg C/B | 12/01/<br>Received   12/03/ |

The following is a summary of my findings regarding your grievance:

This complaint has been reviewed with Ms. Foose, Registered Superviso:
You are scheduled to be monitored in hepatitis clinic. On December 1, 199:
you were examined and denied any weight loss, fatigue, abdominal pain fo
jaundice (yellowing of skin). Abdomen and liver upon exam were norma
without tenderness. Your liver enzymes were elevated but not excessibly so
Another liver profile (blood test) is scheduled to monitor liver enzymes.
1992, your liver enzymes were elevated. In 1996, your liver enzymes we:
normal. It is medically prudent and feasible to monitor the liver enzyme
before a more invasive test such as a liver biopsy is performed.

JAR:tlk

c:    Deputy Wakefield
      Deputy Whitman
      Mr. Lidgett
      Ms. Foose
      Case Record
      Mr. Rackovan

| Refer to DC-ADM 804, Section VIII,<br>for instructions on grievance<br>system appeal procedures. | SIGNATURE OF GRIEVANCE COORDINATOR<br><br>*Jeffrey Rackovan* | DATE<br><br>12/14/ |

TO: Mr. R. Meyers Superintendent SCI-Rockview
From: William M. Clark AY 5585
Subject: Appeal from Grievance # ROC 0706-99
DATE: Dec. 16, 1999

Mr. R. Meyers,

I disagree with the response I received to my grievance in that I did not deny any symptoms related to Hepatitis C. On the contrary, I do suffer from fatigue, abdominal pain and loss of appetite to name a few.

According to the American Liver Foundation and The Hepatitis Foundation International, a liver biopsy and treatment for Hepatitis C with Interferon and ribavirin are Standard procedure.

Since I may have had HCV for many years, it would seem medically prudent to have a liver biopsy and a viral load test done as soon as possible. The Center for Disease Control has already established national guidelines for the treatment of HCV with FDA approved drugs ie. Interferon and ribavirin. I feel I Should be receiving treatment now.

Sincerely,

**COMMONWEALTH OF PENNSYLVANIA**
**Department of Corrections**
**State Correctional Institution at Rockview**
(814-355-4874)
December 20, 1999

**SUBJECT:**   Appeal in Grievance  #ROC0706-99

**TO:**         William Clark, AY5585
               Bldg C/B

**FROM:**       R. W. Meyers
               Superintendent

I have reviewed your grievance, the response provided by the Grievance Coordinator,
as well as your appeal, which was received this date.

I am in agreement with the Grievance Coordinator's response and, therefore, your
appeal is denied.

RWM:dka

c:      Deputy Wakefield
        Deputy Whitman
        Mr. Lidgett
        Ms. Foose
        Case Record
        Mr. Rackovan

TO: MR. Bitner Chief Hearing Examiner
FROM: William Clark  AY 5585
SUBJECT: Final appeal from Grievance #ROC0706-99
DATE: Dec. 24, 1999

Mr. Bitner,
    This is an appeal for final review because my initial appeal to Superintendent meyers at SCI- Rockview was denied.
    To my information and belief, inmates here at SCI- Rockview are currently being treated for Hepatitis C virus with interferon and ribavirin.
    According to both the American Liver Foundation and the Hepatitis Foundation International, the Center For Disease Control in Atlanta Ga. has already established treatment guidelines for HCV and the Food and Drug Administration has approved Interferon and Ribavirin for treatment.
    They all recommend early diagnosis and treatment of HCV can prevent more serious types of liver disease Why am I being denied treatment. The DOC has known I have had HCV since the early 1990s.

                                    Sincerely,
                                    William Clark

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**1451 N. MARKET STREET**
**ELIZABETHTOWN, PA  17022**

OFFICE OF THE
CHIEF HEARING EXAMINER

January 4, 2000

William Clark,  AY-5585
SCI Rockview

Re:    DC-ADM 804 - Final Review
Grievance No. ROC-0706-99

Dear Mr. Clark:

This is to acknowledge receipt of your appeal to final review of the above numbered grievance.

In accordance with the provisions of DC-ADM 804, VI D, as amended effective November 1, 1997, I have reviewed the entire record of this grievance; including your initial grievance, the Grievance Officer's response, your appeal from initial review and the Superintendent's response.  I have also carefully reviewed the issues you raise to final review.

Upon completion this review, it is the decision of this office to uphold the responses provided by staff at the institutional level. The Department has been reviewing all aspects of Hepatitis C treatment as we wish to provide you with proper treatment at the proper time.  However, there is no nationwide agreement on the treatment of Hepatitis C.  Your medical records will be reviewed by the institution Medical Director, or his or her designee, and a determination will be made whether treatment is appropriate for you at this time.  You will be called to the Medical Department and your case will be discussed with you.

I concur with the responses already provided at the institution level.  Accordingly, your appeal to final review must be denied.

Sincerely,

Robert S. Bitner
Chief Hearing Examiner

RSB:ph
pc:    Superintendent Meyers

**DC-804**
**PART 1**

*EXH. B2*

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
**P.O. BOX 598**
**CAMP HILL, PA. 17001-0598**

*EXH. B2*

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. | ROC-0641-

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| JEFFREY RACKOVAN | ROCKVIEW | 8/10/01 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| WILLIAM M. CLARK    AY-5585 | William M. Clark | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| BLOCK WORKER | EB | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance:

DURING A CONSULTATION ON AUGUST 7, 2001 WITH DR. SYMONS, WAS INFORMED THAT THE LIVER BIOPSY HE FELT I NEEDED + REQUESTED IN JULY, 2001 WAS DENIED. NO REASON OR ALTERNATIVE WAS GIVEN. APPROXIMATELY 3 DAYS LATER DR. SYMONS APPEALED THE DECISION AND IT ALSO WAS DENIED. DR. SYMONS ADVISED ME THAT THE ALTERNATE PLAN WAS TO HAVE ME GENOTYPED. I ASKED IF THIS WOULD TELL US THE EXTENT OF DAMAGE TO MY LIVER AND HE SAID IT WOULD NOT, THAT IT MAY HELP AS FAR AS HOW TO TREAT. (GENOTYPING SHOULD HAVE BEEN DONE BEFORE ANY TREATMENT STARTED.) THE FACT THAT I DID NOT RESPOND TO THE RIBAVARIN/INTERFERON TREATMENT AND THE CONSTANT UNBEARABLE ITCHING CONCERNED DR. SYMONS ENOUGH THAT AT LEAST A PHYSICIAN HERE AT ROCKVIEW REQUESTED THE BIOPSY, SOMETHING I HAVE BEEN REQUESTING FOR ALMOST 2 YEARS NOW. MY SECOND CONCERN IS (SEE PT. 2 STATEMENT

B. Actions taken and staff you have contacted before submitting this grievance:

MY CONTACT WAS WITH DR. SYMONS AND BOTH REQUESTS CONCERNING THIS GRIEVANCE WERE DENIED (SEE ABOVE). I DID NOT CONTACT LARRY LIDGETT AS I WAS INFORMED WEXFORD MADE THE ABOVE DECISIONS.

Your grievance has been received and will be processed in accordance with DC-ADM 804.

*Jeffrey Rackovan*
Signature of Grievance Coordinator

Medical

*PART 1 OF 2*

Mr. Lidgett 8/21

8/14/01

Date
Rec 8/28

**WHITE**—Grievance Coordinator Copy      **CANARY**—File Copy      **PINK**—Action Return Copy      **GOLDENROD**—Inmate Copy

DC-804
PART 1

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA. 17001-0598

**OFFICIAL INMATE GRIEVANCE**

GRIEVANCE NO. _RC 06 41-01_

| TO: GRIEVANCE COORDINATOR | INSTITUTION | DATE |
|---|---|---|
| JEFFREY RACKOVAN | ROCKVIEW | 8/10/01 |
| FROM: (Commitment Name & Number) | INMATE'S SIGNATURE | |
| WILLIAM M. CLARK   AY-5585 | William Clark | |
| WORK ASSIGNMENT | QUARTERS ASSIGNMENT | |
| BLOCK WORKER | EB | |

**INSTRUCTIONS:**
1. Refer to the inmate handbook Page 12 and DC-ADM 804 for information on the inmate grievance system.
2. State your grievance in Block A in a brief and understandable manner.
3. Next, you are required to list in Block B the specific actions you have taken to resolve this matter. Be sure to include the identity of staff members you have contacted.

A. Brief, clear statement of grievance (CONT.)

THAT I SHOULD BE RECEIVING THE NEW TREATMENT (PEGOLATED INTERFERON) BECAUSE OF MY NON-RESPONSIVENESS TO THE ORIGINAL TREATMENT. AT MY 8/7/0 CONSULTATION WITH DR. SYMONS HE STATED THAT BECAUSE MY IRON COUNTS WERE SO HIGH DURING THE ORIGINAL TREATMENT (WHICH CAN RESULT IN NEGATIVE EFFECT OF TREATMENT), THAT I SHOULD HAVE BEEN DISCONTINUED ON THE INTERFERON/RIBAVARIN AND BEEN PHLEBOTOMIZED (BLED) TO GET THE IRON COUNTS DOWN TO NORMAL RANGES (WAS DONE ONLY AFTER THE SIX (6) MONTH TREATMENT PERIOD). DR. SYMONS ALSO STATED THAT A LIMITED NUMBER OF INMATES, WHOSE VIRAL LOAD WAS NOT EXCESSIVE + WHO FAILED TO RESPOND TO THE FIRST TREATMENT, IS BEING APPROVED. FOR THESE REASONS AND BECAUSE I FEEL THE MEDICAL DEPT. WAS NEGLECTFUL DURING MY FIRST PERIOD OF TREATMENT, I AM REQUESTING TO START THE NEW TREATMENT WITHOUT DELAY. (RIBAVARIN COULD BE ADDED WHEN APPROVED) AND A BIOPSY

B. Actions taken and staff you have contacted before submitting this grievance:

SEE PART 1

Your grievance has been received and will be processed in accordance with DC-ADM 804.

Jeffrey Rackovan                    PART 2    OF 2              8/14/01
Signature of Grievance Coordinator                                      Date

**WHITE**—Grievance Coordinator Copy    **CANARY**—File Copy    **PINK**—Action Return Copy    **GOLDENROD**—Inmate Co

DC-804
Part 2

**COMMONWEALTH OF PENNSYLVANIA**
**DEPARTMENT OF CORRECTIONS**
P.O. BOX 598
CAMP HILL, PA 17001

Revised
December 20

OFFICIAL INMATE GRIEVANCE
INITIAL REVIEW RESPONSE

GRIEVANCE NO.    #ROC-0641-0

| TO: (Inmate Name & DC No.) | FACILITY | HOUSING LOCATION | GRIEVANCE DATE 08/10/0 |
|---|---|---|---|
| William Clark, AY-5585 | SCIR | Bldg E/B | Received  08/14/0 |

The following is a summary of my findings regarding your grievance:

A review of this inmate's medical record was done.

This grievance was filed August 10, 2001. Blood work for genotyping <u>was</u> <u>done</u> August 9, 2001.

Pegolated interferon is not yet on the market for administration but will be in the near future.

The details given by this inmate describes all the care, concern and treatment given to this inmate by Dr
Symons. Ongoing treatment is occurring.

JAR:tlk

c:    Deputy Tennis
      Deputy Whitman
      Mr. Lidgett
      Ms. Foose
      Mr. Price
      Case Record
      Mr. Rackovan

| Print Name & Title of Grievance Officer | SIGNATURE OF GRIEVANCE OFFICER   CHCA | DATE  8-22-0 |
|---|---|---|

TO: FACILITY
MANAGER

EXH. B2

FROM: WILLIAM CLARK
#AY-5585

## APPEAL OF GRIEVANCE

DATED: 8/26/0

RE: # ROC-0641-01   PG. 1

THIS APPEAL IS IN RESPONSE TO THE INITIAL REVIEW BY LARRY LIDGETT I RECEIVED ON 8/23/01. MY FIRST CONCERN IN MY GRIEVANCE IS THAT SINCE I WAS INFORMED OF MY HEPATITIS C IN OCTOBER OF 1999 I HAVE CONTINUALLY ASKED FOR AND BEEN REFUSED A LIVER BIOPSY. NOW, AFTER 22 MONTHS, DR. SYMONS REQUESTS THE BIOPSY BECAUSE OF MY BLOOD TESTS (LAB RESULTS, INCLUDING ANOTHER RISE IN MY ALPHAFETA PROTEIN LEVEL) AND THE INCESSANT ITCHING I SUFFER. THIS PRIMARY CONCERN WAS NEVER ADDRESSED IN THE INITIAL REVIEW RESPONSE. THE ALTERNATIVE TO A BIOPSY WAS ADDRESSED, STATING THAT GENOTYPING WAS DONE. WHAT WAS NOT ADDRESSED IS THE FACT THAT THIS TEST DOES NOTHING TO DIAGNOSE THE LEVEL OF DAMAGE TO MY LIVER. IT ALSO DOES NOT RESPOND TO MY STATEMENT IN THE ORIGINAL GRIEVANCE THAT GENOTYPING SHOULD BE DONE BEFORE ANY TREATMENT BEGINS AND WAS NOT. MY GRIEVANCE ALSO ASKS FOR PEGOLATED INTERFERON FOR THE REASONS STATED WITHIN (PG. 2 OF DC-804). MR. LIDGETT'S REPLY IS THAT THIS TREATMENT IS NOT YET ON THE MARKET FOR ADMINISTRATION. I DO NOT UNDERSTAND THIS STATEMENT, BUT I DO KNOW THIS TREATMENT WAS APPROVED BY THE FDA IN JANUARY, 2001. BECAUSE OF THE REPLY GIVEN THERE IS NO RESPONSE TO MY CONCERNS ABOUT MY IRON COUNTS AND NOTHING ABOUT THE INITIAL TREATMENT FAILURE. THE LAST STATEMENT IN THE RESPONSE SAYS "DETAILS GIVEN BY ME DESCRIBE CARE, CONCERN AND TREATMENT BY DR. SYMONS" AND THAT ONGOING TREATMENT IS

<u>APPEAL</u> <u>OF</u> <u>GRIEVANCE</u>
RE:# ROC-0641-01   PG. 2

OCCURING. I SPECIFICALLY STATE IN MY GRIEVANCE "... CONCERNED
DR. SYMONS ENOUGH THAT AT LEAST A PHYSICIAN HERE AT ROCKVIEW
REQUESTED THE BIOPSY, SOMETHING I HAVE BEEN REQUESTING FOR
ALMOST 2 YRS. NOW." (PG. 1 OF DC-804 PART 1) EXCEPT FOR
ATARAX, WHICH WAS PRESCRIBED FOR MY ITCHING AND DOES NOT
WORK FOR ME NOW OR IN THE PAST, NO ONGOING TREATMENT
IS OCCURING AT THIS TIME. I AGAIN REQUEST A LIVER
BIOPSY AND THE PEGOLATED INTERFERON TREATMENT FOR
THE REASONS STATED ABOVE AND IN MY ORIGINAL GRIEVANCE.

William Clark   AY-5585
WILLIAM CLARK

DATED: 8/26/01

COMMONWEALTH OF PENNSYLVANIA
Department of Corrections
State Correctional Institution at Rockview
(814) 355-4874
September 5, 2001

SUBJECT:    Appeal to Grievance #ROC-0641-01

TO:         William Clark, AY-5585
            Building E/B

FROM:       R. W. Meyers
            Superintendent

Your medical situation is well known by our medical staff, Dr. Symons, and Wexford
Health Sources.  Everything that can be done is being done.

The liver biopsy was denied at utilization review.  Pegolated interferon is not considered
a part of your treatment protocol at this time according to Dr. Symons.  The plan at
present is to continue the genotyping and monitor your situation for any changes.

RWM:tlk

c:    Deputy Tennis
      Deputy Whitman
      Mr. Lidgett
      Ms. Foose
      Mr. Price
      Case Record
      Mr. Rackovan

*RECEIVED IN INMATE DESK MAIL 9/7/01 wme*

9/9/01

To: CHIEF, SECRETARY'S OFFICE OF INMATE GRIEVANCES AND APPEALS

RE: APPEAL TO FINAL REVIEW

GRIEVANCE # ROC-0641-0

WILLIAM CLARK

D.O.C.# AY-5585

MY APPEAL TO YOU IS BASED ON THE CONTENTS OF MY FIRST (INITIAL) GRIEVANCE AND THE APPEAL AND THE RESPONSES I GOT IN BOTH CASES. IN RESPONSE TO THE APPEAL TO THE FACILITY MANAGER I FEEL NOTHING THAT COULD BE BEING DONE IS BEING DONE, INCLUDING MY REQUEST FOR A BIOPSY AND THE PEGOLATED INTERFERON. IN THAT SAME RESPONSE IT STATES, "THE PLAN AT PRESENT IS TO CONTINUE GENOTYPING..." ONCE A GENOTYPE HAS BEEN DONE, WHAT IS THERE TO CONTINUE? WITHOUT A BIOPSY, WHICH DR. SYMONS DID STATE TO ME SHOULD BE DONE, NO ONE CAN MAKE A CORRECT DIAGNOSIS TO WHAT PHASE LIVER DAMAGE I AM SUFFERING AT THIS TIME. HOW CAN ANYONE TREAT IF THEY DON'T KNOW THE EXTENT OF THE DAMAGE?

I DON'T KNOW WHO I AM ADDRESSING HERE EXCEPT FOR A TITLE, BUT PLEASE HEAR THIS. THE ITCHING I ENDURE IS EVERYDAY, MOST OF THE DAY AND WORSE AT NIGHT. IT GET MADDENING. THE MEDICAL STAFF TELLS ME IT'S CAUSED BY LIVER DAMAGE, BUT I CAN GET NO DEFINATIVE ANSWERS