IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WILLIAM CLARK,                    :
                                  :
        Plaintiff                 :
                                  :        CIVIL NO. 1:CV-01-0764
        vs.                       :
                                  :        (Judge Caldwell)
MARTIN HORN, et al.,              :
                                  :
        Defendants                :

M E M O R A N D U M

I.      *Introduction*.

        The pro se plaintiff, William Clark, filed this
lawsuit while he was incarcerated at SCI-Rockview, Bellefonte,
Pennsylvania, alleging an Eighth Amendment violation for the
failure to disclose to him in 1992 that he had hepatitis C, a
viral infection of the liver, and for the medical treatment he
later began receiving in 2000 after he learned about the
infection.  He has also made a state-law claim for negligence in
his treatment.  Plaintiff seeks damages and injunctive relief.

        The defendants can be divided into two groups.  The
first group is the "Correction Defendants": Martin F. Horn,
former secretary of the Pennsylvania Department of Corrections
(the "DOC"); Robert W. Meyers, superintendent at SCI-Rockview;
and Larry L. Lidgett, former SCI-Rockview health care
administrator.  The second group is the "Wexford Defendants":

Wexford Health Sources, Inc. ("Wexford"), the private entity
that contracted to provide medical care for prisoners at
Rockview; and Dr. John Symons, the Wexford physician serving as
the contract medical director at Rockview.

We are considering three motions for summary judgment:
one filed by the Correction Defendants, a second by the Wexford
Defendants and a third by Plaintiff. We will consider the
motions under the well established standard. *See Anderson v.
Consolidated Rail Corp.*, 297 F.3d 242, 246-47 (3d Cir. 2002).


II.    *Background*.

The summary-judgment record establishes the following.
(We will sometimes borrow the parties' language or paraphrase
it.) The hepatitis C virus ("HCV"), a blood-borne virus causing
inflammation of the liver, was discovered in 1989. Before then,
the hepatitis caused by HCV was called "non-A, non-B hepatitis."
(Doc. 91, exhibit 3, penalty-of-perjury declaration of Berel B.
Arrow, D.O., assistant medical director, Bureau of Health Care
Services, ¶¶ 9, 11 and 12). In May 1990, the first routine
anti-body test for HCV became available and then a better one in
July 1992. (*Id.*, ¶ 13). The virus is passed through razors,
needles, toothbrushes, nail files, tattooing, body piercing and
unprotected sex. (*Id.*, ¶ 10). Approximately 85% of HCV

-2-

infections become chronic, gradually developing over a period of twenty to thirty years into cirrhosis. (*Id.*, ¶ 15). The result could be complete liver failure leading to death, unless a liver transplant is done. (*Id.*, ¶ 17).

In 1991, interferon was approved to treat chronic HCV. It could not cure the disease but could reduce the amount of virus in the body and slow down liver damage. It had serious side effects: (1) flu-like symptoms; (2) fatigue; (3) irritability, depression and anxiety; (4) loss of appetite; (5) nausea and diarrhea; and (6) mild hair loss. (*Id.*, ¶¶ 33 and 36).

In 1998 a "dual therapy," composed of the drugs ribaviron and intron, was approved to treat HCV. The side effects were similar to interferon's. (*Id.*, ¶ 37). Currently, pegylated interferon is being used to treat the disease. (*Id.*, ¶ 46).

Plaintiff was born on September 11, 1954. On August 27, 1985, he was sentenced to five to fifteen years' imprisonment. He began serving his sentence on August 28, 1985, at SCI-Graterford and was paroled on November 28, 1989. On March 20, 1992, he was recommitted to Graterford for a six-month term as a technical parole violator because cocaine was found in his urine. He was released on September 6, 1992. About three

-3-

years later, on September 15, 1995, Plaintiff once again did a
six-month term in Graterford for a parole violation when police
found cocaine in his car after a traffic stop.  He was released
on April 28, 1996.  About five months later, on November 6,
1996, Plaintiff was recommitted to Graterford as a convicted
parole violator.  On March 10, 1997, Plaintiff was transferred
to SCI-Rockview until his release on or about March 10, 2003, to
a treatment center in Philadelphia and then on or about July 8,
2003, release into society.

        Defendant Horn was the DOC's secretary from March 1,
1995, until December 30, 2000.  (He was succeeded by Jeffrey A.
Beard.)  The secretary's job is to provide safe, secure
facilities for inmates.  During Horn's tenure, there were about
36,000 inmates in Pennsylvania correctional facilities.  There
are five deputy secretaries assisting him.  Horn is not a
physician.

        Defendant Meyers has been Rockview's superintendent
since February 1998.  He is not a physician, and Rockview has
housed thousands of inmates during his tenure.

        Defendant Lidgett, a nurse, retired as health care
administrator at Rockview in September 2001.  He began working
at Rockview in November 1982, became nurse supervisor in 1985
and then health care administrator in June 1994.  Lidgett was
responsible for managing the health care of the inmates,

-4-

overseeing the screening for diseases, administering routine and emergency treatment, managing a multidisciplinary health-care staff and monitoring the services of the contracted medical vendor.

Wexford contracted to provide medical care for prisoners at Rockview in September 1996, including utilization review and case management. Defendant Doctor Symons became the contract medical director at Rockview in September 1998. He examines, diagnoses and treats inmates and refers inmates for consultations when medically necessary.

Plaintiff felt all right between 1992 and 1995. (Doc. 91, exhibit 2, Clark deposition, p. 30). Roughly in early 1998, however, he began to feel tired all the time, exhausted very easily, and physically unable to do things without feeling run down. He does not recall whether he sought medical attention at that time. Dr. Symons first saw Plaintiff on November 13, 1998, treating him for psoriasis. Dr. Symons also saw Plaintiff for the same condition on December 8, 1998, and January 13 and 26, March 5, April 20, and May 6, 1999, with no complaints from Plaintiff of fatigue, abdominal pain, jaundice or other symptoms of HCV.

In October 1999, Clark requested that he be tested for HIV and HCV. The test for HCV, a liver profile, was performed on October 15. It revealed that Clark did have HCV by the

presence of HCV antibodies and slightly elevated liver enzymes
(a sign of liver injury).[1]  Sometime in late October or early
November 1999, a nurse discussed the test results with him.
According to Plaintiff, she told him he probably had the disease
in 1992, based on his prison medical records from that year,
(doc. 91, exhibit 2, Clark deposition, p. 39), which showed that
he had elevated liver enzymes then.  In 1995, blood testing
showed that Clark's liver enzymes were normal.  (*Id.*, p. 64).[2]

On November 10, 1999, Plaintiff saw Dr. Symons for his
psoriasis, but his HCV was also discussed.  Clark asked Dr.
Symons for treatment with interferon, but Dr. Symons told him
that he probably would not receive treatment for his HCV because
his liver enzymes were only slightly elevated.  (*Id.*, pp. 41-
43).

On December 1, 1999, Plaintiff was seen at the
prison's hepatitis C clinic.  According to the medical records,
he denied at that time weight loss, fatigue, abdominal pain or
jaundice, but he did request moisturizing cream for his
psoriasis.  (Doc. 106).

---

[1]  Testing showed that Clark did not have HIV.

[2]  Parenthetically, Clark stated that he was not surprised
that he had HCV because of his long history of drug use,
including the use of drugs intravenously.  (Doc. 91, exhibit 2,
pp. 16-17, 40).

On the same day, Plaintiff filed a grievance about his HCV condition under the DOC's formal, three-step grievance procedure, set forth in DC-ADM 804.  The grievance sought a liver biopsy, a viral-load test and treatment with interferon. It did not seek damages, although damages are permitted under the prison grievance procedure.  This grievance was denied by the Rockview grievance coordinator on December 14, 1999, who replied that nurse supervisor Foose stated it was medically prudent to simply monitor Clark's liver enzymes for the time being, given the lack of symptoms.  On appeal to superintendent Myers, the superintendent affirmed this decision on December 30, 1999.  At the third and final step of the process, the DOC's chief hearing examiner also rebuffed Plaintiff on January 4, 2000.

In the meantime, in the fall of 1998, the DOC had established a task force to address the treatment of prisoners with HCV.  The task force had members from the Bureau of Health Care, various correctional institutions, the psychology field, the DOC's medical vendors, including Wexford, the Department of Health and the Department of Welfare.  (Doc. 92, exhibit 4, ¶ 12).  This task force, which initially met in early 1999 and continues to meet, developed a protocol to treat inmates with HCV.  The protocol is revised from time to time.  The first one was issued in December 1999 and is currently in its sixth

-7-

version.  (Doc. 91, exhibit 3, attachment J).  Dr. Symons had no
personal involvement with preparing or drafting the protocol,
but did note that it went into effect in January 2000.  (Doc.
96, exhibit A, ¶¶ 11 and 17).

On February 17, 2000, after an evaluation by Dr.
Eggler, Plaintiff expressed a desire for the interferon dual
therapy, then available for HCV treatment.  As part of the
evaluation process, the following took place.  On February 23,
2000, Clark's serum iron levels were tested.  On April 14, 2000,
he underwent a psychiatric review, which revealed no psychiatric
problems that might be exacerbated as a side effect of the
treatment.  On May 5, 2000, his record was reviewed to determine
if his remaining time in prison would be sufficient (exceeding
twelve months) for Rockview to begin treatment.  On July 13,
2000, an ultrasound was performed on his liver and spleen,
revealing that his liver was "mildly enlarged with dense texture
consistent with diffuse liver disease and/or cirrhosis," and
that the hepatic veins were normal.  (Doc. 112, exhibit M).  On
August 16, 2000, a viral-load test showed that Plaintiff's HCV
viral load was 678,000 international units.

On September 15, 2000, Plaintiff began receiving the
interferon dual therapy treatment.  On November 15, 2000, a
liver profile showed that Plaintiff's liver enzymes were
slightly elevated and that there had been no significant

-8-

interval changes from nine previous profiles. Between September
2000 and February 2001, Clark was monitored through the
hepatitis C clinic and sick call. He suffered side effects from
the therapy, including increased serum iron levels, flu-like
symptoms, nausea, and weight loss.

On February 28, 2001, Clark's viral load was 267,000,
and the therapy was stopped at that point. For it to have been
successful, Plaintiff's viral load should have been under 300.
Plaintiff then underwent a series of phlebotomies to reduce his
serum iron levels, and his serum iron levels were monitored.

On July 2, 2001, Plaintiff met with Dr. Eidsvoog to
discuss his liver disease. At that time, treatment with
pegylated interferon was discussed. On July 10, 2001, Dr.
Symons requested a liver biopsy. That request was denied (and
Dr. Symons' appeal of that denial) by Wexford's utilization
review committee, which proposed an alternative plan, to
determine the genotype of Plaintiff's HCV. That testing showed
that Plaintiff had genotype 1, the most difficult hepatitis C
virus to treat, with a success rate of 20 to 25%, according to
Dr. Symons.

On August 10, 2001, Plaintiff filed another grievance,
this time seeking treatment for his HCV with pegylated
interferon and a liver biopsy, and again not seeking damages.
This grievance was denied by the Rockview grievance coordinator

-9-

on August 22, 2001, who noted that genotyping had been done and that pegylated interferon had not yet been approved for treatment.  On appeal to superintendent Myers, the superintendent affirmed this decision on September 5, 2001, noting that Dr. Symons did not consider pegylated interferon to be part of his treatment at that time and that the utilization review committee had denied the request for a biopsy.  At the third and final step of the process, the DOC's chief grievance coordinator denied Plaintiff's appeal on October 10, 2001.

From July 2001 through November 2002, Rockview's medical department continued to monitor Clark's liver enzymes and conduct viral-load testing.

In May 2002, the federal government approved pegylated interferon for use, but it was not in ready supply because of demand.  In July 2002, Clark was started on this treatment, but began to experience side effects like nausea, weight loss and problems with his blood platelet count.  On September 6, 2002, an ultrasound of Clark's liver and spleen "revealed no significant internal change from the previous ultrasound." (Doc. 96, exhibit A, Dr. Symons' penalty-of-perjury declaration, ¶ 35).  On October 1, 2002, because of the side effects, Plaintiff's dose was reduced.

Dr. Symons has opined that Plaintiff received "reasonable and appropriate medical attention on every occasion"

-10-

that he needed it while incarcerated at Rockview.  (Id., ¶ 9).

David Rowe, D.O., Wexford's chief medical officer since May

1999, has also opined "within a reasonable degree of medical

certainty" that the care Clark received at Rockview was

appropriate for his hepatitis C condition.  (Doc. 96, Dr. Rowe's

penalty-of-perjury declaration, ¶ 13).  He also opined that

Wexford's utilization review department uses community health-

care guidelines in determining the propriety of consultations

like liver biopsies, and that the department determined that the

liver biopsy was not medically warranted.  (*Id.*, ¶ 8).  Dr.

Berel B. Arrow, assistant medical director, Bureau of Health

Care Services, also opined that the standard of care Plaintiff

received for his HCV was appropriate.  (Doc. 91, exhibit 3,

penalty-of-perjury declaration, ¶ 49).


III.  *Discussion*.

    A.  *Exhaustion of Administrative Remedies*.

       In pertinent part, 42 U.S.C. § 1997e(a) provides that

a prisoner can bring no action under section 1983 "with respect

to prison conditions" . . . until such administrative remedies

as are available are exhausted."  Both groups of defendants

argue that summary judgment must be entered against Plaintiff

because he failed to exhaust his administrative remedies by not

asking for damages while he was pursuing his two grievances,
even if he did exhaust all three levels of the process in an
attempt to obtain treatment, including an appeal to the DOC's
chief hearing examiner.  In support, they cite *Thomas v. Myers*,
No. 3:CV-00-1887 (M.D. Pa. Mar. 25, 2002) (Caputo, J.), *appeal
pending*, No. 02-2028 (3d Cir.); and *Spruill v. Gillis*, No.3:CV-
01-1625 (M.D. Pa. May 29, 2002) (Vanaskie, C.J.), *appeal
pending*, No. 02-2659 (3d Cir.).  They also point out that the
"Supreme Court has made clear that prisoners must exhaust
administrative remedies as to any claim that arises in the
prison setting, regardless of any limitations on the kind of
relief that may be granted through a grievance process,"
(Wexford Defendants' supporting brief at p. 5), citing *Porter v.
Nussle*, 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002), and
*Booth v. Churner*, 532 U.S. 731, 121 S.Ct. 1819, 149 L.Ed.2d 958
(2001).

    Both *Thomas* and *Spruill* did hold that a prisoner who
did not seek damages through the grievance process had failed to
exhaust administrative remedies and hence could not pursue a
civil rights action seeking damages.  *Spruill* also held that the
failure to seek declaratory relief administratively also barred
such relief in a lawsuit.  However, respectfully disagreeing
with our colleagues, we reject the argument.

-12-

First, the strength of the ruling in these cases is weakened because in both of them my colleagues went on to rule on alternative grounds that the plaintiffs had no claims. Second, both of them relied on *Geisler v. Hoffman*, No. 99-1971 (3d Cir. Sept. 29, 2000), an unreported Third Circuit opinion designated "not precedential" by the panel that filed it.  While *Geisler* did hold that the failure to seek damages administratively would have barred seeking damages in court, the force of this holding is also weakened by an alternative holding, that Geisler had failed to exhaust administrative remedies by not pursuing his grievance beyond the first step of the administrative process.  Further, while we are not adverse to relying on nonprecedential opinions of the Court of Appeals, indeed often finding them of great assistance in resolving issues before us, the panel in *Geisler* provided no reasoning to support its holding that the failure to seek a specific remedy in the administrative process, even if the prisoner there had gone through the final two steps in the process, *Geisler* slip op. at p. 4, would bar pursuit of a lawsuit (which might have played a role in its designation as a "not precedential" opinion).

More importantly, the panel in *Geisler* did not have the benefit of the Supremes Court's subsequent opinions in

-13-

*Porter* and *Booth,* cited by Defendants for the unrelated rules
that a prisoner must exhaust available administrative remedies
even if those remedies would not have provided the relief sought
judicially, *see Booth*, and even if the prisoner is seeking
relief for a single incident, rather than a general condition of
confinement.  *See Porter*.

In *Booth*, the Supreme Court addressed the meaning of
"such administrative remedies as are available," as stated in
section 1997e(a).  It noted that "'remedy'" can mean either
specific relief obtainable at the end of a process of seeking
redress or the process itself, the procedural avenue leading to
some relief."  532 U.S. at 738, 121 S.Ct. at 1823-24, 149
L.Ed.2d at 965.  The Court decided that in the context of
section 1997e(a), remedy meant the process, not the specific
relief sought at the end of the process.  In *Porter*, the Court
discussed the benefits or purposes behind Congress's mandating
in section 1997e(a) the exhaustion of administrative remedies:

> [C]orrective action taken in response to an
> inmate's grievance might improve prison
> administration and satisfy the inmate,
> thereby obviating the need for litigation.
> *Booth*, 532 U.S., at 737, 121 S.Ct. 1819.  In
> other instances, the internal review might
> "filter out some frivolous claims."  *Ibid.*
> And for cases ultimately brought to court,
> adjudication could be facilitated by an
> administrative record that clarifies the
> contours of the controversy.  *See ibid.; see*

-14-

>           *also Madigan*, 503 U.S., at 146, 112 S.Ct.
>           1081.

534 U.S. at 525, 122 S.Ct. at 988, 152 L.Ed.2d at 21-22.

        In light of *Booth* and *Porter*, we cannot accept

Defendants' argument that Plaintiff's failure to seek damages in

the administrative process, even though he pursued that process

through all three of its levels, is fatal to his case.  *Booth*

identified the remedy to be exhausted as the process, not any

relief sought at the end of the process.  Additionally,

Plaintiff's exhaustion of the process has satisfied the purposes

behind section 1997e(a), as identified in *Porter*.[3]

        B.  *The Eighth Amendment Standard*.

        The Eighth Amendment prohibits the "'unnecessary and

wanton infliction of pain contrary to contemporary standards of

decency.'"  *Rouse v. Plantier*, 182 F.3d 192, 197 (3rd Cir. 1999)

(quoting *Helling v. McKinney*, 509 U.S. 25, 32, 113 S.Ct. 2475,

125 L.Ed.2d 22, 31 (1993)).  In the context of prison medical

care, the plaintiff must prove that (1) he had a serious medical

---

        [3]  We note that we had previously rejected this argument in
*Woods v. Beard*, No. 1:CV-01-2249 (M.D. Pa. Sept. 3, 2002),
although we had not articulated any reasons.  Additionally,
Judge Kane has not accepted the argument.  *See Mutombo v. Carl*,
No: 1:CV-02-2047 (M.D. Pa. July 31, 2003) (order adopting
Magistrate Judge Smyser's report rejecting *Geisler* nonexhaustion
argument).

need and (2) that the defendants were deliberately indifferent to that need.  *Id.*

Deliberate indifference requires "obduracy and wantonness," "a recklessness or conscious disregard of a serious risk" to the prisoner.  *Rouse, supra*, 182 F.3d at 197 (quoted cases omitted).  It follows that medical malpractice, as serious as it is, does not state an Eighth Amendment claim.  *Id.*  **Nor is there an Eighth Amendment violation when a prisoner simply disagrees with a prison doctor's course of treatment.**  ***Young v. Quinlan*, 960 F.2d 351, 358 n. 18 (3d Cir. 1992).**  Additionally, a nonphysician defendant cannot be considered deliberately indifferent for failing to respond to an inmate's medical complaints when the inmate is already receiving treatment from the prison's medical staff.  *See Durmer v. O'Carroll*, 991 F.2d 64, 69 (3d Cir. 1993).

A serious medical need is "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention."  *Monmouth County Correctional Institutional Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir. 1987)(quoted case omitted); *McCabe v. Prison Health Services*, 117 F. Supp. 2d 443, 450 (E.D. Pa. 1997); *Rodriguez v. Brewington-Carr*, 2002 WL 484714, at *4 (D. Del.).  A serious medical need may also be

-16-

established if the denial or delay of medical care results in
the unnecessary and wanton infliction of pain or a lifelong
handicap or permanent loss. *Monmouth County, supra,* 834 F.2d at
347.

In *Rouse*, the Third Circuit gave concrete examples of
what would constitute deliberate indifference:

> We have found "deliberate indifference"
> in a variety of circumstances, including
> where the prison official (1) knows of a
> prisoner's need for medical treatment but
> intentionally refuses to provide it; (2)
> delays necessary medical treatment based on
> a non-medical reason; or (3) prevents a
> prisoner from receiving needed or
> recommended medical treatment. *See Durmer*,
> 991 F.2d at 68 (citing *Monmouth County
> Correctional Inst. Inmates v. Lanzaro*, 834
> F.2d 326, 346-47 (3d Cir. 1987)).

182 F.3d at 197.

    C.    *The Wexford Defendants' Motion For
          Summary Judgment.*

Plaintiff's Eighth Amendment claims against the
Wexford Defendants (Wexford and Dr. Symons) are the following.
First, between September 1997 and October 1999, while he was
incarcerated at Rockview, both defendants were deliberately
indifferent to Plaintiff's serious medical needs by failing to
notify him, or by failing to have in place a notification
protocol, that would have informed Plaintiff that he had HCV,
thereby preventing him from seeking care in the community,

-17-

making the lifestyle changes necessary to minimize the damage to his liver, and taking steps to prevent him from passing the disease onto others.  (Complaint, ¶¶ 50 and 53).[4]

Second, between September 1997 and August 1999, both defendants were deliberately indifferent to Plaintiff's serious medical needs by failing to have in place a treatment protocol, thereby preventing him from receiving treatment while he was imprisoned so that he could either be cured or minimize the damage to his liver.  (Complaint, ¶¶ 51 and 54).

Third, between September 1997 and March 2001, both Defendants were deliberately indifferent to Plaintiff's serious medical needs by failing to have in place an HCV treatment protocol that would have required a liver biopsy, thereby insuring that the interferon treatment he did receive would be effective.  (Complaint, ¶¶ 52 and 55).  In this last claim, Plaintiff also alleges the Wexford Defendants were negligent.

In moving for summary judgment on these claims, the Wexford defendants argue as follows.  First, Dr. Symons cannot be liable because civil rights liability requires the personal involvement of the defendant, *see Sutton v. Rasheed*, 323 F.3d

---

[4]  It is undisputed that consumption of alcoholic beverages by a person with HCV increases the risk of liver damage. Plaintiff stated that he while he was not incarcerated between 1992 and 1995 he consumed about "a case a week" (presumably of beer).  (Doc. 91, exhibit 2, p. 28).

-18-

236, 249 (3d Cir. 2003), citing *Rode v. Dellarciprete*, 845 F.2d
1195, 1207-08 (3d Cir. 1988), and the record shows that Dr.
Symons had no personal involvement in Plaintiff's care before
November 1998 or with the development of any hepatitis C
protocol.  Additionally, the care Dr. Symons did give Plaintiff
for his HCV was medically appropriate.  Second, citing *Buckner
v. Toro*, 116 F.3d 450 (11th Cir. 1997), Defendants contend
Wexford cannot be liable because respondeat superior does not
apply in civil rights actions, *see also Capone v. Marinelli*, 868
F.2d 102, 106 n.7 (3d Cir. 1989), and there is no evidence
Wexford had a policy or custom in regard to medical care at
Rockview that was unconstitutional.  Here, Defendants rely on
the care Clark received for his HCV starting in February 2000,
as described above in the Background section of this memorandum,
after the DOC instituted its first HCV protocol.

        In opposition, Plaintiff argues that he has been
hampered by a lack of counsel and of an expert medical witness.[5]

---

[5]  On August 22, 2002, Plaintiff filed a motion for
appointment of counsel.  By order of December 19, 2002, we held
the motion in abeyance, pending a decision on Defendants'
summary-judgment motions.  On June 9, 2003, we stayed
consideration of Defendants' motions while we made an attempt to
find counsel for Plaintiff after granting conditionally the
motion for appointment of counsel.  We were unsuccessful in
finding counsel and on September 5, 2003, after learning that
Clark had been released from prison, revoked the June 9 order
and denied appointment of counsel without prejudice.

He also contends that: until January 2000 the Wexford Defendants only screened prisoners for HCV, rather than give them the available treatments, which was their obligation as the contract medical supplier; the reason for not doing so was the expense of HCV treatment; these defendants failed to implement a protocol to treat HCV prisoners; and the treatment he did receive was deficient in two respects: he was not given a liver biopsy before treatment was started and during treatment he did not receive phlebotomies to reduce his serum iron levels.

Summary judgment must be granted Dr. Symons on the Eighth Amendment claims.  As to any deficiency in a notification or treatment protocol, Dr. Symons only became Rockview's medical director in September 1998.  There is no evidence that he was aware of Plaintiff's HCV at that time, and he had no involvement with, or responsibility for, creating any protocols. Additionally, within months of becoming aware in October or November 1999 that Plaintiff had the disease, Dr. Symons, and other Wexford doctors, began treating him with the then-current treatment.

As to the failure to have a liver biopsy performed, the medical literature Plaintiff has filed does indicate that a liver biopsy is recommended so that the actual condition of the liver can be assessed, but, as we read the literature, the recommendation is made to determine whether treatment should

begin at all, since some individuals, depending on age and condition of the liver, could afford to delay a treatment that itself causes serious side effects.  Here, Plaintiff did receive treatment, so a liver biopsy is not an issue.  *See* Doc. 112, Plaintiff's exhibit A, p. 14; exhibit F, pp. 10 and 11.[6]

As to the failure to give Plaintiff phlebotomies to reduce his serum iron levels, the medical literature he cites indicates that high iron levels in the liver could interfere with interferon's effectiveness, but the literature also states that studies trying to make the connection have been inconclusive.  *See* Doc. 112, Plaintiff's exhibit A, p. 15.

As to Wexford, we also believe that summary judgment must be entered in its favor.  Wexford contracted to provide medical care for prisoners at Rockview in September 1996.  It may have had a duty to inform Plaintiff of his HCV condition and to treat, but Plaintiff has no expert testimony to establish that the delay between September 1996 and January 2000 worsened his condition.  We think that absent such testimony, the claim

---

[6]  On page 11 of exhibit F, a year 2000 publication of Johns Hopkins University School of Medicine, it reads: "Physicians can take one of two approaches to the management of patients with chronic hepatitis C: (1) treating all such patients without performing a liver biopsy or (2) customizing treatment recommendations based on the histologic results of liver biopsy."

must fail.  *See Johnson v. Pennsylvania Department of Corrections*, 2002 WL 485635 (E.D. Pa.).

          Plaintiff has also made a state-law claim for medical malpractice against the Wexford Defendants.  Citing *Maurer v. Trustees of the University of Pennsylvania*, 418 Pa. Super. 510, 516, 614 A.2d 754, 757 (1992), Defendants argue that this claim fails because Plaintiff has no medical expert.  We agree that a medical expert is necessary on this state-law claim.  Hence, Defendants are entitled to summary judgment on it.

          D.  *The Correction Defendants' Motion For*
              *Summary Judgment*.

          Plaintiff's Eighth Amendment claims against the Correction Defendants are essentially the same as those outlined against the Wexford Defendants.  First, defendants Horn, Myers and Lidgett were deliberately indifferent to Plaintiff's serious medical needs: (1) between 1992 and 1999 by failing to have in place a notification protocol that would have informed Plaintiff that he had HCV, thereby preventing him from seeking care in the community (complaint ¶¶ 44, 47 and 56); (2) between 1992 and August 1999 by failing to have in place a treatment protocol, thereby preventing him from receiving treatment while he was imprisoned so that he could either be cured or minimize the damage to his liver (complaint, ¶¶ 45, 48 and 57); and (3)

-22-

between September 1992 and March 2001, by failing to have in place an HCV treatment protocol that would have required a liver biopsy, thereby insuring that the interferon treatment he did receive would be effective.  (Complaint, ¶¶ 46, 49 and 58).  In the third claim, Plaintiff also alleges the Correction Defendants were negligent.

In moving for summary judgment on these claims, the Correction Defendants argue as follows.  First, the action against Defendants in their official capacities for damages is barred by the Eleventh Amendment.  Second, Plaintiff has no Eighth Amendment claim because there is no evidence that there was any deliberate indifference to a serious medical need by any defendant and because prison officials cannot be held deliberately indifferent when they rely on the judgment of physicians, as Horn and Meyers did here during the grievance process.  Third, there is no evidence that the Correction Defendants had any personal involvement in the failure to inform Plaintiff of his HCV status or to have in place a treatment protocol, and their supervisory positions are not enough to impose civil rights liability on them.  Fourth, the Correction Defendants are entitled to qualified immunity against a civil rights damages claim.  Fifth, as nonphysicians, the Correction

-23-

Defendants cannot be liable for the state-law claim of medical malpractice.[7]

We believe Defendants are entitled to summary judgment for the following reasons.  First, they are correct in arguing that the Eleventh Amendment bars damages against them in their official capacities. *See A.W. v. The Jersey City Public Schools*, 341 F.3d 234, 238 (3d Cir. 2003).  Second, in regard to the failure to have a notification protocol in place, Defendants correctly assert, at least as to 1992, that there is no showing of their personal involvement in the failure to tell Plaintiff of his potential HCV status.  Defendant Horn became the DOC's secretary in March 1995.  Defendant Meyers has been Rockview's superintendent since February 1998.  Defendant Lidgett became Rockview's health care administrator in June 1994.  As to the time period after these dates, Plaintiff's claim, either on failure to notify or failure to treat, fails for the same reason mentioned in connection with the Wexford Defendants--Plaintiff has no expert testimony establishing that from March 1995, or June 1994, or February 1998, his HCV status was worsened by a delay in treatment.  As to any defects in the treatment itself, the Correction Defendants could rely on the treatment being

_____

[7] As discussed above, the Correction Defendants also argued that Plaintiff had failed to exhaust administrative remedies.

given by the Wexford Defendants.[8] *See Durmer, supra.*  Finally, we agree that the Correction Defendants cannot be liable on the state-law claim, for the same reason why the Wexford Defendants cannot be liable; Plaintiff would need an expert to establish this claim.

We will issue an appropriate order.



 /s/William W. Caldwell
William W. Caldwell
United States District Judge

Date:  September 29, 2003

_____

    [8]  Based on the foregoing, we need not address the qualified-immunity defense.  However, we have serious doubts whether, broadly speaking, the Correction Defendants had no constitutional duty to have a policy of addressing the needs of prisoners with HCV, or at least telling them they had the illness.

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


    WILLIAM CLARK,                 :
                                   :
                                   :
             Plaintiff             :    CIVIL NO. 1:CV-01-0764
                                   :
          vs.                      :    (Judge Caldwell)
                                   :
    MARTIN HORN, et al.,           :
                                   :
             Defendants
```

                            O R D E R


            AND NOW, this 29th day of September, 2003, it is

ordered that:

            1.  The Correction Defendants' motion
       (doc. 82) for summary judgment and the
       Wexford Defendants' motion (doc. 81 ) for
       summary judgment are granted, and
       Plaintiff's motion (doc. 111) for summary
       judgment is denied.

            2.  The Clerk of Court shall enter
       judgment in favor of all Defendants and
       against Plaintiff and close this file.




                              /s/William W. Caldwell
                             William W. Caldwell
                             United States District Judge